UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

JOHN THIBODEAUX, ET AL

VS.

J.M. DRILLING, LLC.,
ET AL

NO. 6:18-CV-501(LEAD)
NO. 6:18-CV-1414 (MEMBER)

JUDGE ROBERT R. SUMMERHAYS

MAGISTRATE JUDGE
CAROL B. WHITEHURST

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Now into Court, through undersigned counsel, come Plaintiffs, John Thibodeaux, Amy

Thibodeaux, and Gabrielle Thibodeaux, who respectfully submit this Memorandum in Support

of their Motion for Summary Judgment on Insurance Coverage:

## SUMMARY OF ARGUMENTS

I.  Rockhill's Insurance Company Commercial Excess Follow Form Policy provides coverage regarding the claims of the Thibodeaux Plaintiffs' (i.e. Plaintiffs' Final Judgment rendered in the underlying state court proceedings);

    A.  Rockhill's "Subsidence Exclusion" does not exclude coverage regarding the claims of the Thibodeaux Plaintiffs:

        1.  Rockhill's "Subsidence Exclusion" does not exclude coverage since J.M.'s negligence does not "arise out of" subsidence but, rather from negligently striking the underground sewer line;

        2.  Rockhill's "Subsidence Exclusion" does not exclude coverage since it contains no "Anti-Concurrent Cause" language and J.M.'s covered negligent act (striking the sewer line) was a Substantial Factor in causing the accident; and

        3.  Rockhill's "Subsidence Exclusion" is overly broad and ambiguous and, therefore, should be construed in favor of the insured, J.M., finding coverage and against Rockhill.

    B.  Rockhill's "Residential Contracting-Construction Defect Exclusion" does not exclude coverage regarding the claims of the Thibodeaux Plaintiffs:

        1.  Rockhill's "Residential Contracting-Construction Defect Exclusion" does not exclude J.M.'s work on designated utility lot 114 under a Master Commercial Contract with AT&T in Sawgrass Subdivision; and

1

2.  Rockhill's "Residential Contracting-Construction Defect Exclusion" is overly broad and ambiguous and, therefore, should be construed in favor of the insured, J.M., finding coverage and against Rockhill.

II.  The accident of June 9, 2015 injuring John Thibodeaux is a single "Occurrence" (such that Admiral's payment of $1 million plus interest and cost exhausted Admiral's "per occurrence" limit and Rockhill is now legally responsible for the payment of the remainder of Plaintiffs' Final Judgment rendered in the underlying state court proceedings).

## BASIC FACTS

The Thibodeaux Plaintiffs initiated a civil suit for personal injuries against J.M. arising out of a single accident which occurred on a designated "utility lot" located in Sawgrass Subdivision, Lafayette, Louisiana on June 9, 2015.  (Fact # 1).  Plaintiffs obtained a judgment in the 15th Judicial District Court, Lafayette, Louisiana, in Docket No. 2015-4167-B as against J.M. Drilling, LLC. (J.M.) in the amount of $3,575,245.00 plus legal interest and costs.  (Fact #36).  That judgment is now **final** since the Louisiana Third Circuit Court of Appeals affirmed J.M.'s liability and the Thibodeaux Plaintiffs' damages and J.M. did not apply for any Supervisory Writs to the Louisiana Supreme Court.  (Fact #36).

On June 9, 2015, Thibodeaux suffered an accident while working on a "utility lot" located in Sawgrass Subdivision when he fell in a hole causing injury.  (Fact #1).  The hole which caused the accident was caused by the negligence of J.M.  (Facts # 4-5).

Both the Trial Court and the Court of Appeal, Third Circuit, found J.M.'s negligence in striking an underground sewer line caused a break / separation in the line.  The break in the line caused the sewer line to leak.  The leak caused a void / cavern to form.  The void / cavern caused Thibodeaux's accident.  (Facts # 2-5).

Plaintiff's liability expert, Randall King, testified in his affidavit:

"that JM Drilling negligently struck the sewer force main pipe with its excavator while performing digging operations on this utility lot. **This initial act caused a break/separation to occur underground. The break caused the sewer line to**

leak.   **The leak caused a void/cavern to form.   The void/cavern caused Thibodeaux's accident.**" (Ex. 32, P. 14). [Emphasis Added]

"**...the substantial factor which caused this accident, the act that set everything else in motion, was JM Drilling's negligent act of striking the sewer line because this initial act is what caused the series of events that resulted in Mr. Thibodeaux's accident. Without JM Drilling's negligent act of striking the sewer line, there would have been no break/separation, no leak, no void/cavern, and no accident.**" (Ex. 32, P.15). [Emphasis Added]

## PROCEDURAL HISTORY

**UNDERLYING STATE COURT LITIGATION**

The Thibodeaux Plaintiffs filed a Motion for Summary Judgment on Liability against J.M. (Ex. 4).  On February 20, 2018, the Trial Court granted summary judgment finding J.M. was at fault for:  (1) negligently striking the underground sewer force main line on the utility lot in February 2015; (2) negligently failing to contact the utility owner to have the broken underground sewer force main line fixed before continuing any work; and (3) J.M.'s negligence caused the underground void/cavern near the AT & T equipment, which, in turn, caused Thibodeaux's accident on June 9, 2015.  (Fact #2).

A jury trial was held during the week of March 26, 2018 and the jury awarded the Thibodeaux Plaintiffs a total of $3,698,118.00 plus legal interest and costs.  (Fact #35).  J.M. filed an appeal and the Third Circuit affirmed the Trial Court's summary judgment and the jury's damage awards with minor revision on John Thibodeaux's loss of future earning capacity claim. The total judgment after the Third Circuit's minor revision is $3,575,245.00.  (Fact #36).

The Third Circuit, in affirming the Trial Court's ruling on liability, stated:

"The record contains sufficient evidence to make it clear that **J.M. damaged the sewer line, which precipitated the leak, that caused the sinkhole.**" [Emphasis Added].
(Ex. 6, pg. 6).

*\*\*\*\*\**

3

**"In our previous grant of summary judgment to Gulfgate, this court noted it was a break in 'the main line, which caused the leak, which caused the washout, which formed the hole into which Thibodeaux fell and was injured."** Thibodeaux, 234 So.3d 106. [Emphasis Added].
(Ex. 6, pg. 7, footnote 1).

At all relevant times, J.M. was insured for primary General Liability insurance in the amount of $1,000,000.00 by Admiral Insurance Co. (Admiral) and for excess liability by Rockhill Insurance Co. (Rockhill) with a "Commercial Follow Form" policy with limits of $5,000,000.00. (Fact # 39). After the jury trial in March 2018, Admiral paid its $1,000,000.00 limits plus judicial interest and costs. (Fact #40). Rockhill has refused to follow-form the Admiral policy although Rockhill's policy is titled "Commercial Follow Form" policy. (Ex. 10; Ex. 12). Rockhill contends that its policy does not actually follow-form the Admiral policy but, rather, contains exclusions not contained in the Admiral policy which support its denial of coverage and payment of the Judgment. (Ex. 10; Ex. 12).

**FEDERAL COURT ACTIONS**

On the eve of the jury trial in Lafayette Parish State Court, Rockhill filed for Declaratory Judgment in Tennessee alleging there was no coverage under the Rockhill policy because of 2 exclusions: 1) the Subsidence Exclusion; and 2) Residential Contracting – Construction Defect Exclusion. (Ex. 9). After obtaining a final judgment against J.M., the Thibodeaux Plaintiffs filed Declaratory Judgment with this Court demanding that Rockhill provide coverage and pay its portion of the Judgment. (Ex. 8). The Tennessee suit was transferred to this Court. (Ex. 28).

During this time, J.M. had filed a devolutive appeal to the Third Circuit regarding liability and jury's damage awards. Admiral paid its policy limits plus judicial interest and costs. At that point, Plaintiffs amended their Complaint to assert a collection action against Rockhill and, alternatively, that the insurance agent, Insight Risk Management LLC, and the insurance broker,

Insurisk Excess & Surplus Lines (CRC Insurance Services, Inc.), breached their fiduciary duty to the insured, J.M. (Ex. 11).

## LAW

**SUMMARY JUDGMENT LAW**

The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Where the burden of production at trial rests on the non-movant, the movant must merely demonstrate an absence of evidentiary support in the record for the non-movant's case. Caudra v. Houston Indep. Sch. Dist., 626 F.3d 808 (5th Cir. 2010). The non-movant must then come forward the specific facts showing that there is a genuine issue for trial. Id.

**TENNESSEE LAW APPLIES TO ROCKHILL POLICY**

Rockhill issued its Excess Commercial Follow Form policy to J.M. Drilling, LLC., whose principal office is located in Milan, Tennessee. (Ex. 13, Insight Bates #9061). Both Louisiana and Tennessee follow the *lex loci contractus doctrine* in insurance disputes and, in coverage disputes, the substantive law of the state where the insurance policy was delivered should apply to the interpretation of the policies. Champagne v. Ward, 893 So.2d 773 (La. 2005); Lee v. Sapp, 163 So.3d 60 (La.App. 2 Cir. 2015); Nelson v. Nelson, 409 S.W.3d 629 Tenn. App. 2013); Stakem v. Randolph, 431 F.Supp.2d 782 (E.D. Tenn. 2006).

Therefore, Tennessee law should apply in the interpretation of the Rockhill policy.

**ROCKHILL HAS BURDEN TO PROVE EXCLUSIONS APPLY**

The insurer bears the burden of proving that the injury was caused by an exclusion in the policy. Hardy & Kelly, LLC. v. QBE Ins. Corp., No.3-11-0155, 2012 WL 1744670 (M.D. Tenn. 5/6/12). The insurer must show that the exclusion applies in order to avoid liability and

exclusionary clauses are to be strictly construed against the insurer. <u>Davidson Hotel Co. v. St. Paul Fire & Marine Ins. Co.</u>, 136 F.Supp.2d 901 (W.D. Tenn. 2001).

Plaintiffs assert that Rockhill cannot meet its burden that either the "Subsidence" or "Residential Construction" exclusion applies in this matter.

## **ARGUMENT**

In the underlying suit, Plaintiffs developed a liability case against J.M which resulted in a judicial determination of those facts bearing on the liability of J.M. These facts are now Law of the Case. Some facts pertinent to the coverage issue before this Court were not relevant to the liability determination and, therefore, not developed in the underlying state court proceeding. Plaintiff now offers supplemental evidence on some aspects of the coverage issues before this Court (those facts which were not relevant to the liability determination in the underlying state court proceedings) and Law of the Case Determinations of the State Court.

The undisputed material facts in this case, which consist of a combination of the underlying state court findings and the evidence cited in support of this motion, conclude the following:

**I. ROCKHILL'S INSURANCE COMPANY COMMERCIAL EXCESS FOLLOW FORM POLICY PROVIDES COVERAGE REGARDING THE CLAIMS OF THE THIBODEAUX PLAINTIFFS' (I.E. PLAINTIFFS' FINAL JUDGMENT RENDERED IN THE UNDERLYING STATE COURT PROCEEDINGS);**

**A. ROCKHILL'S "SUBSIDENCE EXCLUSION" DOES NOT EXCLUDE COVERAGE REGARDING THE CLAIMS OF THE THIBODEAUX PLAINTIFFS:**

**1. ROCKHILL'S "SUBSIDENCE EXCLUSION" DOES NOT EXCLUDE COVERAGE SINCE J.M.'S NEGLIGENCE DOES NOT "ARISE OUT OF" SUBSIDENCE BUT, RATHER FROM NEGLIGENTLY STRIKING THE UNDERGROUND SEWER LINE;**

**a) UNDISPUTED FACTS REGARDING THE ACCIDENT**

On June 9, 2015, John Thibodeaux suffered an accident on 114 Meadowgate (Lot 114) in Sawgrass Subdivision in Lafayette Parish when he fell in a hole causing injury. (Fact #1). The hole which caused the accident was caused by the negligence of J.M. The Trial Court found "…J.M. Drilling is at fault for : 1) negligently striking the underground sewer force main line at 114 Gate in February 2015; 2) negligently failing to contact the utility owner (Water and Wastewater) to have the broken underground sewer force line fixed before continuing any work; and 3) J.M. Drilling's negligence caused the underground void/cavern near AT&T PFP box and AT&T handhold #1 which, in turn caused John Thibodeaux's accident on June 9, 2015." (Fact #2).

The Court of Appeal, Third Circuit affirmed the finding of negligence by the Trial Court noting:

> "The record contains sufficient evidence to make it clear that J.M. damaged the sewer line, which precipitated the leak, that caused the accident" and "In our previous grant of summary judgment to Gulfgate, this court noted it was a break in 'the main line, which caused the leak, which caused the washout, which formed the hole into which Thibodeaux fell and was injured'". (Fact #3).

J.M. Drilling negligently struck the sewer force main line with its excavator while performing digging operations on the utility lot, Lot 114. (Fact #4). J.M. Drilling's negligent striking of the sewer line caused a break/separation to occur underground. The break caused the sewer line to leak. The leak caused a void/cavern to form. The void/cavern caused Thibodeaux's accident. (Fact #5).

J.M. Drilling's negligent act of striking the sewer line was the substantial factor in causing Thibodeaux's accident because J.M Drilling's initial negligent act caused the series of events that resulted in Thibodeaux's accident. (Fact #6). Without J.M. Drilling's negligent act of striking the sewer line, there would have been no break/separation of the line, no leak, no void/cavern and no accident. (Fact #7).

The work being performed by J.M. Drilling relevant to the accident was to dig a 4ft X 4ft hole about 4ft deep with an excavator (backhoe). (Fact #11). At the time of the excavation of the 4ft X 4ft hole the conditions were wet, such that the hole continually filled with water making it almost impossible to see the bottom of the hole as J.M. Drilling dug. (Fact #12). J.M. Drilling employees never knew they struck and broke the sewer line during the excavation of the bore hole on Lot 114. Not knowing they struck and broke the sewer line, J.M. Drilling's employees never knew they needed to report a break in the sewer line. J.M. Drilling never reported a break in the sewer line in connection with the excavation on Lot 114. (Fact #13).

### b) ROCKHILL'S SUBSIDENCE EXCLUSION

Rockhill's subsidence exclusion reads as follows:

"This policy will NOT apply:

****

**21.    Subsidence**

to any liability, whether direct or indirect, arising out of, caused by, resulting from, contributed to, or aggravated by the subsidence, settling, expansion, sinking, slipping, falling away, tilting, caving in, shifting, eroding, mud flow, rising, or any other movement of land or earth if any of the foregoing emanate from the operations of the insured or any other person for whose acts the insured is legally liable." (Ex. 13, Insight Bates #9075, 9080).

Rockhill has alleged that its Subsidence Exclusion applies to preclude coverage for Plaintiffs' Judgment since J.M.'s negligence "arises out of" subsidence. That is simply not correct, J.M. was found at fault for negligently striking and breaking the underground sewer line and failing to have it repaired. (Facts #2-5). **J.M.'s liability "arises out of" the act of negligently striking / breaking the sewer line, not subsidence.**

### c) UNDERGROUND UTILITY DAMAGE PREVENTION LAW

The Damage Prevention Law, La. R.S. 40:1749.11, et. seq., is designed to protect the public from damage resulting from underground utilities being damaged. Weatherly v. Fonseca &

Assoc., L.L.C., 48 So.3d 394 (La.App. 3 Cir. 10/6/2010), writ denied, 52 So.3d 887 (La. 1/7/2011). This statute establishes a duty on contractors to avoid damage to underground lines.

Further, the Damage Prevention Law recognizes that sometimes those underground utilities will be struck and damaged during excavating operations. La.R.S. 40:1749.17 (A) requires an excavator, such as J.M., who damages underground utilities to notify the owner of the utility of the location and nature of the damage in order that repairs are made.

### d) J.M.'S LIABILITY ARISES FROM NEGLIGENTLY STRIKING / DAMAGING THE SEWER LINE

In Louisiana, liability arises from failure to locate underground utilities prior to excavating and then striking and damaging the underground utilities. MCI Communication Services, Inc. v. Hagan, 74 So.3d 1148 (La. 2011); John Thibodeaux, et al. v. Gulfgate Construction, et al., 234 So.3d 89 (La.App. 3 Cir. 2017); Weatherly v. Fonseca & Associates, L.L.C., supra.; Bellsouth Tellecomms., Inc. v. Eustis Engineering Co. Inc., 974 So.2d 749 (La.App. 4 Cir. 2017); South Central Bell v. Milton J. Womack & Associates, Inc., 744 So.2d 635 (La.App. 1 Cir. 1998), writ denied, 742 So.2d 889 (La. 1999); Bellsouth v. Industrial Enterprises, Inc., 690 So.2d 145 (La.App. 1 Cir. 1997); South Central Bell v. Sewerage & Water Board of New Orleans, 652 So.2d 1090 (La.App. 4 Cir.), writ denied, 654 So.2d 1090 (La. 1995).

### e) SUBSIDENCE IS HOW ACCIDENT HAPPENED, NOT THE SOURCE OF J.M.'S LIABILITY

J.M.'s liability does not "arise out of", directly or indirectly, subsidence. Subsidence is *how the accident happened, ie., John Thibodeaux was working and the ground gave way suddenly and unexpectedly.* The Third Circuit was clear of J.M.'s liability when the Third Circuit affirmed the Trial Court's finding of liability against J.M.:

> "It is clear that J.M. was digging in the vicinity of the sewer line, with an excavator, digging deeper than the broken pipe. It is near impossible that J.M. dug the two,

four-foot square holes in the area marked in exhibit five at the depth indicated by Mr. Moore without hitting the pipe. This is clearly reiterated by the photo attached as Gamez one. J.M. offered no evidence supporting any other source of damage to the pipe. *The record contains sufficient evidence to make it clear that J.M. damaged the sewer line, which precipitated the leak, that caused the sinkhole.*" [Emphasis Added]. (Ex. 6, pg. 6).

The Third Circuit, again, made it clear that J.M.'s liability arose from negligently striking the underground utility:

"In our previous grant of summary judgment to Gulfgate, this court noted **it was a break in 'the main line, which caused the leak, which caused the washout, which formed the hole into which Thibodeaux fell and was injured.'"** *Thibodeaux,* 234 So.3d at 106. [Emphasis Added]. (Ex. 6, pg. 7, Footnote 1).

J.M's liability "arises out of" the negligent act of striking / breaking the underground sewer line, not subsidence. Rockhill confuses the source of J.M.'s liability with how the accident happened. A hypothetical will make this point clear.

Assume J.M. negligently strikes an underground gas pipe and over time the escaping gas works its way to the surface by "shifting" or "eroding soil" (excluded perils in the Rockhill Subsidence Exclusion). A spark ignites the gas and an explosion ensues which injures a worker. J.M.'s assumed liability would arise from negligently striking the underground gas pipe not from "shifting" or "eroding soil". The explosion is how the accident happened. There would be coverage under the Rockhill policy.

### 2. ROCKHILL'S "SUBSIDENCE EXCLUSION" DOES NOT EXCLUDE COVERAGE SINCE IT CONTAINS NO "ANTI-CONCURRENT CAUSE" LANGUAGE AND J.M.'S COVERED NEGLIGENT ACT (STRIKING THE SEWER LINE) WAS A SUBSTANTIAL FACTOR IN CAUSING THE ACCIDENT

In finding J.M. negligent for damaging the sewer line, the Third Circuit Court of Appeal held: "…**it was a break in 'the main line, which caused the leak, which caused**

the washout, which formed the hole into which Thibodeaux fell and was injured."

Thibodeaux, 234 So.3d 106. [Emphasis Added] (Ex. 6, pg. 7, footnote 1).

Plaintiff's expert, Randall King, similarly found:

"that JM Drilling negligently struck the sewer force main pipe with its excavator while performing digging operations on this utility lot. **This initial act caused a break/separation to occur underground. The break caused the sewer line to leak. The leak caused a void/cavern to form. The void/cavern caused Thibodeaux's accident.**" (Ex. 32, P. 14). [Emphasis Added]

It is King's expert opinion that:

"…**the substantial factor which caused this accident, the act that set everything else in motion, was JM Drilling's negligent act of striking the sewer line because this initial act is what caused the series of events that resulted in Mr. Thibodeaux's accident. Without JM Drilling's negligent act of striking the sewer line, there would have been no break/separation, no leak, no void/cavern, and no accident.**" (Ex. 32, P.15). [Emphasis Added]

### a) TENNESSEE IS CONCURRENT CAUSE INSURANCE STATE

Tennessee recognizes the concurrent cause doctrine which provides that there is insurance coverage in a situation where a non-excluded cause is a **substantial factor** in producing the damage or injury, even though an excluded cause may have contributed in some form to the ultimate result and, standing alone, would have properly invoked the exclusion contained in the policy. Clark v. Sputniks, LLC., 368 S.W.3d 431 (Tenn. 2012), citing, Allstate Ins. Co. v. Watts, 811 S.W.2d 883 (Tenn. 1991); For Senior Help, LLC. v. Westchester Fire Ins. Co., 451 F.Supp.3d 837 (M.D. Tenn. 2020). This test allows for the reality that, in many personal injury actions predicated on negligence, there may be more than one legal cause of the injuries suffered. Clark v. Sputniks, LLC, supra. For the injury to be covered in a situation in which multiple events may have caused an injury and one of the events is excluded from insurance coverage, the covered event must be a **substantial factor** in causing the damage. Id.

Coverage cannot be defeated simply because the excluded risk might constitute an additional cause of the injury.  For Senior Help, LLC. v. Westchester Fire Ins. Co., supra.  See Also Planet Rock, Inc. v. Regis Ins. Co., 6 S.W.3d 484 (Tenn. App. 1999); St. Paul Reinsurance Co. v. Williams, No. W2003-00473-COA-R3-CV (Tenn. 2004).

### b) DEFINITION OF SUBSTANTIAL FACTOR

In McDonald v. State Farm Fire and Cas. Co., 119 Wn.2d 724, 837 P.2d 1000 (Wash. 1992), the Washington Supreme Court gave a precise definition of when a concurrent cause is a substantial factor in causing the accident:

> "... where a peril specifically insured against sets other causes into motion which, in an unbroken sequence, produce the result for which recovery is sought, the loss is covered, even though other events in the chain of causation are excluded from coverage.  Stated in another fashion, where an insured risk itself sets into operation a chain of causation in which the last step may have been an excepted risk, the excepted risk will not defeat recovery."  [Citations omitted].

McDonald v. State Farm Fire and Casualty Co., 119 Wn.2d @ 731.

The seminal case when a concurrent cause is a "substantial factor" in causing the accident is Sabella v. Wisler, 377 P.2d 889 (Cal. 1963).  The California Supreme Court held that a substantial factor creates a condition which is acted upon by a subsequent or immediate peril.  In this case, the negligence of the contractor, Wisler, in installing a sewer line (a covered peril) emptied waste water into loose fill.  The leaking waste water acted upon poor foundation soils which led to the excluded peril of foundation settlement.  A critical fact in this case was that there was no evidence of subsidence the first four years the Sabellas owned the house.  Subsidence became a problem only after the sewer line began leaking.  Thus, the substantial factor in causing the loss was the negligent installation of the sewer line, not the defective way Wisler filled the quarry.

In Dow Chemical Co. v. Royal Indem. Co., 635 F.2d 379 (5th Cir. 1981), the 5th Circuit held that a subsidence exclusion did not bar coverage where a construction dome collapsed. The substantial cause of the collapse was defective welding, a covered risk.

### c)  COVERED PERIL THAT SETS CHAIN OF EVENTS INTO MOTION IS A SUBSTANTIAL FACTOR

The courts have found coverage under the concurrent cause/substantial factor test where a covered peril sets into motion a chain of events which causes a loss/accident even though there is a non-covered peril somewhere in the chain.  Goodman v. Fireman's Fund Insurance, 600 F.2d 1040 (4th Cir. 1979); Davis v. United Services Automobile Association, 222 Cal.App.3d 1322 (Ca. 1990).

In Goodman, plaintiff, a yacht owner, purchased "hull" insurance from Fireman's Fund. The policy excluded coverage for loss to yacht caused by "ice and/or freezing". When plaintiff laid up his yacht for the winter, he failed to drain sea water from the cooling system and to close the sea valves, permitting sea water to enter the cooling system. Water in the cooling system froze during the winter, causing system breaks and allowing sea water to enter the hull. The yacht sank.

The court found two causes for the loss, (1) plaintiff's negligence in failing to drain the sea water (covered), and (2) frozen water in the hull (not covered). The court stated that the policy would provide coverage, even though a covered peril combined with an excluded peril to cause loss, if the covered peril was the substantial factor of the loss. The court looked past the freezing water in the cooling system because the substantial cause of the loss is not necessarily the last peril in the chain of events.

**The court held the initiating peril in a chain of events is generally a substantial cause of the loss, even when other foreseeable and sometimes excluded perils follow.**  The court found that the freezing water in the cooling system resulted from the negligent manner in which

the plaintiff laid up his yacht. The substantial cause of the yacht's sinking was plaintiff's negligence and, therefore, there was coverage.

In Davis, USAA insured plaintiff's home for several years. Plaintiff claimed he suffered losses caused by an excluded peril of earth movement and the non-excluded peril of contractor negligence in failing to reinforce the foundation slab and failing to properly prepare subgrade soils when the home was originally built.

The evidence established that earth movement was the last event in the chain of events and how the accident happened. Plaintiff's expert testified that damage to the house was set into motion by the contractor's negligence in preparation of the subgrade soil and the foundation. ***The court found coverage since the substantial factor causing the loss was the contractor's negligence which set all other events in motion.***

### d) TENNESSEE CASES APPLYING SUBSTANTIAL FACTOR TEST

In Davidson Hotel v. St. Paul Fire and Marine Ins., supra., water (covered peril) infiltrated a bus duct in an electric room which resulted in an electrical disturbance which activated the sprinkler system leading to water damage at the hotel. The insurer contended that the damage originated from a corroded water heater. The policy excluded damage caused by or resulting from rust unless caused by a peril not otherwise excluded in the policy. The Court, in explaining the substantial factor test, stated:

> "Thus, under a policy insuring against property loss 'directly' resulting from a particular cause or risk, but excluding coverage against loss by certain other enumerated other causes, the insurer's contention that coverage does not exist since an excluded risk combined with an included risk to bring about the loss is without merit."
> Davidson Hotel, 136 F.Supp.2d at 906.

14

The Court in <u>Davidson Hotel</u> found that the substantial factor causing the loss was water (covered peril) which flowed onto the bus duct.  The covered peril set everything else into motion, the electrical disturbance, which caused the activation of the sprinkler system, which caused water damage.  While there were other factors leading to the loss that were excluded (rust of water heater), there was coverage under the policy.

In <u>Capital Indemnity Corp. v. Braxton</u>, 24 F.App'x 434 (6th Cir. 2001), the insured (day care center) employee picked up children in a van to bring to the day care center.  Upon arrival, their employee negligently failed to remove a minor child from van and the child died due to heat exposure.  The insurer (CGL policy) asserted there was no coverage due to "automobile" exclusion.  The Court found that the use of the van triggered all other events that followed (ie, death of child) and was the substantial factor.  In essence, the Court found that, without use of the van, the child would not have been in it nor forgotten upon arrival at day care center.

### e)  ANTI-CONCURRENT CAUSE CLAUSES IN EXCLUSIONS

**The only way insurers can avoid the concurrent cause / substantial factor test for coverage is to place anti-concurrent cause (ACC) clauses in their policies.**  <u>Colorado Intergovernmental Risk Sharing Agency v. Northfield Ins. Co.</u>, 207 P.3d 839 (Colo. App. 2008) [citing standard ISO policy language]; <u>Citizens Property Ins. Corp. v. Salkey</u>, 260 So.3d 371 (Fla. App. 2018).  ACC clauses are intended to exclude from coverage any loss caused in part by a covered peril which concurrently contributes in any sequence to a loss.  <u>Paulucci v. Liberty Mut. Fire Ins. Co.</u>, 190 F.Supp.2d 1312 (M.D. Fla. 2002); <u>Insurance Co. of State of Pa. v. ALT Affordable Housing Services, Inc.</u>, 1999 WL 33290622 (W.D. Tex. 1999).

A model ACC provides as follows: "We do not insure for such regardless of: a) the cause of the excluded event; b) other causes of the loss; or c) whether other causes acted concurrently or

in any sequence with the excluded event to produce the loss." ANDREW B. DOWNS & LINDA M BOULDUAN, LAW AND PRAC. OF INS. COVERAGE LITIG. Section 52:9 (West 2016). See also <u>Colorado Intergovernmental Risk Sharing Agency v. Northfield Ins. Co.</u>, supra.

In Tennessee, the Courts have approved similar ACC language and recognized it is the only way to avoid the concurrent cause / substantial factor test. <u>Yogi's Primopromo LLC v. Nationwide Gen. Ins. Co.</u>, No. 1:18-cv-00313, 2020 WL 6365509 (E.D. Tenn. 8/7/2020); <u>Hardy & Kelly LLC. v. QBE Ins. Co.</u>, supra.; <u>Front Row Theatre, Inc. v. Am. Mfr's. Mut. Ins. Cos.</u>, 18 F.3d 1343 (6th Cir. 1994).

### f) ROCKHILL USED ACC LANGUAGE IN OTHER EXCLUSIONS IN THE POLICY

The Rockhill policy at issue was drafted by Rockhill although an ISO (Insurance Industry Organization) form was available. (Ex. 27, pg. 28, line 14 – pg. 30, line 14, pg. 76, line 15 – pg. 78, line 21). Rockhill used a version of ACC language in Exclusion No. 19-Fungi Exclusion and No. 22-Silica Exclusion. Rockhill used the same ACC language in the Organic Pathogen Exclusion in the Endorsement Section of the policy. This ACC language reads as follows: ***"regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage"***. (Ex. 13, Insight Bates # 9080-9081, 9098).

### g) ROCKHILL SUBSIDENCE EXCLUSION DOES NOT CONTAIN ACC LANGUAGE

The Rockhill policy contains a Subsidence Exclusion which reads as follows:

"This policy will NOT apply:

\*\*\*\*

**21.    Subsidence**

to any liability, whether direct or indirect, arising out of, caused by, resulting from, contributed to, or aggravated by the subsidence, settling, expansion, sinking, slipping, falling away, tilting, caving in, shifting, eroding, mud flow, rising, or any other movement of land or earth if any of the

foregoing emanate from the operations of the insured or any other person for whose acts the insured is legally liable." (Ex. 13, Insight Bates # 9075, 9080).

Plaintiffs point out that, the Fungi Exclusion (No. 19) on the <u>same page</u> and the Silica Exclusion (No. 22) on the <u>next page</u> have the following ACC language: ***"regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage"***. Rockhill also uses the similar ACC language in the Organic Pathogen Exclusion in the Endorsements attached to the policy. (Ex. 13, Insight Bates # 9080-9081, 9098)

**The Subsidence Exclusion (No. 22) does not contain Rockhill's chosen phrase to convey ACC language. <u>In fact, it does not contain ACC language of any type.</u> This absence should be construed against Rockhill.**

Clearly, the structure of the policy establishes when Rockhill seeks to exclude coverage for any loss caused in part by a covered peril which concurrently contributes in any sequence to a loss it uses a specific phrase as seen in the Fungi, Silica, and Organic Pathogen Exclusions. But, there is no doubt, that ACC language is not present in the Subsidence Exclusion as written.

### h) ACC LANGUAGE MANDATED TO PRECLUDE CONTRACTOR NEGLIGENCE

Review of state/federal cases involving similar subsidence exclusions are clear that, for the subsidence exclusion to apply to preclude contractor negligence, the exclusions have to contain ACC language. See <u>High Street Lofts v. American Family Mut.</u>, 821 F.Supp.2d 1235 (D. Colorado 2011); <u>Arkansas Valley v. Cont'l. Western</u>, 709 F.Supp.2d 1232 (D. Colorado 2010); <u>State Farm Fire and Cas. Co. v. Bongen</u>, 925 P.2d 1042 (Alaska 1996); <u>Millar v. State Farm Fire and Cas. Co.</u>, 804 P.2d 822 (2nd Dist. Arizona 1990); <u>Homeowners Ins. v. Andriacchi</u>, No. 331260 (Michigan Appeal 2017); <u>LAM Investments v. Public Service Mut. Ins.</u>, No. 12-5576 (U.S. Dist. N.J. 2016); <u>Employers Ins. v. Lexington Ins.</u>, No. EDCV 10-00810-VAP (Cent. Dist. CA 2014);

Quanta v. Amberwood Devopment, No. CV-11-01807-PHX-JAT (U.S. Dist. Arizona 2014);Hearn v. Ernie Ins., No. M2012-00698-COA-R3-CV (Ct. Appeal, Nashville, Tenn. 2013).

If there is no ACC language in the subsidence exclusion, courts find coverage for negligent acts which ultimately cause earth movement. Fairfield Homes, Inc. v. Granite State Ins. Co., CV-09-360 TUC DCB (U.S. Dist. Ct. Arizona 2011). In Fairfield, the court found that the subsidence exclusion (which did not contain ACC language) did not preclude coverage for liability arising out of the contractor's negligence. Without ACC language, the court stated that the subsidence exclusion would only apply if subsidence was the sole cause of the accident/damages.

Courts have interpreted subsidence exclusion language similar to Rockhill's and determined that ACC language has to be included in the exclusion in order for contractor negligence to be excluded from coverage. See Qaunta Indem. Co. v. Amberwood Development, Inc., supra.; Blackhawk Corp. v. Gotham Ins. Co., 63 Cal.Rptr.2d 413 (Cal.App. 4th 1997). The courts are clear that terms such as "any liability", "directly or indirectly", "arising out of", and/or "emanates", does not constitute ACC language in exclusions.

### i) J.M.'S NEGLIGENCE WAS THE SUBSTANTIAL FACTOR CAUSING ACCIDENT

J.M.'s negligence of striking the underground sewer line is covered under the Rockhill policy. J.M.'s negligence was the "substantial factor" in causing the accident, i.e. it set into motion a series of events. (Facts #5-7).

Without J.M.'s negligent act of striking the sewer line, there would be no break/separation in the line, no leak, no void/cavern, and no accident. (Fact #7). The "covered risk" set into operation a chain of causation that caused the accident. There should be coverage since the substantial factor causing the loss was J.M.'s negligence which set all other events into motion

(leak of the underground pipe, the underground washout caused by the leak, and the hole onto which Thibodeaux fell and injured himself).  (Facts #6, 46).

### 3. ROCKHILL'S "SUBSIDENCE EXCLUSION" IS OVERLY BROAD AND AMBIGUOUS AND, THEREFORE, SHOULD BE CONSTRUED IN FAVOR OF THE INSURED, J.M., FINDING COVERAGE AND AGAINST ROCKHILL

#### a) TENNESSEE LAW ON INTERPRETATION OF INSURANCE POLICIES

Tennessee law requires the court construe the policy fairly and reasonably.  Angus v. Western Heritage Ins. Co., 48 S.W.3d 728 (Tenn.Ct.App. 2000).  Exclusions are to be *strictly and strongly* construed against the insurer who drafted the policy.  Palmer v. State Farm Mut. Auto. Ins. Co., 614 S.W.2d 788 (Tenn. 1981); Johnson & Assoc., LLC. v. Hanover Ins., 572 S.W.3d 636 (Tenn.App. 2018).  Where language is susceptible to more than one reasonable interpretation, the language is ambiguous.  If ambiguous language limits coverage, that language must be construed against the insurer and in favor the insured.  CBL & Associates Management, Inc. v. Lumbermans Mut. Co., 2006 WL 2087625 (E.D. Tenn. 2006); American Justice Ins. Reciprocal v. Hutchinson, 15 S.W.3d 811 (Tenn. 2000).

Tennessee law mandates exclusions are to be strictly construed against the insurer.  Palmer v. State Farm Mut. Auto. Ins. Co., supra.  Exclusions are to be construed against the insurer and in favor of the insured for insurance coverage.  Allstate Ins. Co. v. Watts, 811 S.W.2d 883 (Tenn. 1991).   All provisions in an insurance policy should be construed in harmony with each other to promote consistency and to avoid repugnancy between various provisions.  Guiliano v. Cleo, Inc., 995 S.W.2d 88 (Tenn. 1999).  An insured should not have to consult a long line of case law or law review articles and treatises to determine the coverage he is purchasing, and, therefore, the insurance contract must be read as a layman would read it.  Harrell v. Minn. Mut. Life Ins. Co., 937 S.W.2d 809 (Tenn. 1996).

### b-1)  EXCLUSION DOES NOT CONTAIN ACC LANGUAGE USED IN POLICY

Plaintiffs anticipate that Rockhill will allege it incorporated "other language" in the Subsidence Exclusion that can be divined to convey the equivalent of the ACC language.  In that event, Plaintiffs first assert that the purported language is ambiguous because an insured is not obligated to divine the meaning of the language.   Harrell v. Minnesota Mut. Life Ins. Co., 937 S.W.2d 809 (Tenn. 1996).  Secondly, the fact that Rockhill used a *specific phrase to convey ACC language throughout all other sections of the policy* makes any change in language ambiguous and susceptible of more than one interpretation.  Recall that Rockhill drafted this particular policy. (Ex. 27, pg. 28, line 14 – pg. 30, line 14).

Pursuant to Tennessee law, the Subsidence Exclusion must be (1) construed in harmony with other provisions and (2) read as a layman would read it.  Applying those rules of insurance interpretation to the Subsidence Exclusion leads to the conclusion that Rockhill is required to use the same ACC language as used in other parts of the policy.

### b-2)  EXCLUSIONS BEFORE AND AFTER "SUBSIDENCE" HAVE ACC LANGAUGE

The Fungi Exclusion (on the same page) contains the following ACC language: *"regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage."*  (Ex. 13, Insight Bates # 9080).  The exclusion immediately following Subsidence (Silica Dust) contains the following ACC language: *"regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to a claim for injury or damage."*  (Ex. 13, Insight Bates # 9081).

### b-3)  TWO INTERPRETATIONS OF SUBSIDENCE EXCLUSION REGARDING ACC

There are two interpretations of this Subsidence Exclusion, namely: (1) The exclusion needs the same ACC phrase used in other parts of the policy to preclude coverage for any loss caused in part by a covered peril which concurrently contributes in any sequence to the loss; or (2) The exclusion is written in a way that excludes concurrent causes even though ACC language is not used.

Rockhill's allegations that its Subsidence Exclusion operates to exclude the concurrent cause/substantial factor test for coverage without ACC language places two interpretations on the exclusion, makes it ambiguous, and therefore, should be construed in favor of J.M. for coverage. Further, in discovery, Rockhill's representatives admitted this policy was not a standard ISO but, instead, drafted by Rockhill.   (Ex. 27, pg. 28, line 14 – pg. 30, line 14, pg. 76, line 15 – pg. 78, line 21). Thus, this exclusion should be construed against the Rockhill and in favor of J.M. for coverage. <u>Garrison v. Bickford</u>, 377 S.W.3d 659 (Tenn. 2012).  Any other interpretation would mean the policy is not in harmony with itself and a layman has no chance to understand the exclusion.

### c)   TWO   INTERPRETATIONS   OF   "OPERATIONS"   IN AMBIGUOUS EXCLUSION

The Subsidence Exclusion applies to the "operations" of J.M.  A narrow construction, as required by Tennessee law, would imply present tense (subsidence happens while J.M. is at the work site and performing operations).  In this case, ***J.M. finished it work operations at Sawgrass on March 14, 2015 and John Thibodeaux's accident happened almost 3 months later on June 9, 2015.*** (Ex. 6; ; Ex. 14, P. 7; Ex. 16, pg. 28, lines 18-23; Ex. 19, pg. 51, lines 5-9; Ex. 33, P. 5). J.M.'s work, under these undisputed material facts, would be "Completed Operations" as defined by Rockhill's policy. (Ex. 13, Insight Bates # 9093).  Rockhill's claim adjuster (Kasal) agrees that J.M.'s work would have been "Completed Operations" under the policy.  (Fact # 25).  There is no

dispute that there is coverage under the Rockhill policy for "Completed Operations". (Ex. 13, Insight Bates # 9093)

Again, there is two interpretations of "operations" as used in Rockhill's exclusion. (ongoing operations versus completed operations). Plaintiffs note that "operations" is not defined in the policy. The term "Completed Operations" is not used in the Subsidence Exclusion even though it is specifically defined in the policy. The term "operations" should be construed narrowly (to mean ongoing, current operations) against Rockhill for coverage since John Thibodeaux's accident happened after J.M. finished its work at Sawgrass Subdivision.

### d) THE SUBSIDENCE EXCLUSION IS AMBIGOUS BECAUSE IT WOULD OPERATE TO EXCLUDE ALL OF J.M.'S NORMAL BUSINESS OPERATIONS (IF GIVEN THE MEANING ASSERTED BY ROCKHILL)

There is no dispute that J.M. performs earth movement work: J.M.'s normal business operations are borehole drilling and digging to install underground fiber optic cable. (Facts # 15-17). As written, Rockhill's Subsidence Exclusion could be read to exclude all normal aspects of J.M.'s work since it purports to exclude "any loss . . . arising out of . . . shifting . . . or any other movement of land or earth if any of the foregoing emanate from the operations of the insured." (Ex. 13, Insight Bates # 9080).    In fact, Rockhill's own designated claim adjuster in this case, Kelli Kasal, has confirmed that is exactly how she interpreted this exclusion in denying coverage for this claim (i.e. as excluding all of J.M.'s drilling operations even though that is exactly what Rockhill knew this insured did)! (Ex. 30, p. 24, line 16 – p. 28, line 2; p. 71, line 2 – p.72, line 6; p. 121, line 20 – p. 123, line 1) This overly broad and unreasonable interpretation would exclude all normal operations of J.M. and result in a policy that provides no practical coverage to its purported insured. This would be a "strained construction" which is not allowed under Tennessee insurance interpretation. U.S. Bank v. Tenn. Farmers Mut. Ins. Co., 277 S.W.3d 381 (Tenn. 2009).

The language of the exclusion in susceptible of two or more interpretations and is therefore ambiguous.

**I. ROCKHILL'S INSURANCE COMPANY COMMERCIAL EXCESS FOLLOW FORM POLICY PROVIDES COVERAGE REGARDING THE CLAIMS OF THE THIBODEAUX PLAINTIFF'S (I.E. PLAINTIFFS' FINAL JUDGMENT RENDERED IN THE UNDERLYING STATE COURT PROCEEDINGS);**

**B. ROCKHILL'S "RESIDENTIAL CONTRACTING-CONSTRUCTION DEFECT EXCLUSION" DOES NOT EXCLUDE COVERAGE REGARDING THE CLAIMS OF THE THIBODEAUX PLAINTIFFS:**

**1. ROCKHILL'S "RESIDENTIAL CONTRACTING-CONSTRUCTION DEFECT EXCLUSION" DOES NOT EXCLUDE J.M.'S WORK ON DESIGNATED UTILITY LOT 114 UNDER A MASTER COMMERCIAL CONTRACT WITH AT&T IN SAWGRASS SUBDIVISION**

Rockhill alleges that its "Residential Contracting-Construction Defect Exclusion" operates to preclude coverage for J.M.'s negligence. Rockhill contends that J.M. was involved in residential construction **"involving property intended in whole or in part for residential habitation."** (Ex. 13, Insight Bates # 9125).

**a) UNDISPUTED FACTS REGARDING J.M.'S WORK**

All work performed by J.M. Drilling relevant to the accident was performed pursuant to a Master Commercial Contract with AT&T covering 3 states: Louisiana, Mississippi and Alabama. (Fact #14). Per the Master Commercial Contract with AT&T, J.M. Drilling was to install fiber optic cable by borehole drilling, digging and excavating to bury fiber optic cable in utility easements along roads and streets and this was the work being performed by J.M. Drilling at all times relevant to the accident. (Fact #15). J.M. Drilling's normal business operations of borehole drilling, digging and excavating necessarily involved "shifting, eroding...rising and other movement of land or earth". (Fact #16).

In 2015, AT&T was expanding fiber optic service. Specific to this litigation, AT&T was expanding service along Hwy 92 in Lafayette Parish installing distribution lines to make service

available to businesses and subdivisions. (Fact #18). The work being performed by J.M. Drilling at Sawgrass Subdivision:

    a.    was per the Master Commercial Contract with AT&T;

    b.    involved the installation of fiber optic cable in utility easements along the streets of the subdivision;

    c.    did not involve connecting fiber optic to any residences;

    d.    was not performed outside the utility easements along the streets of the subdivision;

    e.    did not involve residential construction;

    f.    did not involve a contract with any contractor involved in residential construction, nor any homeowner or lot owner; and

    g.    did not involve property intended for residential habitation.

        (Fact #19)

At no time did J.M. Drilling perform any work related to any residence nor conduct any residential construction. (Fact #20).

All work performed by J.M. Drilling relevant to the accident occurred on the utility easement on Lot 114. (Fact #8). J.M. Drilling's negligent act of striking the sewer line occurred on the utility easement on Lot 114. (Fact #9). The break of the sewer line, the leak of the pipe, the void/cavern and Thibodeaux's accident all occurred on the utility easement on Lot 114. (Fact #10).

Lot 114 Sawgrass Subdivision was a designated utility lot located in Sawgrass Subdivision containing utilities such as Cox, AT&T, and the sewer station for the Subdivision. (Fact #26). Utility lot 114 did not contain a residence at all relevant times to the accident. (Fact #27). Utility lot 114 is not of sufficient size to allow a residence to be constructed. (Fact #28). Utility lot 114 from the time of the accident to the present time does not contain a residence. (Fact #29).

J.M. Drilling did not have any contract with the developer of Sawgrass Subdivision, any residential home builder building homes in Sawgrass Subdivision, nor any lot owner in Sawgrass Subdivision building a residential home. (Fact #48). At Sawgrass Subdivision, in January to early

March 2015, J.M. Drilling did not construct a residential home, work on any residence, make any AT & T fiber optic connections to any residence, nor work for any builders/contractors.  (Fact #49).

J.M. Drilling completed the work for the AT&T Commercial Contract at Sawgrass Subdivision by early March 2015, at which time all J.M. Drilling personal and equipment were removed from Sawgrass Subdivision.  (Fact #21).  Since early March 2015, J.M. Drilling has not returned to Sawgrass Subdivision for any further work.  (Fact #22).

When J.M. Drilling performed its work in February 2015 and early March 2015, AT & T service (telephone, internet, television) was not yet available to any residential home in Sawgrass Subdivision (earliest it was available was after mid-June 2015).  (Fact #50).  At the time of the accident the fiber optic lines were not yet energized and complete.  (Fact #30).

> **b)  ROCKHILL'S  RESIDENTIAL  CONTRACTING  - CONSTRUCTION DEFECT EXCLUSION**

The relevant portion of Rockhill's Residential Contracting – Construction Defect Exclusion reads as follows:

> "Residential Contracting – Construction Defect Exclusion
>
> ****
> This policy does not apply to any loss, cost or expense, directly or indirectly arising out of or related to the liability of 'Contractors' for 'Residential Construction'.
>
> As used in this exclusion:
>
> 'Contractors' means all developers, general contractors, subcontractors, trade persons, organizations, or any other person or entity involved in 'Residential Construction'.
>
> 'Residential Construction' means all development, design, building or other construction, improvements, site selection, surface or subsurface site preparation, or any work, products or component parts thereof or services provided in relation to any of the foregoing, involving property ***intended in whole or in part for residential habitation.*** 'Residential Construction' does not mean your work performed on, or your product used in apartments.  Apartments do not include condominiums, town houses, or any multi-family dwelling that has been converted into rental units

or rented to others, nor does it include apartment buildings or complexes if they have been converted into condominiums or co-operatives." [Emphasis Added]. ****. " (**Ex. 13**, Insight Bates # 9125).

### c)   J.M.'S WORK DID NOT INVOLVE PROPERTY INTENDED FOR RESIDENTIAL HABITATION

J.M's work at the time of the accident was not involving property intended in whole or in part for residential habitation.

### 1)   J.M.'S WORK WAS NOT RESIDENTIAL, BUT COMMERCIAL

J.M. had a Master Contract with AT&T to provide its services in connection with AT&T's expansion of service along Hwy 92, Lafayette Parish. (Facts # 14,15,18,19). AT&T's expansion of service benefited both businesses and subdivisions. (Fact # 18). However, J.M's contract with AT&T was a commercial contract only. (Fact #15). J.M. did not have a contract with any contractor involved in residential construction: no developer, homebuilder, nor homeowner. (Fact # 48).

### 2)   J.M'S WORK DID NOT INVOLVE PROPERTY INTENDED FOR RESIDENTIAL HABITATION

All relevant work performed by J.M. occurred on the designated utility lot (Lot 114). J.M.'s negligent act occurred on the utilty lot. (Fact # 8). The break, the leak of the pipe, the void/cavern, and Thibodeaux's accident all occurred on the utility lot. (Facts # 9,10).

The designated utility lot (Lot 114) was not "property intended in whole or in part for **residential habitation**. The utility lot was intended for utilities only. At the time of the accident and through the present date: Lot 114 did not contain a residence, Lot 114 was too small to contain a residence, and the utilities occupying Lot 114 prevented a residence from being located on it. (Facts # 26-29).

### d) PRIMARY INSURER DID NOT APPLY ITS RESIDENTIAL EXCLUSION

The primary insurance policy of Admiral contains a similar residential construction exclusion.  Admiral determined the exclusion was not applicable to J.M.'s business operations. Admiral defended J.M. without reservation and ultimately paid its $1,000,000 per occurrence limit. (Facts #40, 51).

### e) CASE LAW CONSISTENT WITH ADMIRAL DETERMINATION

Cases have held that, for the Residential Exclusion to apply, the insured must perform actual work on or to the residential structure.  American States Ins. Co. v. Delean's Tile, 319 P.3d 38 (Wash.App. 2014) [Work included tile work in deck areas, courtyard areas, staircase to common garage, and lapping membranes to siding of building walls]; Admiral Ins. Co. v. Joy Contractors, Inc., 972 N.E.2d 103 (N.Y. 2012) [Tower crane used to construct luxury high rise condominium]; Berkshire Hathway Homestate Ins. Co. v. SQI, Inc., 132 F.Supp.3d 1275 (W.D. Wash. 2015) [Roofing work on 65 residential units]; Hunters Ridge Condominium Assoc. v. Sherwood Crossing, LLC., 395 P.3d 892 (Or.App. 2017) [Installation of siding and weatherproofing on condominium buildings].

Importantly, in these cases, the insured had a contract with the building owners and/or general contractors who were constructing the buildings.  J.M. did not have any contract with any homeowner, builder, and/or developer and did not do any work on any home structure on any lot in the subdivision.  Instead, J.M. installed AT & T fiber optic cable to utility easements adjacent to roadways and did not connect to any home.

### 2. ROCKHILL'S "RESIDENTIAL CONTRACTING-CONSTRUCTION DEFECT EXCLUSION" IS OVERLY BROAD AND AMBIGUOUS AND, THEREFORE, SHOULD BE CONSTRUED IN FAVOR OF THE INSURED, J.M., FINDING COVERAGE AND AGAINST ROCKHILL

### a) ROCKHILL, ITSELF, HAS TWO INTERPRETATIONS OF THE EXCLUSION

In finding Rockhill's "Residential Contracting – Construction Defect Exclusion" ambiguous, **the Court need look no further than Rockhill's own representatives, Mike Towell (Rockhill underwriter for this policy/claim) and Kelli Kasal (Rockhill claim adjuster for this policy/claim),** <u>who interpret and apply this exclusion in entirely different manners</u>.

Towell (underwriter) testified that the "intent" of the exclusion was to preclude coverage for actual work on residential homes:

> "A:  Basically it was crafted to be work on residential—new residential construction. The company was not interested in picking up new residential construction…
> Q:  The intent of the exclusion was to exclude work by people who did work on new residential houses, correct?
> …
> A:  Yes, sir.
> Q:  And we know that the information you had regarding the scope of the work of JM Drilling was that they did work digging and boring conduit for the installation of telephone and fiberoptic lines transmitting services between points from the original spot to wherever it was going to be used.  Was it your belief and intent that this exclusion would exclude what they did?
> …
> A:  No. It was just a standard exclusion that was attached to the—the form." (Ex. 27, p. 49, line 3- p. 50, line 11)

Towell understood the nature of J.M.'s work and conceded that he did not believe it applied to J.M.'s work.  (Ex. 27, p. 24, lines 3 – 22; p. 36, line 13 – p. 38, line 13; p. 49, line 1 - p. 50, line 11).  Towell was clear that the intent of the exclusion was not to preclude from coverage work similar to J.M.'s at Sawgrass.  (Ex. 27, p. 52, line 7 – p. 53, line 21).

Meanwhile, Kasal (claims adjuster) testified that the exclusion applies to any work being performed on a "residential site:" (Ex. 30, p. 34, line 7 – p. 36, line 21; p. 44, lines 8-22)

> "Q:  Okay. So am I deriving correctly that the importance, from your standpoint, is that this work occurred inside the confines of a residential subdivision?
> A:  Yes." (Ex. 30, p. 36, lines 18-21)

**In fact, Kasal even testified that she would apply this exclusion to any work being performed well outside a residential site if the work ultimately connected to a residential construction site at some point:** (Ex. 30, p. 36, line 24 – pg. 39, line 21)

> "Q:   So if J.M. were boring to lay fiber-optic line along a state highway that at some point connected to a residential construction site, a subdivision, what would your judgment of coverage be on those facts?
>
> A:     I would still rely on the residential construction." (Ex. 30, pg. 39, lines 16-21).

Contrary to Towell, Kasal believed that the intent of the exclusion precluded from coverage work similar to J.M.'s at Sawgrass.  (Ex. 30, pg. 44, lines 8-22).

Pursuant to Tennessee law, this Court should find the exclusion is ambiguous and construe the language against Rockhill and in favor of its insured, J.M., for coverage.

### b)  TITLE OF EXCLUSION HAS TO HAVE MEANING

The title of this Exclusion reads as follows "Residential Contracting-**Construction Defect Exclusion**".  The term "construction defect" is a *modifier* and limits the exclusion to "construction defects" not "bodily injury" as defined by the policy.  Rockhill's claims adjuster (Kasal) admitted that John Thibodeaux made a "bodily injury" claim as defined on page 23 of the policy.  (Ex. 30, pg. 112, lines 14-20).  This Court should construe this exclusion narrowly and strongly against Rockhill since John Thibodeaux suffered "bodily injury" due to J.M.'s negligence and there was no "construction defect" involved.

### c)  EXCLUSION IS OVERBROAD AND COULD APPLY TO ALL OF J.M.'S WORK

Rockhill's exclusion is overbroad and ambiguous.  Any type of work that a commercial contractor would do would be considered "Residential Construction" under Rockhill's interpretation of its policy.

For example, a contractor installing electrical lines connected to poles adjacent to highways in a utility easement would be considered "residential construction" if a nearby subdivision to these power lines eventually connected to them for power. A second example would be a farmer who produces corn that is made into ethanol that runs a factory that produces fiber optic cable eventually placed in subdivisions on behalf of AT & T would be "residential construction". This would be an "unreasonable" and "unfair" interpretation, which is not how policies are interpreted. S. Trust Ins. Co. v. Phillips, 474 S.W.3d 660 (Tenn.App. 2015). And, this is not how a "layman" would read the residential construction exclusion. Id.

## II. THE ACCIDENT OF JUNE 9, 2015 INJURING JOHN THIBODEAUX IS A SINGLE "OCCURRENCE" (SUCH THAT ADMIRAL'S PAYMENT OF $1 MILLION PLUS INTEREST AND COSTS EXHAUSTED ADMIRAL'S "PER OCCURRENCE" LIMIT AND ROCKHILL IS NOW LEGALLY RESPONSIBLE FOR THE PAYMENT OF THE REMAINDER OF PLAINTIFFS' FINAL JUDGMENT RENDERED IN THE UNDERLYING STATE COURT PROCEEDINGS)

### A. MULTIPLE ACTS OF NEGLIGENCE ARE NOT MULTIPLE OCCURRENCES

Rockhill has alleged that there were two (2) occurrences in this single accident, single plaintiff claim and that Admiral should therefore have paid two (2) per-occurrence limits (i.e. total of $2,000,000.00) before there is coverage under the Rockhill Commercial Follow Form Excess policy. (Ex. 10 & 12). Rockhill argues that, since J.M. Drilling was held to be negligent in both striking the sewer drain pipe and in failing to have the pipe fixed after striking it, those two negligent acts constitute two separate "occurrences" for the purpose of determining Admiral's applicable policy limits to this single accident, single plaintiff claim. This novel argument is both at complete odds with the definition of "occurrence" in these insurance policies and has been routinely and consistently rejected by the Courts.

The applicable Admiral and Rockhill policies both similarly define an "occurrence" as "...an accident...". (Ex. 13, Insight Bates # 9091-9092; Ex. 15, Insight Bates # 9347). However, "an accident" is not a defined term under either policy. The plain meaning interpretation of "an accident" as found in Admiral's and Rockhill's definition of an "occurrence" is a single accident, since the singular "accident" is used and not the plural "accidents." This results in an occurrence being defined as a single accident. On the day of June 9, 2015, it is undisputed that Thibodeaux sustained one accident, he fell in a hole. Therefore, under these insurance policies there is one occurrence.

While it is entirely unreasonable and illogical for Rockhill to assert that there can be two occurrences in a single accident, single plaintiff claim, that argument in and of itself: 1) only highlights the ambiguous nature of the term "occurrence" as used and relied on by Rockhill in its argument, 2) results in an interpretation that is entirely inconsistent with how a lay person would read the policy; and 3) should therefore under Tennessee law should be construed against the insurer and in favor of coverage for the insured.

In Tennessee, the courts, with similar definitions of "occurrence" in insurance policies, do not look at the number of negligent acts and/or injuries. American Modern Select Co. v. Humphrey, No. 3:11-CV-129 (E.D. Tenn. 2012). In American Modern, the court found there was only one occurrence when plaintiff suffered 147 bite wounds on her arms by seven different dogs during a twenty-minute attack.

In Davis v. Kentucky Farm Bureau Mut. Ins. Co., 495 S.W.3d 159 (Ky.Ct.App. 2016), defendant was insured by insurance policy with limits of $500,000.00 per occurrence. The definition was similar to the Admiral and Rockhill policy. Plaintiffs claimed there should be three

occurrences since there was three separate acts of negligence by the insured.  The court disagreed and stated:

> "However, merely because there were multiple negligent acts that combined to cause a single injury or multiple causes of action may be asserted does not mean there were multiple occurrences as that term is unambiguously defined in the Kentucky Farm Bureau policy. *There are frequently multiple acts of negligence that cause a single injury. For instance, a negligent driver in a car accident may have been inattentive because he was intoxicated and distracted by his texting and speeding. As a result of the driver's negligence, a collision occurs injuring another person.*
>
> *Under those circumstances, although there were multiple acts of negligence, it cannot be reasonably argued there was more than one accident caused by the driver's negligence.*
>
> Under the unambiguous language of the policy, the meaning of 'occurrence' in the Kentucky Farm Bureau is 'accident'. There was only one accident, Ja'Corey's choking on a push-pin. The $500,000.00 limit applies." [Emphasis Added].
>
> Davis v. Kentuck Farm Bureau Mut. Inc. Co., 495 S.W3d @ 166-167.

In the present case, one person, Thibodeaux, had one accident when the ground gave way and he fell into a hole injuring himself at Lot 114.  (Ex. 4; Ex. 5; Ex. 6; Ex. 14, P.7).  The negligent act of J.M. precipitated a sequence of events resulting in Thibodeaux's accident.  The undisputed facts establish that, though J.M. was negligent, J.M. never knew it struck the sewer line and, therefore, was unaware there was a need to report a break to the owner.  J.M.'s negligence has causal and logical connections under the Damage Prevention Law, La.R.S. 40:1949.11, et. seq.  The duty not to break the underground pipe is related to the duty to have it fixed.  These are simply interrelated, connected duties.

Cases from different jurisdictions have disregarded Rockhill's arguments that multiple acts of negligence mean multiple occurrences under the insurance policy.  Fleming v. Air Sunshine, Inc., 311 F.3d 282 (3rd Cir. 2002); Nationwide Mut. Fire Ins. Co. v. Kubacko, 706 N.E.2d 17 (Ohio 1997); Cincinnati Indemnity Co. v. Southwestern Line Constructors, 422 P.3d 1086 (Arizona App.

1, 2018); Fellowship of Christian Athletes v. Axis Insurance Co., 758 F.3d 982 (8th Cir.

2014); North American Specialty Insurance v. Royal Surplus Lines, 541 F.3d 552 (5th Cir. 2008).

The cases are quite clear that no single claim or injury can give rise to multiple occurrences

merely because several acts of negligence combine to produce a single result. Auto-Owners Ins.

Co. v. Munroe, 614 F.3d 322 (7th Cir. 2010); Western World Ins. Co. v. Wilkie, 2007 WL 3256947

(E.D. N.C. 2007); Hollis v. Lexington Ins. Co., 180 F.Supp.3d 422 (E.D. Va. 2016) [Insured had

many breaches of duty that caused fire work shell to explode close to plaintiff but there was only

one accident/occurrence-the explosion of the fire work shell].

## B. ADMIRAL JUDICIAL ADMISSION OF ONE OCCURRENCE UNDER POLICY

Admiral paid its policy limits of $1,000,000.00 plus judicial interest after the jury trial.

Admiral prepared Release where Admiral is very clear that there was only one occurrence:

> "That, by virtue of the payment by Admiral Insurance Company of the amount
> recited hereinabove, under Commercial General Liability insurance policy No.
> CA00019278-01 issued to J.M. Drilling, LLC., as named insured, for the policy
> period May 2, 2015 to May 2, 2016, Admiral Insurance Company has *exhausted
> its policy limit of $1,000,000.00 for each occurrence . . .*" [Emphasis Added].

(Ex. 31, pg. 3).

Plaintiffs assert that Admiral made a judicial admission/confession that its policy limit of

one occurrence was exhausted. Rockhill cannot now allege that there are two occurrences under

the Admiral policy.

In Louisiana, it is well settled that an admission by a party in a pleading constitutes a

judicial confession and is full proof against the party who made it. CT Traina, Inc. v. Sunshine

Plaza, Inc., 861 So.2d 156 (La. 2003). A judicial confession has the effect of waiving evidence as

the subject of the admission. Id. A declaration made by a party's attorney has the same effect as

one made by the party himself. Id.

Admiral defended J.M. throughout the underlying state court proceedings and made a judicial confession that there was one occurrence under the policy.  Based on Louisiana law, Rockhill cannot now challenge that determination under Admiral's policy.

Finally, Rockhill's own policy clearly states that its limit of liability will not increase even though there are "number of claims" made against the insured.  (Ex. 13, Insight Bates #9072). Thus, Rockhill, in its own policy, agrees that the number of negligent claims do not equal the number of occurrences.

## CONCLUSION

Wherefore, for the foregoing reasons, the Thibodeaux Plaintiffs respectfully request this Honorable Court grant their Motion for Summary Judgment and find that the Rockhill policy provides coverage to J.M. in the matter entitled "John Thibodeaux, et. al. vs. Gulfgate Construction, et. al.", Docket No. 2015-4167-B for the Judgment against J.M. in the 15th Judicial District Court in Lafayette, Louisiana.

And for all general and equitable relief, etc.

Respectfully Submitted,

/s/ Edward O. Taulbee, IV
/s/ Christopher E. Taulbee
Edward O. Taulbee, IV, LA Bar #12699
Christopher E. Taulbee, LA Bar #30753
1023 E. St. Mary Blvd.
Lafayette, LA 70503-2347
Phone: 337-269-5005
Fax:        337-269-5096
Email: etaulbee@taulbeelaw.com

/s/ Max Michael Menard
Max Michael Menard, LA Bar #22833
200 Church Street
P.O. Box 1196
Youngsville, LA 70592
Phone: 337-857-6123
Fax:    337-451-5707
Email: max@youngsvillelawyer.com

## CERTIFICATE

I hereby certify that a copy of the above and foregoing has this day been electronically mailed to all counsel of record.

Lafayette, Louisiana, this 5th day of March 2021.

/s/ Edward O. Taulbee
Edward O. Taulbee, IV.-#12669