UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| JOHN THIBODEAUX, ET AL | NO. 6:18-CV-501(LEAD) |
| | NO. 6:18-CV-1414 (MEMBER) |
| VS. | |
| | JUDGE ROBERT R. SUMMERHAYS |
| J.M. DRILLING, LLC., | MAGISTRATE JUDGE |
| ET AL | CAROL B. WHITEHURST |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON ESTOPPEL / WAIVER CLAIM AGAINST ROCKHILL INSURANCE COMPANY REGARDING SUBSIDENCE EXCLUSION

Now into Court, through undersigned counsel, come Plaintiffs, John Thibodeaux, Amy Thibodeaux, and Gabrielle Thibodeaux, who respectfully submit this Memorandum in Support of their Motion for Summary Judgment on their Estoppel / Waiver Claim Against Rockhill Insurance Company regarding its Subsidence Exclusion:

### RELIEF SOUGHT

Plaintiffs have filed this Motion for Summary Judgment regarding Estoppel / Waiver seeking a ruling that Plaintiffs are entitled to judgment as a matter of law that Rockhill should be estopped from asserting the Subsidence Exclusion as a coverage defense under its Excess Commerical Follow Form Policy, or be deemed to have waived the application of the Subsidence Exclusion because of the following acts of negligence, bad acts, misrepresentations and/or deceptive practices:

I.    **ROCKHILL SHOULD BE ESTOPPED FROM DENYING COVERAGE ON THE BASIS OF ITS SUBSIDENCE EXCLUSION BECAUSE IT MISREPRESENTED THE TERMS OF ITS POLICY BY PROMOTING IT AS A "FOLLOW FORM" POLICY AND FAILING TO DISCLOSE EXCLUSIONS EMBEDDED OR HIDDEN IN THE BODY OF ITS NON-STANDARD, PROPREITARY POLICY FORM WHICH WERE CONTRARY TO THE UNDERLYING COVERAGE AND CONTRARY TO STANDARD ISO EXCLUSIONS;** AND

1

II.   **IN THE ALTERNATIVE, ROCKHILL SHOULD BE ESTOPPED FROM DENYING COVERAGE ON THE BASIS OF ITS SUBSIDENCE EXCLUSION BECAUSE IT FAILED TO PROVIDE ITS NON-STANDARD, PROPRIETARY POLICY FORM TO INSIGHT AND/OR JM DRILLING WITH ITS INSURANCE QUOTE.**

### FACTS

The Thibodeaux Plaintiffs initiated a civil suit for personal injuries against J.M. arising out of a single accident which occurred on a designated "utility lot" located in Sawgrass Subdivision, Lafayette, Louisiana on June 9, 2015. (Fact # 1). Plaintiffs obtained a judgment in the 15th Judicial District Court, Lafayette, Louisiana, in Docket No. 2015-4167-B as against J.M. Drilling, LLC. (J.M.) in the amount of $3,575,245.00 plus legal interest and costs. (Facts #25-26). That judgment is now **final** since the Louisiana Third Circuit Court of Appeals affirmed J.M.'s liability and the Thibodeaux Plaintiffs' damages and J.M. did not apply for any Supervisory Writs to the Louisiana Supreme Court. (Fact #26).

On June 9, 2015, Thibodeaux suffered an accident while working on a "utility lot" located in Sawgrass Subdivision when he fell in a hole causing injury. (Fact #1). The hole which caused the accident was caused by the negligence of J.M. (Facts # 4-5).

Both the Trial Court and the Court of Appeal, Third Circuit, found J.M.'s negligence in striking an underground sewer line caused a break / separation in the line. The break in the line caused the sewer line to leak. The leak caused a void / cavern to form. The void / cavern caused Thibodeaux's accident. (Facts # 2-5). J.M. Drilling violated the inter-related and inter-connected duties of the "Louisiana Underground Utilities and Facilities Damage Prevention Law", La. R.S. 40:1749.11, et. seq. by negligently striking and damaging the underground sewer force line and by failing to have the broken sewer line fixed by its owner (Water & Wastewater). (Fact #28).

At the time of John Thibodeaux's accident, J.M. Drilling was insured with the following insurance package for the 2015/2016 policy year:  (1) Primary Commercial General Liability Policy issued by Admiral Insurance Company, policy no. CA000019278-02, with policy limits of $1,000,000.00., and (2) Commercial Excess Follow-Form Policy issued by Rockhill Insurance Company, policy no. R XSL RU 000621-03, with policy limits of $5,000,000.00.  (Fact #29). Admiral Insurance Company defended J.M. Drilling throughout the underlying state suit.  On June 29, 2018, Admiral Insurance Company paid its policy limits ($1,000,000.00), plus judicial interest to that date ($164,415.99) and court costs in the underlying state suit.  (Fact #30).

Rockhill Insurance Company denied coverage to J.M. Drilling based on: (1) "Subsidence" exclusion, (2) "Residential Contracting" exclusion, and (3) Admiral Insurance Company did not exhaust its policy limits since there were two "occurrences".  (Fact # 31).  Rockhill's denial of coverage based on its Subsidence Exclusion is the subject of this Motion for Summary Judgement regarding Estoppel/Waiver.

At all relevant times, J.M. Drilling's normal business operations was burying fiber optic lines by boring, drilling, and excavating pursuant to a contract with AT&T.  The AT&T contract had specific insurance requirements.  The AT&T contract required J.M. Drilling to obtain insurance which met the following requirements:

1) Commercial General Liability insurance written on standard ISO form;
2) Umbrella/Excess Liability insurance with terms and conditions **"at least as broad as the underlying Commercial General Liability"**; and
3) Explosion, Collapse, and Underground Damage Liability must not be excluded for any underground work. (Fact #32.4)

J.M. Drilling needed to obtain an insurance package to meet the specific insurance requirements of the AT&T contract.

**At all relevant times hereto, J.M. Drilling retained a retail insurance agent, Insight Risk Management, to represent it in the negotiation for and placement of an insurance package to insure its business operations.** (Fact #32)  J.M. Drilling requested that Insight obtain an insurance package which provided full coverage for its normal business operations and which satisfied the insurance requirements of its contract with AT&T. (Fact #32.5)  J.M. Drilling relied on Insight to provide it with an insurance package which met the requirements stated above. (Fact #32.7)

Insight was a retail insurance agent who held itself out to be a well qualified, professional insurance agent. (Fact #32.1)  Insight accepted the assignment to procure and place the insurance package (CGL & Excess Liability insurance) which met J.M. Drilling's needs and satisfied the insurance requirements of AT&T (J.M.'s primary client).  (Fact #32.6)   At all relevant times hereto, Insight was fully familiar with the business operations of J.M. Drilling. (Fact #32.2)  Insight knew that AT&T was J.M.'s primary client and knew the insurance requirements that the AT&T contract imposed upon J.M.  (Fact #32.3)  Insight knew that a Subsidence Exclusion was not a suitable exclusion for an insurance policy insuring J.M. Drilling. (Fact #52)

Insight procured and placed both commercial general liability and excess liability coverages for J.M. Drilling from at least 2010-2016.  Specifically for the 2015/2016 policy period, Insight procured and placed Commercial General Liability coverage with Admiral and Commercial Follow Form excess liability coverage with Rockhill.  The CGL coverage placed with Admiral was written on a standard ISO policy form. (Fact #34)   The Commercial Follow Form excess liability coverage placed with Rockhill was not written on a standard ISO policy form, but rather was written on a non-standard, proprietary form drafted by Rockhill. (Fact #43)

The Rockhill Commercial Follow Form excess policy presented and recommended for acceptance by Insight to J.M. Drilling for the 2015/2016 policy year did not meet the insurance requirements of the AT&T contract and did not insure J.M. Drilling's normal business operations because it contained a subsidence exclusion.  The presence of the subsidence exclusion violated the terms of the AT&T contract's insurance requirements because:

1) It resulted in a Rockhill excess policy that was not as broad as the underlying standard ISO CGL policy issued by Admiral; and

2) Collapse and underground damage liability for any underground work must not be excluded. (Fact #52.2)

Insight never advised J.M. Drilling that the proposed Rockhill excess policy did not meet the insurance requirements of the AT&T contract and did it provide full coverage for J.M. Drilling's normal business operations. (Fact #52.3)   If Insight had advised J.M. Drilling that the Rockhill policy did not meet the insurance requirements of the AT&T contract, J.M. Drilling would never have assented or accepted the Rockhill policy and never have paid the premium. (Fact #52.4)

Insight states it never knew the Rockhill policy contained a subsidence exclusion. (Fact #52.5)  If it had known that Rockhill's 2015/2016 quoted excess policy contained a Subsidence Exclusion, Insight would have never accepted and bound Rockhill's insurance proposal on behalf of J.M. Drilling. (Fact #52.6)

In the process of procuring an excess liability policy as part of the insurance package for J.M. Drilling for the relevant time period, Insight was required to go through a wholesale broker/agent, Insurisk, to gain access to Rockhill Insurance Company.   Insight never communicated directly with Rockhill, and vice versa.  All communications went through Insurisk. (Fact #33)

It is clear that Insight did not want a Subsidence Exclusion in the package of insurance policies for J.M. Drilling. (Fact #50)  Insight knew that a Subsidence Exclusion was not suitable for J.M. Drilling's insurance package both because of the nature of J.M. Drilling business operations and the insurance requirements of the AT&T contract. (Fact #52-52.2)  In fact, in a previous year Insight had requested that this same wholesale broker, Insurisk, have a Subsidence Exclusion removed from J.M. Drilling's 2011 insurance package, specifically with reference to a commercial general liability policy by Colony Insurance Company. (Fact #51)

In regards to J.M. Drilling's insurance package for the 2015/2016 policy year (which were in effect at the time of Thibodeaux's accident), Admiral's Primary Commercial General Liability Policy was issued on a standard ISO Commercial General Liability Policy Form. (Fact # 34).  Admiral's Primary CGL Policy did not have a Subsidence Exclusion. (Fact # 37)  A Subsidence Exclusion is not found in a standard ISO Commercial General Liability Policy Form. (Fact #38)  All knowledgeable insurance agents, brokers, and insurers know, or should know, the terms and exclusions contained in standard ISO insurance policy forms, and that said policy forms do not contain a Subsidence Exclusion. (Fact #36)

Rockhill Insurance Company quoted a "Commercial Follow Form Liability" excess policy above Admiral's Primary Commercial General Liability Policy for the 2015/2016 policy year. (Fact #40)  Rockhill's excess coverage quote that was forwarded to Insight for consideration represented that it was providing "Commercial Follow Form Liability" coverage. (Fact #40)  That same Rockhill quote also included an attached "Forms & Endorsement Schedule" that contained a list of exclusions, but Subsidence Exclusion was not a listed exclusion in that schedule. (Fact #41)  The only reference to Rockhill's actual policy form on its excess liability quote for the 2015/2016 policy year was a reference to a form number, RIC 3700. (Fact #45)

The RIC 3700 policy form is a proprietary, non-standard insurance policy form that was drafted by Rockhill and contained 32 pages. It is not a standard ISO insurance policy form readily recognized in the insurance industry. (Fact #43)   The Rockhill excess liability policy the 2015/2016 policy year (year of Thibodeaux's accident) was issued on Rockhill's own RIC 3700 policy form. (Fact #43)   Rockhill's policy was specifically titled "Commercial Follow Form Policy." (Fact #42)   However, the Subsidence Exclusion was embedded by Rockhill in the body of this proprietary, non-standard Commerical Follow Form Policy (i.e. form "RIC 3700") and not listed as a specific endorsement as it would have been in a standard ISO policy. (Fact #44)

Rockhill was knowledgeable of the normal business operations of J.M. Drilling, knew that J.M. was in the boring, excavating, and digging business at the time of the placement of this 2015/2016 policy, and knew J.M. had a contract with AT&T. (Fact #48)   Rockhill knew that a Subsidence Exclusion was of particular importance for a company that does digging and underground boring work, like J.M. Drilling, as it would exclude a substantial risk of their normal business operations since boring and digging necessarily involved "shifting, eroding…rising and other movement of land or earth." (Facts #47-49)

Despite this knowledge, Rockhill (and its agents) **never notified or alerted** Insight (or J.M. Drilling) that its excess "Commerical Follow Form Policy" contained a Subsidence Exclusion that was not disclosed on its quote, nor disclosed it in the Forms & Endorsement Schedule which Rockhill attached to its quote. (Fact #46)   In other words, Rockhill did not disclose that its "Commercial Follow Form Policy" did not cover the known risk central to normal business operations of JM Drilling while the standard ISO CGL policy did provide such coverage.

The year after Thibodeaux's accident, Rockhill quoted excess liability coverage for the 2016/2017 policy year using a different insurance policy form than in previous years (i.e. policy

form CX 0001). (Fact #53) This time Rockhill's 2016/2017 quote included an attached "Forms & Endorsement Schedule" that included Subsidence Exclusion as a listed exclusion. (Fact #54)  Upon receipt of the 2016/2017 Rockhill quote, Insight immediately requested that the Subsidence Exclusion be removed from the Rockhill policy.  (Fact #55)  Within 3 minutes of receiving Insight's request to remove the Subsidence Exclusion, Rockhill agreed to remove the Subsidence Exclusion since it was not on the underlying Admiral primary policy and Rockhill's excess policy was a "Follow Form" policy.  (Fact #56)  Interestly, Rockhill did not charge any additional insurance premium for undertaking the additional risk when it agreed to remove the Subsidence Exclusion from its 2016/2017 excess policy. (Fact #57)  Further, Rockhill admitted that had it been asked to remove the Subsidence Exclusion from its excess policy for the 2015/2016 policy year (the year of Thibodeaux's accident) there is no reason that it would not have agreed to remove it. (Fact #58)

## PROCEDURAL HISTORY

### UNDERLYING STATE COURT LITIGATION

The Thibodeaux Plaintiffs filed a Motion for Summary Judgment on Liability against J.M. (Ex. 4).  On February 20, 2018, the Trial Court granted summary judgment finding J.M. was at fault for:  (1) negligently striking the underground sewer force main line on the utility lot in February 2015; (2) negligently failing to contact the utility owner to have the broken underground sewer force main line fixed before continuing any work; and (3) J.M.'s negligence caused the underground void/cavern near the AT & T equipment, which, in turn, caused Thibodeaux's accident on June 9, 2015.  (Fact #2).

A jury trial was held during the week of March 26, 2018 and the jury awarded the Thibodeaux Plaintiffs a total of $3,698,118.00 plus legal interest and costs. (Fact #25).  J.M. filed

an appeal and the Third Circuit affirmed the Trial Court's summary judgment and the jury's

damage awards with minor revision on John Thibodeaux's loss of future earning capacity claim.

The total judgment after the Third Circuit's minor revision is $3,575,245.00.  (Fact #26).

The Third Circuit, in affirming the Trial Court's ruling on liability, stated:

"The record contains sufficient evidence to make it clear that **J.M. damaged the sewer line, which precipitated the leak, that caused the sinkhole.**" [Emphasis Added].
(Ex. 6, pg. 6).

\*\*\*\*\*
**"In our previous grant of summary judgment to Gulfgate, this court noted it was a break in 'the main line, which caused the leak, which caused the washout, which formed the hole into which Thibodeaux fell and was injured."**
Thibodeaux, 234 So.3d 106.  [Emphasis Added].
(Ex. 6, pg. 7, footnote 1).

At all relevant times, J.M. was insured for primary General Liability insurance in the

amount of $1,000,000.00 by Admiral Insurance Co. (Admiral) per a standard ISO policy and for

excess liability by Rockhill Insurance Co. (Rockhill) with a "Commercial Follow Form" policy

with limits of $5,000,000.00 per a non-standard policy drafted by Rockhill.  (Facts #29,34,43).

After the jury trial in March 2018, Admiral paid its $1,000,000.00 limits plus judicial interest and

costs. (Fact #30).  Rockhill has refused to follow-form the Admiral policy although Rockhill

quoted excess "Commercial Follow Form Liability" coverage AND Rockhill's policy is titled a

"Commercial Follow Form Policy."  (Facts 40,42).  Rockhill contends that its policy does not

actually follow-form the Admiral policy but, rather, contains exclusions not contained in the

standard ISO Admiral policy which support its denial of coverage and payment of the Judgment.

(Ex. 10; Ex. 12).

**FEDERAL COURT ACTIONS**

On the eve of the jury trial in Lafayette Parish State Court, Rockhill filed for Declaratory Judgment in Tennessee alleging there was no coverage under the Rockhill policy because of 2 exclusions: 1) the Subsidence Exclusion; and 2) Residential Contracting – Construction Defect Exclusion. (Ex. 9). After obtaining a final judgment against J.M., the Thibodeaux Plaintiffs filed Declaratory Judgment with this Court demanding that Rockhill provide coverage and pay its portion of the Judgment. (Ex. 8). The Tennessee suit was transferred to this Court.

During this time, J.M. had filed a devolutive appeal to the Third Circuit regarding liability and jury's damage awards. Admiral paid its policy limits plus judicial interest and costs. At that point, Plaintiffs amended their Complaint to assert a collection action against Rockhill and, alternatively, that the insurance agent, Insight Risk Management LLC, and the insurance broker, Insurisk Excess & Surplus Lines (CRC Insurance Services, Inc.), breached their fiduciary duty to the insured, J.M. (Ex. 11).

Further, Plaintiffs have asserted that Rockhill should be estopped from denying coverage on the basis of the Subsidence Exclusion due to its misrepresentations, bad acts, and negligence (or that of its agents) upon which the insured reasonably relied on. (Ex. 28; Ex. 29) It is this claim that is the subject of this Motion for Summary Judgment.

## LAW

**SUMMARY JUDGMENT LAW**

A party may move for summary judgment, identifying each claim or the part of which claim, on which summary judgment is sought. The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

Defense of a proper summary judgment motion requires more than a mere denial. Any party opposing such a motion is required to bring forward "significant probative evidence" demonstrating the existence of a triable issue of fact. *Planters Nat. Leasing v. Woods*, 687 F.2d 117 (U.S. 5th Cir. 1982)

## TENNESSEE LAW APPLIES TO ROCKHILL POLICY

Rockhill issued its Excess Commercial Follow Form policy to J.M. Drilling, LLC., whose principal office is located in Milan, Tennessee. (Ex. 13, Insight Bates #9061). Both Louisiana and Tennessee follow the *lex loci contractus doctrine* in insurance disputes and, in coverage disputes, the substantive law of the state where the insurance policy was delivered should apply to the interpretation of the policies. Champagne v. Ward, 893 So.2d 773 (La. 2005); Lee v. Sapp, 163 So.3d 60 (La.App. 2 Cir. 2015); Nelson v. Nelson, 409 S.W.3d 629 Tenn. App. 2013); Stakem v. Randolph, 431 F.Supp.2d 782 (E.D. Tenn. 2006).

Therefore, Tennessee law should apply in the interpretation of the Rockhill policy.

## ESTOPPEL / WAIVER LAW

The seminal Tennessee case regarding the application of Estoppel / Waiver within the context of insurance policies, and broadening coverages under such policies, is *Bill Brown Construction Co. v. Glens Falls Insurance Company, 818 S.W.2d 1 (Tenn. Supreme Court 1991)*. In *Bill Brown Construction,* the Tennessee Supreme Court held that an insurer may be estopped from denying coverage for any loss due to misrepresentations upon which the insured reasonably relies. *Id.* The two elements of an estoppel / waiver claim are:

1.    Misrepresentation by Insurer (which can be through its agent); and

2.    Reasonable reliance by the Insured.

In *Bill Brown Construction*, Plaintiff, Bill Brown, met with an insurance agent for the insurer, Glens Falls Insurance Company, and asked the agent for a full coverage policy on the cargo transported in its business.   The plaintiff testified that the agent told him he had full coverage.  An accident occurred when a piece of cargo being hauled by plaintiff struck the bottom of an overhead bridge in transport.  The cargo was knocked off the trailer and damaged. The tractor trailer hauling the cargo was not damaged.  The insurer, Glens Falls, denied coverage for the damage claim asserting that its policy afforded coverage only if the cargo was damaged as a result of a collision involving the vehicle itself, as opposed to a collision involving only the cargo.  The plaintiff filed suit claiming defendant insurer was precluded from denying coverage by waiver or estoppel, among other arguments.

The Tennessee Supreme Court confirmed that estoppel is available to protect a right, not create one.  *Id*.  In its reasoning, the Tennessee Supreme Court ruled that regardless of which language is selected by the insurer, the insured has a valid right to expect coverage as promised by the insurer's agent.  *Id.*  Therefore, the doctrine of waiver and estoppel should be available to protect that interest, even though the effect is to broaden coverage.  *Id.*

The Tennessee Supreme Court noted "our holding is supported by the analogy to the law of sales which we recognized in *Vulcan Life & Accident Ins. Co. v. Segars, supra, 391 S.W.2d at 397-98*:

> 'The situation seems to be strikingly analogous to that expressed in the familiar rule of law of sales to the effect that a vender supplying an article which he knows is to be used for a specific purpose **impliedly warrants that the article furnished is suitable for that purpose**.' [Emphasis Added.]
>
> *818 S.W.2d 1 (Tenn. Supreme Court 1991).*

In *Bill Brown Construction*, the Court found "by analogy, that the reasons for holding sellers of goods liable for implied warranties of fitness made by their agents are equally persuasive in the context of sales of insurance contracts. *Id.*

In continuing its analysis, the Tennessee Supreme Court reasoned:

"An insurance policy is a contract of adhesion drafted by the insurer. We decline to adopt a rule which would permit the insurer to exculpate itself from liability for the misrepresentations of its agents, by the mere expediency of placing conditions or limitations of coverage in an insuring clause. Technical distinctions, created by the insurer within its field of expertise and exclusive control, should not dictate the fortunes of innocent insureds who reasonably rely upon the misrepresentations of agents of the insurer.

Moreover, the insurer is in a better position to minimize the frequency of occasions in which the reasonable expectations of an insured are not supported by the policy language. By training its agents in the language of its policies, and by simplifying the policy language itself, the insurer can reduce the frequency of misrepresentations and increase the difficulty of proving reasonable reliance." *Id.*

Although the Tennessee Supreme Court in *Bill Brown Construction* dealt with estopping an insurer from denying coverage on the basis of mispresentations of the insurer's agent, it is obvious that the estoppel / waiver remedy and the Court's analysis and findings also apply equally to estopping an insurer from denying coverage on the basis of misrepresentations made directly by the insurer itself. *Id.*

## ARGUMENT

In the underlying suit, Plaintiffs developed a liability case against J.M which resulted in a judicial determination of those facts bearing on the liability of J.M. These facts are now Law of the Case. Some facts pertinent to the coverage issue before this Court were not relevant to the liability determination and, therefore, not developed in the underlying state court proceeding. Plaintiff now offers supplemental evidence on some aspects of the coverage issues before this

Court (those facts which were not relevant to the liability determination in the underlying state court proceedings) and Law of the Case Determinations of the State Court.

There is no dispute that J.M. Drilling did not receive the insurance package it requested for the 2015/2016 policy year, i.e. an insurance package which satisfied the insurance requirements of the AT&T contract and provided full coverage for its normal business operations. A major deficiency in the insurance package provided to J.M. Drilling for the 2015/2016 policy year was the inclusion of a subsidence exclusion in the Rockhill "Commercial Follow Form" excess policy (that was not in the underlying Admiral primary policy). In other words, there was a failure of the primary cause of the negotiation for procurement and placement of the Rockhill policy. Plaintiff asserts that the negligence, misrepresentations, deception, and other bad acts of Rockhill led to this failure.

The undisputed material facts in this case, which consist of a combination of the underlying state court findings and the evidence cited in support of this motion, conclude the following:

**I.    ROCKHILL SHOULD BE ESTOPPED FROM DENYING COVERAGE ON THE BASIS OF ITS SUBSIDENCE EXCLUSION BECAUSE IT MISREPRESENTED THE TERMS OF ITS POLICY BY PROMOTING IT AS A "FOLLOW FORM" POLICY AND FAILING TO DISCLOSE EXCLUSIONS EMBEDDED OR HIDDEN IN THE BODY OF ITS NON-STANDARD, PROPREITARY POLICY FORM WHICH WERE CONTRARY TO THE UNDERLYING COVERAGE AND CONTRARY TO STANDARD ISO EXCLUSIONS;**

To be clear, for the purposes of this Motion for Summary Judgment on Estoppel / Waiver **Plaintiffs are not asserting that Rockhill had a duty to read the underlying Admiral CGL policy and explain all the differences between its policy and the Admiral policy.** However, Plaintiffs are asserting that Rockhill had a duty to know the standard exclusions contained in the standard ISO CGL insurance policy that was used by Admiral for the underlying coverage and

that such Admiral policy therefore did not have a Subsidence Exclusion in it. (Facts #36, 61) With this knowledge, Rockhill had a duty to alert or notify Insight / J.M. Drilling that its policy contained a Subsidence Exclusion not contained in the underlying CGL policy (which was issued on a standard ISO policy form).

In order for Plaintiffs to prevail on this Estoppel / Waiver claim against Rockhill, Plaintiffs have the burden of proving that 1) Rockhill misrepresented the terms of its policy, and 2) Insight / J.M. Drilling reasonably relied on Rockhill's misrepresentation.  Plaintiffs embrace this burden and submit that the undisputed facts of this case prove just that.

James Mahurin, insurance expert retained by Insight in this matter, has testified that Insurance Industry custom and practice required Rockhill to disclose and notify Insight / J.M. Drilling that its non-standard, proprietary "follow form" policy (drafted by Rockhill) contained a non-standard subsidence exclusion in the body of its policy form that was not listed in the "Forms & Endorsement Schedule" of its 2015/1016 insurance quote (especially since Rockhill knew that J.M. Drilling's normal business operations involved boring, digging, and excavating and that a subsidence exclusion was of a particular importance to a company engaged in that particular business and knew of J.M. Drilling's contract with AT&T. (Facts #48-49, 61) Mahurin has testified that Rockhill failed in its disclosure responsibilities in this matter and engaged in deceptive practices that misrepresented the terms of its excess policy.

Plaintiffs insurance expert, Akos Swierkiewicz, agrees that Rockhill failed to comply with its disclosure responsibilities under insurance industry custom and practice when it failed to alert the involved parties as to the presence of the Subsidence Exclusion contained in its proposed/quoted excess policy.  (**Ex. 31**, p. 226, lines 5-17; p. 231, p. 232, line 2 – p. 236, line 24)

The expert testimony of these two well-qualified experts is undisputed on these points. Although Rockhill has retained its own insurance expert in this matter, Rockhill's expert rendered no opinion on this issue in her expert report and pursuant to the Federal Rules of Civil Procedure and the Scheduling Order of this Court is precluded from doing so, either now or at trial.

ROCKHILL'S KNOWLEDGE

At the time Rockhill quoted its excess coverage for the 2015/2016 policy year (year of Thibodeaux's accident), Rockhill knew that the underlying Admiral Policy was issued using a standard ISO CGL policy. It is undisputed that Rockhill knew, or should have known, that a Subsidence Exclusion is not found in a standard ISO CGL policy. Therefore, it was on notice that Admiral's policy did not contain a Subsidence Exclusion.

At all relevant times, Rockhill knew that JM Drilling was in the boring, digging and excavacting business. Rockhill has admitted that it knew that a Subsidence Exclusion (i.e. an exclusion that purports to exclude all work that results in movement of land or earth) was of particular importance to JM Drilling as it would exclude a substantial risk of their normal business operations.[1]

Rockhill knew that is own proprietary policy form was not a standard ISO insurance policy form. Rockhill knew that its own proprietary policy form contained a Subsidence Exclusion **embedded or hidden** in the body of its policy form and that its Subsidence Exclusion was not listed on the Forms & Endorsement Schedule which it attached to its insurance quote.

---

[1] In fact, as interpreted by Rockhill in its denial of coverage in this case, such subsidence exclusion would essentially exclude ALL of its normal operations. (Ex. 30, p. 24, line 16 – p. 28, line 2; p. 71, line 2 – p.72, line 6; p. 121, line 20 – p. 123, line 1)

Simply put, Rockhill knew that a Subsidence Exclusion was not suitable for JM Drilling's insurance package, it knew Admiral's policy did not have a Subsidence Exclusion, it knew its own policy did have a Subsidence Exclusion, and it knew that the presence of its Subsidence Exclusion was not identified on its insurance quote.

Plaintiffs submit that it is this knowledge that forms the support and basis behind:

1)   why Rockhill had a duty to disclose and notify Insight / JM Drilling of the presence of the Subsidence Exclusion in its policy; and

2)   why by not doing so it engaged in deceptive practices and clearly misrepresented the terms of its policy to Insight / J.M. Drilling.


FOLLOW FORM

Despite having the knowledge discussed above, Rockhill promoted its excess policy as providing "Commerical Follow Form" liability coverage on top of the underlying Admiral Policy. (Fact #60) That is how Rockhill described the coverage it was offering in its insurance quote and that is what it titled its policy.  Rockhill created and drafted its insurance quote and excess policy form (i.e. RIC 3700), both of which were directly within its field of expertise as an excess insurer.  It had exclusive control over the wording and structure of both.  It chose to use the words "Follow Form" in its representations to Insight / J.M. Drilling.  It chose to use its own non-standard, proprietary form (instead of a customary standard ISO insurance form).  It chose to structure its own policy form to where the Subsidence Exclusion was not a listed exclusion in the "Forms & Endorsement Schedule" that was attached to its quote.  Instead, Rockhill structured its policy such that the Subsidence Exclusion was embedded or hidden in the policy form, contrary to the ISO standard.

As recognized by the Tennessee Supreme court in *Bill Brown Construction*, Insight and/or J.M. Drilling had a valid right to expect coverage as promised and the doctrine of waiver and estoppel should be available to protect that interest. *Bill Brown Construction Co. v. Glens Falls Insurance Company, 818 S.W.2d 1 (Tenn. Supreme Court 1991).*

MISREPRESENTATION

The undisputed facts are clear that Rockhill did not fully disclose the terms of its non-standard, proprietary excess Commercial Follow Form Policy. Instead, Rockhill promoted its quoted excess policy as a "Follow Form" policy, while at the same time it knew that its own proprietary form contained an additional 27 undisclosed non-standard exclusions that were not listed on the Forms & Endorsement Schedule it attached to its insurance quote that was provided to Insight / J.M. Drilling.

Within the context of the Tennessee Supreme Court's analogous analysis in *Bill Brown Construction* of the persuasive nature of the law of sales' implied warranty of fitness in the context of sales of insurance contracts, it is crystal clear that Rockhill knew that when it offered its excess "Follow Form" policy, the policy did not follow form on this crucial, substantial subsidence risk; in other words **Rockhill offered an insurance policy to JM Drilling that it knew was unfit for JM Drilling's intended purpose.** *Id.*

The undisputed expert testimony in this case establishes that Rockhill engaged in deceptive practices and misrepresented the terms of its policy:

> "I [Mahurin] see it as somewhat pretending to be a follow form, and it has more exclusion than a standard form umbrella policy has in it. **I look at it as deception**...its being presented as a following form. It has more exclusions in it than a standard form umbrella policy would have in it. It has 27 exclusions in the body of the policy and has 15 more that are attached. [Emphasis Added]
> ***

18

"What they are doing, they are adding a lot more exclusions than you would have had if you had a standard form excess policy from a different source. **I look at what they have done as misleading and misrepresenting what they are selling.**" [Emphasis Added] (Ex. 26, p. 53, lines 5-22; p. 56, lines 1-12)

There is no contrary expert opinion / testimony or evidence on this point.

Insurance Industry custom and practice required Rockhill to disclose these non-standard exclusions on either the Forms & Endorsement Schedule of its insurance quote or specifically alert or notify Insight / JM Drilling of these exclusions through separate communications, simply furnishing the policy is not enough. (Fact #61)  By failing to disclose that it had 27 exclusions embedded in the body of its policy form that were beyond those found in standard ISO policies, including the subsidence exclusion, Rockhill misrepresented the terms of its excess policy (Fact #62).  Plaintiff submits these overt misrepresentations by Rockhill of the terms of its policy are the exact type of deceptive practices that the Estoppel / Waiver remedy are intended to prevent.

REASONABLE RELIANCE

Upon receipt of Rockhill's insurance quote for the 2015/2016 policy year, Insight's representative, Brenda Johnson, has testified she reviewed the quote and noted it was for "Follow Form" excess coverage.  She further reviewed the Forms & Endorsement Schedule of that quote and confirmed Subsidence Exclusion was not listed on that schedule. (Ex.25, p. 47, line 5 – p. 48, line 1)  She testified that customary practice in the Insurance Industry required the Subsidence Exclusion (a non-standard ISO exclusion in ISO policies) to be included in that Forms & Endorsement Schedule. (Ex. 25, p. 41, line 18 – p. 42, line 1)  Insight's testimony regarding this Insurance Industry customary practice is confirmed by Insight's expert, James Mahurin, whose opinions and testimony are undisputed on this point. (Fact #61)

Importantly, the year after Thibodeaux's accident, Rockhill quoted its excess liability coverage for the 2016/2017 policy year using a different policy form than in previous years (i.e.

this time it chose to use policy form CX 0001). (Fact #53) This time Rockhill's 2016/2017 quote

included an attached "Forms & Endorsement Schedule" which low and behold included

Subsidence Exclusion as a listed exclusion on that schedule. (Fact #54)  Upon receipt of the

2016/2017 Rockhill quote, Insight immediately requested that the Subsidence Exclusion be

removed from the Rockhill policy.  (Fact #55)  This request is clear proof that Insight relied on

Rockhill's 2015/2016 misrepresentation.  In other words, as soon as Rockhill cured the

misrepresentation and disclosed the Subsidence Exclusion on the Forms & Endorsement

Schedule it attached to its quote, Insight immediately addressed it and had it removed.

As confirmed by the undisputed expert testimony of Mahurin on this point, Insight's

reliance on Rockhill's misrepresentations (i.e. failures to disclose its non-standard exclusions,

including Subsidence Exclusion, embedded in its non-standard, proprietary excess policy form

which it promoted as being "Follow Form" coverage) was entirely appropriate and reasonable.

(Fact #63).

As noted by the Tennessee Supreme Court in *Bill Brown Construction*, technical

distinctions created by the insurer within its field of expertise and exclusive control should not

dictate the fortunes of innocent insureds who reasonably rely upon the misrepresentation of the

insurer. (CITE)  For these reasons and on this basis, Plaintiffs requests that this Court grant this

Motion for Summary Judgment Estopping Rockhill from denying coverage on the basis of its

subsidence exclusion.

II.     **IN THE ALTERNATIVE, ROCKHILL SHOULD BE ESTOPPED FROM
        DENYING COVERAGE ON THE BASIS OF ITS SUBSIDENCE EXCLUSION
        BECAUSE IT FAILED TO PROVIDE ITS NON-STANDARD, PROPRIETARY
        POLICY FORM TO INSIGHT AND/OR JM DRILLING WITH ITS INSURANCE
        QUOTE**

It is anticipated that Rockhill will attempt to argue that it attached its policy form to its insurance quote and forwarded same to its designee, Insurisk (its wholesale broker and agent). However, there are two fatal problems with such an argument:

1)      First, the undisputed insurance expert testimony in this case confirms that such act alone, i.e. Rockhill forwarding the policy without disclosing or alerting the parties of the presence of the non-standard subsidence exclusion it knew was embedded in its policy, is insufficient and does not satisfy its disclosure responsibilities to Insight / J.M. Drilling. (Fact #61); and

2)      Second, even assuming the Court does not grant Plaintiffs' Motion for Summary Judgment on the basis of #1, than in the alternative Plaintiffs highlight that the undisputed evidence in this case reveals that Rockhill did not forward its policy form to Insight. (Fact #45.1)  The only evidence Rockhill can pose is that Rockhill forwarded its policy form to Insurisk.  However, the duty owed by Rockhill was to Insight / J.M. Drilling, not Insurisk, and Plaintiffs submit that Rockhill can't delegate its duty away.

First, the undisputed insurance expert testimony in this case is that insurance industry customary practices required Rockhill to alert or notify Insight / J.M. Drilling that its non-standard proprietary excess policy contained non-standard exclusions, specifically the Subsidence Exclusion, embedded in its policy form, instead of being listing in the Forms & Endorsement schedule it attached to its insurance quote (as it would normally have been listed in a standard ISO policy). (Facts #43-44,46,48-49, 59, 60-62)  Although Rockhill has retained its own insurance expert in this matter, Rockhill's expert rendered no opinion on this issue in her expert report and pursuant to the Federal Rules of Civil Procedure and the Scheduling Order of this Court is precluded from doing so, either now or at trial.  Therefore, the expert testimony of James Mahurin, that the act of simply forwarding the policy alone (without disclosing or alerting the parties of the presence of the non-standard subsidence exclusion it knew was embedded in its policy, including the subsidence exclusion) is insufficient and does not satisfy its disclosure responsibilities to Insight / J.M. Drilling is undisputed. (Fact #61)

Second, in the alternative, Plaintiffs highlight for this Court that Insight's representative,
Brenda Johnson, has testified that when she received Rockhill's excess insurance quote the
actual policy form (i.e. RIC 3700) was not attached to Rockhill's quote. (Fact #45.1) Insight's
representative further testified that the only details regarding the quoted excess policy for the
2015/2016 policy year that was found in Rockhill's quote was contained on the actual quote
itself, representing that it was quoting and offering Commercial Follow Form Liability Coverage,
and the Exclusions found in the Forms & Endorsement Schedule Rockhill attached to its quote,
which did not contain the Subsidence Exclusion listed. (Facts #41-45.1)

The only assertion that Rockhill has made in this litigation to date is that it forwarded its
policy form associated with its 2015/2016 excess quote to its designee, Insurisk (i.e. its
wholesale broker). Despite such assertion, Insight (the retail agent) denies ever receiving the
policy form with the quote.  There is no affirmative evidence that Rockhill's designee ever
forwarded the policy form to Insight / J.M. Drilling with the 2015/2016 quote.

Plaintiffs submit that Rockhill should not be able to exculpate itself from its disclosure
duties / responsibilities to Insight / J.M. Drilling by delegating them away, particularly when the
lines of communication between Insight (retail agent), Insurisk (designee/wholesale broker) and
Rockhill (insurer) were structured to benefit Rockhill (i.e. per Rockhill's underwriter, Michael
Towell, this allowed Rockhill to avoid having to comply with multiple regulatory schemes in
different states (Ex. 20, p. 19, line 14 – p. 20, line 22)).   These lines of communication (inserting
Insurisk between Insight/J.M. Drilling and Rockhill) were required by Rockhill and benefited
Rockhill alone.  To the extent that Rockhill relied on its designee to fulfill Rockhill's own direct
disclosure duty to Insight, the risk of failure of that direct duty was Rockhill's, and Rockhill's
alone.

Under the applicable Insurance Industry custom and practice, Rockhill had a duty to disclose the terms of its own non-standard excess policy form to Insight / J.M. Drilling, specifically as it relates to the Subsidence Exclusion which Rockhill knew was of particular importance to JM Drilling as it would exclude a substantial risk of their normal business operations. (Fact #61)  It is undisputed that the Subsidence Exclusion was not listed on Rockhill's insurance quote, not listed in the Forms & Endorsement Schedule Rockhill chose to attach to its quote, and not identified in any separate communications forwarded by Rockhill to Insight / J.M. Drilling. (Facts #41-46)

Plaintiffs submit that Rockhill's failure to provide its own non-standard policy form to Insight / J.M. Drilling along with its 2015/2016 insurance quote constitutes clear negligence, deceptive practices, and/or misrepresentation that serves as an independent basis for a granting of this Motion for Summary Judgment finding that Rockhill is estopped from denying coverage on the basis of the Subsidence Exclusion because it failed to provide its non-standard, proprietary policy form (which was drafted by Rockhill) to Insight / J.M. Drilling with its insurance quote.

## CONCLUSION

Wherefore, for the foregoing reasons, the Thibodeaux Plaintiffs respectfully request that this Honorable Court grant their Motion for Summary Judgment on their Estoppel / Waiver Claim Against Rockhill Insurance Company Regarding the Subsidence Exclusion.  Further, Plaintiffs request that this Honorable Court order Rockhill Insurance Company to pay the remainder of the outstanding Final Judgment as referenced above.  Finally, Plaintiffs request that all costs associated with this hearing be assessed against Defendant, Rockhill Insurance Company..

And for all general and equitable relief, etc.

Respectfully Submitted,

/s/ Edward O. Taulbee, IV
/s/ Christopher E. Taulbee
Edward O. Taulbee, IV, LA Bar #12699
Christopher E. Taulbee, LA Bar #30753
1023 E. St. Mary Blvd.
Lafayette, LA 70503-2347
Phone: 337-269-5005
Fax:        337-269-5096
Email: etaulbee@taulbeelaw.com

/s/ Max Michael Menard
Max Michael Menard, LA Bar #22833
200 Church Street
P.O. Box 1196
Youngsville, LA 70592
Phone: 337-857-6123
Fax:    337-451-5707
Email: max@youngsvillelawyer.com

## CERTIFICATE

I hereby certify that a copy of the above and foregoing has this day been electronically mailed to all counsel of record.

Lafayette, Louisiana, this 24 day of March 2021.

/s/ Edward O. Taulbee
Edward O. Taulbee, IV.-#12669