PLAINTIFF'S EXHIBIT
17

15TH JUDICIAL DISTRICT COURT

PARISH OF LAFAYETTE

STATE OF LOUISIANA

JOHN THIBODEAUX AND AMY THIBODEAUX,

INDIVIDUALLY, AND ON THE BEHALF OF

THEIR MINOR DAUGHTER, GABRIELLE THIBODEAUX,

AND EMILY THIBODEAUX

VERSUS                          DOCKET NO: 2015-4167

GULFGATE CONSTRUCTION, LLC,

MILTON WATER SYSTEM, INC.,

AND WATER & WASTEWATER UTILITIES, INC.

**************************************************

1442 DEPOSITION OF

JM DRILLING, LLC,

THROUGH ITS REPRESENTATIVE, MARK MOORE

The deposition of MARK MOORE, as representative of JM DRILLING, LLC, was taken at the office of Mr. Melvin Eiden, 701 Robley Drive, Suite 210, Lafayette, Louisiana, on March 8, 2016, commencing at 9:30 a.m., before Jean M. Breaux, Certified Court Reporter.

JEAN M. BREAUX, C.C.R.
P.O. BOX 81862, LAFAYETTE, LA   70598
(337) 233-5536

ORIGINAL

1

A P P E A R A N C E S

REPRESENTING THE PLAINTIFFS:

MR. MAX MICHAEL MENARD

ATTORNEY AT LAW

200 CHURCH STREET

P.O. BOX 1196

YOUNGSVILLE, LA   70592

     and

MR. EDWARD O. TAULBEE, IV

TAULBEE LAW FIRM

100 ASMA BOULEVARD, SUITE 140

LAFAYETTE, LA   70508

REPRESENTING MILTON WATER SYSTEM, INC.:

MR. SCOTT RANEY

APPEARING FOR:   MR. MICHAEL D. LONEGRASS

GALLOWAY, JOHNSON, TOMPKINS, BURR & SMITH

ONE SHELL SQUARE

701 POYDRAS STREET, 40TH FLOOR

NEW ORLEANS, LA   70139

REPRESENTING GULFGATE CONSTRUCTION:

MS. JANICE REEVES

MARICLE & ASSOCIATES

111 UNITED PLAZA, SUITE 350

8545 UNITED PLACE BOULEVARD

BATON ROUGE, LA   70809

REPRESENTING WATER & WASTEWATER UTILITIES, INC:

MR. MAX J. COHEN

LOWE STEIN HOFFMAN ALLWEISS & HAUVER

ONE SHELL SQUARE

701 POYDRAS STREET, SUITE 3600

NEW ORLEANS, LA   70139

REPRESENTING JM DRILLING, LLC:

MR. MELVIN A. EIDEN

RABALAIS & HEBERT

701 ROBLEY DRIVE, SUITE 210

LAFAYETTE, LA   70503

ALSO PRESENT:

MR. JOHN THIBODEAUX, PLAINTIFF

I N D E X

PAGE NO.

EXAMINATION BY MR. TAULBEE................7, 145

EXAMINATION BY MR. COHEN.....................129

EXAMINATION BY MS. REEVES...................140

EXAMINATION BY MR. RANEY..............143, 151

JEAN M. BREAUX, C.C.R.
P.O. BOX 81862, LAFAYETTE, LA   70598         4
(337) 233-5536

E X H I B I T S

PAGE NO.

EXHIBIT NUMBER 1 IDENTIFIED...................30

EXHIBIT NUMBER 2 IDENTIFIED...................30

EXHIBIT NUMBER 3 IDENTIFIED...................37

EXHIBIT NUMBER 4 IDENTIFIED...................40

EXHIBIT NUMBER 5 IDENTIFIED...................40

EXHIBIT NUMBER 6 IDENTIFIED...................50

EXHIBIT NUMBER 7 IDENTIFIED...................50

EXHIBIT NUMBER 8 IDENTIFIED...................50

EXHIBIT NUMBER 9 IDENTIFIED...................50

EXHIBIT NUMBER 10 IDENTIFIED..................51

EXHIBIT NUMBER 11 IDENTIFIED..................57

EXHIBIT NUMBER 12, 13, 14 & 15 IDENTIFIED...60

EXHIBIT NUMBER 16 IDENTIFIED.................101

EXHIBIT NUMBER 17 & 18 IDENTIFIED..........113

EXHIBIT NUMBER 19 IDENTIFIED.................116

EXHIBIT NUMBER 20 IDENTIFIED.................150

S T I P U L A T I O N S

It is stipulated and agreed by and between counsel for the parties that the deposition of MARK MOORE, as representative of JM DRILLING, LLC, is hereby taken pursuant to notice, as authorized by the Louisiana Code of Civil Procedure.

That the witness waives the right to read and sign the deposition;

That all objections, save those as to the form of the question and the responsiveness of the answer, are reserved until such time as this deposition or any part thereof may be used or sought to be used in evidence;

That JEAN M. BREAUX, Certified Court Reporter, officiated in administering the oath to the above-mentioned witness.

PROCEEDINGS:

MARK MOORE,

AS REPRESENTATIVE OF JM DRILLING, LLC,

who, after having been duly sworn by the above-mentioned Court Reporter, was examined and testified as follows:

EXAMINATION BY MR. TAULBEE

BY MR. TAULBEE:

Q    Sir, my name is Edward Taulbee, and I have some questions for you today.

Would you tell me your name?

A    Mark Moore.

Q    "Moore"?

A    Moore.

Q    Okay.

MR. TAULBEE:

You have a very soft voice. I'm slightly hard of hearing. I need you to speak up, all right?

THE WITNESS:

Okay.

MR. TAULBEE:

And make sure that, that gentleman and over there can hear what you tell me, because everybody in the room is going

to be listening to you.  All right?

THE WITNESS:

Yes, sir.

BY MR. TAULBEE:

Q   How old are you, sir?

A   Thirty-nine.

Q   By whom are you employed?

A   JM Drilling.

Q   How long have you worked for JM Drilling?

A   Since 2011.

Q   Where do you reside?

A   Petal, Mississippi.

Q   P-E-T-A-L?

A   That's correct.

Q   What position do you presently hold with JM Drilling?

A   Manager.

Q   What are your duties as a manager?

A   I direct a crew, I lay out the jobs, hmm, pretty much just handle all the work, or anything -- you know, all the hands-on -- management type; everything but the administrative duties or accounting, that's work that I'm not involved in.

Q   All right.  How long have you held that

position?

A    Since 2012.

Q    What did you do for JM Drilling before 2012?

A    My first year, I was mostly just learning the business, did mostly the -- just hand work, and the drilling, just everything that the job entails.

Q    So, 2012, to now, you're the manager of JM Drilling Operations?

A    Uh-huh (yes), not the whole company, of course, there's several managers.

Q    Okay.  You are "a" manager?

A    A manager, yeah.

Q    Do you have a geographic region that you manage?

A    Usually I do everything in Louisiana and Southern Mississippi.

Q    How many other managers in co-equal positions does the company have?

A    Two.

Q    What are the geographic areas the other two managers deal with?

A    Hmm, they can -- pretty much all of us, we can all go different places.  So, there's,

uh -- we -- we are constantly bidding jobs. And they'll send me and my guys out to one section, and the other guys to other sections. It's not always territorial based, so -- but, usually, since I live in Hattiesburg -- or in Petal, you know, they -- they tend to give me the jobs that's closest to my home, and the other managers -- there's another manager that lives in Georgia, and another manager that lives in North Mississippi, so, usually whatever is closest is, uh -- is how they decide who goes where.

Q   Who is the Georgia manager at this time?

A   Danny Blythe.

Q   Say it again?

A   Danny Blythe.

Q   Spell his last name?

A   B-L-Y-T-H-E.

MR. TAULBEE:

You have a wonderful accent, it's a Mississippi accent. So, every once in a while, I'm not going to pick up what you tell me until I get used to your accent. Okay?

THE WITNESS:

Okay.

MR. EIDEN:

I think it's a Tennessee accent.

MR. TAULBEE:

I have a -- I have --

THE WITNESS:

Tennessee.

MR. TAULBEE:

All right, there you go.  North Mississippi, Tennessee.

MR. COHEN:

I'm from Memphis, so I'm sure I'm going to understand everything you say immediately.

BY MR. TAULBEE:

Q    All right.  Danny Blythe?

A    Yes, sir.

Q    How long has Mr. Blythe been a manager for JM Drilling?

A    Uh, I'd have to talk to the owner for that.  Hmm, it's been at least 15 years.

Q    All right.  North Mississippi, who is the manager there?

A    Kevin Elfring.

Q    Spell his last name?

A    E-F-F-R-I-N-G [sic].

Q    And how long has he been a manager?

A    I'm sorry, it's E-L-F-R-I-N-G.

Q    Got it.  How long has he been a manager?

A    Hmm, since 2013.

Q    Who preceded him for that geographic area?

A    Hmm, before him, we had a manager, his name was Scott Dowell (spelled phonetically), and he was -- he quit some -- sometime before -- before Kevin was hired.

Q    What is the business of JM Drilling?

A    We install fiber optic cable.

Q    And who are your primary customers?

A    AT&T.  And we also do work for -- we've done work for Verizon, uh -- and -- mostly -- mostly any company that involves fiber optics.  I -- I'd have to talk to, you know, the owner, to tell you exactly all the companies that we work for.  Ninety -- ninety percent of the work is AT&T.

Q    Thank you.  That's been the case for the last several years?

A    Yes, sir.

Q    Since your work for the company started,
in 2011, what states have you personally
worked in?

A    Louisiana, Alabama, Mississippi, Illinois.

Q    Since you've been a manager, what states
have you personally worked in?

A    The same.

Q    Since you've been a manager, has any other
manager operated a job in Louisiana other
than you?

A    Yes.

Q    Who would have operated jobs in Louisiana
other than you?

A    Kevin Elfring.

Q    Do you know how many jobs he had, other
than the ones you had, in Louisiana?

A    Hmm, sometimes me and Kevin work together.
He's -- he's actually a step above me, so,
sometimes we work together on a job,
especially the complicated ones, uh, like
this one was.  He actually helped me on
this job here.  So, hmm, usually, uh, if
it's a -- if it's, you know, something
that's a complicated job like this, we go
down together and, uh, we work together

for a couple of days, then he'll go back to his job, and then I'll handle things while he's gone.

Q    You told me earlier that there tended to be three co-equal managers, and now you just added a layer of "he's above" --

A    Well, we -- well, he's --

MR. TAULBEE:

Wait.  First off, I speak slowly. Some people say I think slowly, but I definitely speak slowly.

THE WITNESS:

Okay.

MR. TAULBEE:

You need to allow me to finish my question before you start answering, for two reasons:  One, the court reporter is taking down every word that is said.  And she's very good, but over time she's going to get tired of trying to track what you and I both say at the same time, and she might make a mistake.

THE WITNESS:

Okay.

MR. TAULBEE:

Secondly, a really good lawyer could change the question after you've said "yes", and it would not be fair to you. I'm not going to intentionally do that to you, but you need to let me finish. Okay?

THE WITNESS:

Okay.

BY MR. TAULBEE:

Q    Now, you have referenced there were three managers, and intended in your replies to indicate they were co-equal. You've now added a layer of "he was above me", or something like that, in reference to Mr. Elfring. Tell me what you meant by that?

A    Well, I never actually said we were all co-equal.

Q    I understand that now. So, tell me what you meant by "he's above me"?

A    He has more experience than I do.

Q    That's obvious. You've only been around a couple of years, he's been around many years.

A    Right.

Q    Is that it?

A    Basically, yeah.  Yeah, he's -- he's a little more experienced with, uh, complicated sets of plans and codes; and I'm a little bit better doing some things, working with the -- working with the crew. He's -- he's more of a superintendent -- superintendent type manager.  He, uh -- he, hmm -- he has some dealings with all the crews in the whole company.  If anybody ever has any questions, we usually go to Kevin.  He's the -- I would say he's the -- the smartest one of us, I guess, he's the most knowledgeable.

Q    On the operational side, amongst the managers, who is the top manager; Mr. Elfring?

A    Yeah, I would say.  I would say --

Q    As far as responsibility and knowledge?

A    Yes.  I would say so, yes.

Q    Mr. Elfring --

A    It would -- it would be a close race between him and Danny Blythe.  Danny -- Danny Blythe has been doing this since --

for 20, 30 years or so, he has probably more experience. But I would say Kevin is, uh -- as far as the technical aspects of the plans, and codes, and things of that sort, Kevin is the one that we go to, to ask questions.

Q   If we were to look at an organizational chart, and we have the three managers, is Mr. Elfring above you on that chart, or are y'all equal?

A   Hmm, yeah, I guess you would say he's -- he's above me, yes.

Q   Is Mr. Blythe above you?

A   Yes.

Q   Okay. If there's a dispute, a discussion, about how we're to do a job or what this set of plans means from the standpoint of what we are to do, if there's a disagreement between you and Mr. Elfring, Mr. Elfring wins every time?

A   Yeah.

Q   And if there's a dispute between you and Mr. Blythe, Mr. Blythe wins every time?

A   That's never -- that's never really occurred, but --

Q    I understand.

A    -- hypothetically --

Q    I'm asking how it works.

A    -- hypothetically speaking, hmm, if there was a disagreement, the owner would probably decide.

Q    As to reading plans and scoping a job out, would you defer to Mr. Elfring if he told you, "I don't think that's right, we need to do it this way"?

A    I would.

Q    Would you do the same thing to Mr. Blythe, defer?

A    I would.

Q    Okay.  Sir, tell me your educational background?

A    I have a -- about 150 credit hours at a university, but no degree.  I have had many classes, engineering, marketing, math, but, uh, that -- that's about it.

Q    Tell me your work experience before 2011?

A    I was a importer/exporter.  I imported Japanese equipment from Japan and Asia, and brought it over here and sold it until about 2008, when the economy crashed.

Q   What did you do between 2008 and 2011?

A   I went back to school.

Q   What school was that?

A   University of Tennessee at Martin.

Q   Why did you never gain a degree?

A.  Well, I have four classes left, and, uh, right before I was about to graduate, that's when I started working again, so, basically one day I hope to complete those four classes.

Q   What degree are you qualified to get if you complete four more hours?

A   Marketing.  I'm four classes away from my marketing degree, and approximately maybe ten classes away from an engineering degree.

Q   What type of equipment did you import?

A   Excavators.

Q   Prior to 2011, when you went to work in the field for JM, you had no experience in installing fiber optic cable, did you?

A   No.

Q   So, you spent a year or so learning in the field?

A   Yes.

Q    On a crew?

A    Yes.

Q    And then they put you in charge of
directing crews?

A    Yes.

Q    Who owns JM Drilling?

A    John Moore.

Q    What's your relationship to John Moore?

A    He's my father.

Q    I should have asked that earlier.

     All right.  So, with no disrespect at
all, the picture that I get is a son
that's returned to the family business
after a period of time of doing other
things; is that true?

A    That's correct.

Q    You're being groomed to take the business
over?

A    Yeah, between me and my -- I have two
other brothers.

Q    Do they work in the business?

A    No.

Q    It's going to be hard for them to take
their business over if they don't work
there.

A    That's what I told my dad.

Q    Okay.  So, when you referenced if there was a dispute between you and Mr. Elfring and Mr. Blythe maybe the owner would have to become involved, that means I've got to go to my dad and ask him who are you going to do this by, me or them?

A    Yes, that could be a strong possibility.

Q    All right, sir.
     Prior to the time that you worked on the job that we're here to talk about, how many jobs did you operate on your own?

A    Hmm, I would have to talk to the secretary about that, but it would be a hundred, many, several.

Q    Within the scope of the jobs that you had operated before the one we're here to discuss, where does this job fall in the complexity range?

A    Well, it's nothing really more complex about the -- the job in itself; it's, uh, usually when we install fiber optic cable, we're installing one -- one cable or two cables.  This one has us installing, I think, three or four in all the different

houses.  So, instead of just pulling one cable along the highway, we -- we were pulling three to four.  So, it's not really any different, hmm, once -- as far as drilling, it's still just one hole, but it's just the amount of pipes that we pull through, and making sure that each -- each cable goes to each house.

Q    Where did this job fall within the size of the projects of the hundred or so you had done before?

A    Somewhere in the middle.  It's not any bigger or any smaller than anything that I've done before.

Q    You were, in fact, in charge of the job at 114 Meadow Gate that included that Sawgrass Subdivision?

A    Yes.

Q    On a job such as this, how much time would you typically spend on the job site?  I'm not talking about this job, but this middle range set of jobs that you've alluded to, when you were in charge of a crew and in charge of a job, how much time would you spend at the job site as opposed

to the total length of time that the crew spent there?

A   It's a company policy that we have a manager on site with every crew pretty much at all times.

Q   Are you essentially the construction supervisor, the guy standing around in a white hat that doesn't have to pick up that much stuff, and makes sure everybody does their job?

A   I'd -- I'd say that's -- that's mostly accurate.

Q   So, on this particular job that included 114 Meadow Gate and the Sawgrass Subdivision that JM did for AT&T, it would be fair to say that on every day that there were operations, you were out there?

A   Yes.

Q   And would it be fair to say that with very minor exceptions, every day that a crew was operating you were with the crew all day long while they operated?

A   Yes.

Q   Do you have a memory of this job?

A   Yes.  I -- I work in a different place

every two weeks, so, hmm, I -- you know, I remember being there. As far as every single bore that we made, you know, I can't -- I can't speak as to, you know, everything we do. I'm in a -- I'm in a different town every two weeks, so.

Q    Why do you reference two weeks?

A    That's usually about how long it takes us to perform a job. Sometimes, hmm -- sometimes it takes us a month, sometimes it takes us, I don't know, three or four days, but.

Q    For a job of the type that is referenced in this lawsuit, that JM was performing, take me through the basic organizational steps necessary to take the job from a set of plans to the finish, for the scope of the work that was being done in Sawgrass Subdivision?

A    Okay. From the -- from the beginning point of having the plans in front of me and the owner saying that we've been awarded the job, assuming that that's taken place already, when I have the plans, the first thing I do is call 811,

and we get these tickets like -- like this (indicating). And my printer, I don't know why it printed it up crazy like that (indicating). But usually you have to call in each street one by one, and you get a locate ticket for each street. And, in this -- in this subdivision, there was many streets, so we had many call-ins. If it was just one highway, then we may drill for five miles or so, or two miles, and only have one ticket. But in this case we have several tickets because there's so many streets.

Q   The ticket you're referring is captioned "Louisiana One Call System"?

A   Yes, sir.

Q   It's been referenced in this lawsuit as a DOTTIE call, do you understand and recognize "DOTTIE"?

A   Yes.

Q   All right. So, the purpose of the call is to identify a work area, and ask DOTTIE to have everyone that's got buried stuff in that work area to come out and identify their buried stuff?

A     That's correct.

Q     All right.  What's the next step?

A     The next step, I go to the job and evaluate the soil conditions.  Hmm, I have to plan on -- we -- we use water to put in our water truck, to drill.  When we drill into the ground, they -- we have a water truck there to spray water through the drill.  So, I have to figure out how we're going to get water.  Sometimes we pump it from, uh, a lake, sometimes there's a ditch that's got water in there, and sometimes I have to go to the water company and get a water meter and hook onto a fire hydrant.  After I figure out the soil conditions and then the water, then I'll take, usually, one of my top two hands, and we'll get a locator and start locating the AT&T -- even though that we call the 811, AT&T don't locate their own cables or fibers if we're doing the job for AT&T, so we're responsible for locating all the AT&T cables.  And, usually, that -- that is, uh, a two-day process anyway, depending on how big the

job is.  It's a -- it's a -- it's a major part of the process of doing the job, is locating AT&T cables.

Q    All right.  What else, what's the next step?

A    The next step, after we get that, we have to make sure everything else is -- is located, and then we get all the machines. We have to have somebody, uh, a CDL driver, bring all the equipment out, which is a excavator, drill, the water truck, sometimes two excavators, and we get all the equipment there.  And then we get ready to drill.  We usually start off by dig -- drilling a -- or digging a bore pit.  Wherever we start, wherever the drill head goes in and wherever the drill head pops out, we'll dig a hole there. So, that way, we make sure that we're not drilling directly into anything that may not have been marked.  And, uh, that -- that's the process of drilling.

Q    Let me ask this question:  In this concept of drilling --

A    Uh-huh (yes).

Q    -- I understand that to some extent you can direct the drill head in one direction or the other?

A    Yes, sir.

Q    But if you're basically going to make a right turn, or a more or less right turn, what you would do is dig a pit on one end for the line to enter?

A    Uh-huh (yes).

Q    What do you call it?  It was a name.

A    A bore pit.

Q    Bore pit.

A    Uh-huh (yes).

Q    B-O-R-E?

A    Yeah.

Q    And then on the other end, before you make the right turn, you would dig another bore pit that would be mostly a straight line between the two bore pits, and then when you needed to turn off on the right-hand turn, you'd use the second bore pit to get lined up and make the right turn; is that true?

A    Yeah, basically.

Q    Okay.  So, if you had a section of line

that was going to make a right turn, you would generally have two bore pits, one on the start and then one at the place where the right turn was being made?

A   Yes.  We can turn and -- in mid drill, but as far as going down one street and then connecting with another street, there's no way to make such a sharp angle like that.

Q   Or, if you were coming down a utility easement and needed to turn right to go into the AT&T spot where everything was going to be connected, you'd drill a second bore pit so you could make that right turn into the AT&T; correct?

A   That's correct, yeah.  We can only turn slightly, you know, with the drill.  If we make any kind of major turns or anything, we have to dig another bore pit and start another bore.

Q   (Counsel draws diagram.)  Did I sort of show that correctly (indicating diagram), if we're going to make a right turn, there's two bore pits that have to be dug?

A   Yes, sir.

        MR. TAULBEE:

I'm going to identify that as Exhibit Number 2.

(EXHIBIT NO. 2 IDENTIFIED)

MR. TAULBEE:

I'm going to back up, and identify as Exhibit No. 1 the Deposition Notice.

(EXHIBIT NO. 1 IDENTIFIED)

MR. TAULBEE:

Thank you, sir.

BY MR. TAULBEE:

Q    All right.  Tell me this, you said in this list of things that you were going to do, you have to make sure everything is marked?

A    Yes, sir.

Q    What did you mean by that?

A    Hmm, as far as, uh -- as the AT&T cables and anything else that may possibly be in the ground.  Of course, we never know what's in there and what's not.  So, if we see evidence or we know something that is there and it's not marked, uh, then, uh, you know, we have to do our best to call 811 repeatedly or try to locate it ourselves.

Q   How would you know something is there if it's not marked? What would -- in your expertise, what would be the things that you would see that would tell you that there's something probably there that I need to be cautious about?

A   Hmm, uh, so, you might be familiar, uh, if you have gas to your house, there's a --

Q   I'm just a lawyer, I'm not familiar with any --

A   Well, like a gas riser, you'll see the little gray things --

Q   All right.

A   -- in somebody's yard. If you see one of those, then you usually know there's gas in the ground. Hmm, sometimes you'll see a little water box in front of people's homes.

Q   What's that?

A   It's like a water valve.

Q   Okay.

A   You'll see, like, a little blue or green box, sometimes it's round, sometimes they have them that stick up about this high (indicating). If you see that in

somebody's yard, you can pretty much bet that there's water -- there's a water line there. So, if we go to the job and we see a water valve, and there's no blue paint on the ground, then we know that the water company hasn't been there.

Q On this job -- I want to skip forward -- there was a sewage lift treatment plant -- I don't know the right word for it. Do you remember that?

MR. COHEN:

Lift station.

BY MR. TAULBEE:

Q Lift station. Do you remember that?

A I -- you know, I -- if that's the thing that was behind this wooden, you know, thing here, I seen the wooden fence, but I had no idea what was behind it.

Q Did you go check?

A No.

Q Why not?

A I'm not authorized to climb a fence.

Q Oh, come on.

A I don't -- I don't climb fences on a job.

Q Did it have a gate?

A    (Witness refers to photograph.)  There appears to be a gate there, yeah.

Q    Did you open the gate and look in?

A    No, I didn't.

Q    All right.  Well, in this concept of trying to make sure everything is marked, if you see something like that -- that fence back there, and you're going to be digging in the area of that fence, and all this equipment, wouldn't you want to try to figure out if that thing back there might have some underground line running to it?

A    If it had a sign on it that said, uh, "Lafayette Sewer System", I would have.

Q    Okay.  Now, are you telling me that in your work around subdivisions throughout Louisiana, you've never been on a site that had a sewage lift station on it that was fenced in on the utility site with all the other utilities; are you telling me that?

A    Say this again?

Q    Sure.  In the hundred or so projects that you've worked in your time as the manager,

are you telling me that on subdivisions you've never seen a fenced-in area for a sewage lift station on a lot that's dedicated for utility servitudes?

A    I can't say that I've never seen that --

Q    Okay.

A    -- but I've never been, uh -- I've never been responsible for having to locate sewer pipe, that's just -- that's just not our --

Q    Well, now you changed on me.

A    Okay, I --

Q    I appreciate -- I appreciate your --

A    I might have seen that, I might have seen one before.

Q    You knew it to be a sewer lift plant, sewer station, probably functioned and served by some kind of underground line, didn't you?

A    No.

Q    All right.  If I were to ask Mr. Blythe and Mr. Elfring if they had ever talked to you about sewage lift stations or you had ever talked to them about sewage lift stations, such that you knew what they

were, what were they going to tell me?

A    Sewage lift stations is not part of our business. We put in the fiber optics. The sewer company is responsible for locating the sewer lines. I -- I worry about what's in the ground next to where we drill. If there's, uh, any kind of thing behind a fence anywhere close, that's -- that's not anything that, uh, we -- we worry about.

Q    No, sir, that's not really what -- true, is it? You told me earlier that you had to be aware of certain objects that would indicate that things were likely buried in the ground so that you'd make sure that they were marked; true?

A    That's what I said, yes.

Q    All right. Isn't it true that you recognized that, that gated area on the back of the utility lot at 114 Meadow Gate was likely something that was served by underground lines; didn't you recognize that when you did this job?

A    No.

Q    Should you have?

A    Should I have?  Uh, no, probably not.
That's, uh -- I call 811, 811 calls the,
uh, utility companies, and that's, uh,
pretty much where my responsibility stops.
As far as what's behind fences, what's
behind gates, that's -- that's not --
that's not my responsibility.  I -- I
can't be responsible for what they put
behind a gate.  If they -- if they put a
sign there that said "Sewer Line Here", if
they had put marker posts that said "Sewer
Line Here" or anything in the ground,
anything notifying anything with a green
color, anything like that, then, yeah,
I would have -- I would have known that
it's, uh -- it's some kind of sewer
facility.  But, as you can see here
(indicating), that's just an old brown
fence, which could really be anything.  It
could be a dumpster back there where all
the houses or all the people that live in
the neighborhood dump their garbage.

Q    Did you see any evidence of people dumping
garage on that lot while you were out
there for those two weeks?

A    Not anymore than I seen any -- any evidence that it was a sewer plant.

MR. TAULBEE:

I'm going to identify as Exhibit Number 3 the photo you were describing to me.

(EXHIBIT NO. 3 IDENTIFIED)

BY MR. TAULBEE:

Q    Let's go back.  It is not your responsibility to know what's behind the fence; true?

A    True.

Q    It is your responsibility to check and make sure all underground lines are marked before you begin your dig process?

A    To the best of my ability, yes.

Q    And when you saw this fence on the back of 114 Meadow Gate, it rose to no question in your mind as to what was back there and would there be a underground line servicing it?

A    No.

Q    You knew this lot, 114 Meadow Gate, to be the service lot for all the equipment that served the neighborhood; true?

A    For what service?

Q    Well, Cox, and cable, telephone, this was the service utility lot for everything that was going to be tied into for the subdivision?

A    Well, there's many places out there with -- with hand holes and peds and stuff, that's not the only one.

Q    Thank you.

          MR. TAULBEE:

          That was not my question, so my job is to object to the responsiveness of your answer.

          THE WITNESS:

          Okay.

BY MR. TAULBEE:

Q    Now, we're going to back up.  You knew this lot -- where these hand holes and everything -- was dedicated to servitudes for services for the subdivision, when you performed the work in Sawgrass Subdivision; right?

A    I knew that these hand holes, (indicating), were serving the houses down those streets, yes.

Q    And by looking at the lot, you knew it was
     a lot that was not intended to be a lot
     for housing; right?

A    I -- I never -- I never posed that
     question to myself.  Hmm, for me, uh, I
     put the fiber in the ground where the
     plans say for it to go, that's, uh --
     that's mostly my -- my thought process
     when I'm doing the job.  Hmm, as far as
     what they were going to do with this piece
     of property, no, I didn't -- I didn't
     think about that.

Q    What does your plat say they're going to
     do with that piece of property, the plat
     you had when you spec'd this job and
     carried it out?

A    Let me find the plans.

          MR. EIDEN:

          I'm sorry.  Can you repeat that

          question, Ed?  I missed it.

BY MR. TAULBEE:

Q    What does the plat say about this lot?

A    (Witness reviews documents.)

Q    Let me make it easy for you.  I'm going to
     refer you to page 2 of 24.

A       Okay.   (Witness reviews document.)

MR. TAULBEE:

And I'm going to identify as Number 4,

that page 2 of 24, as produced by your

lawyer in this lawsuit.

(EXHIBIT NO. 4 IDENTIFIED)

MR. TAULBEE:

And I'm going to identify as 5, a

slightly enlarged portion of that

page, focusing on 114 Lot.

(EXHIBIT NO. 5 IDENTIFIED)

BY MR. TAULBEE:

Q       What does Lot 114 show to be on your plat?

A       A sewer lift station.

Q       No, it -- the lot is shown --

A       Oh, okay.   Okay, 114.

Q       -- as the -- as the easement area for all

the services; correct?

A       (Witness reviews document.)

Q       Can you read it enough to know --

A       Yeah.

Q       -- they're not going to build a house on

that lot?

A       Yeah, in this little -- this one little

section right here (indicating), yes.

Q    All right.  And what's shown in the back, where that brown fence would be in Exhibit Number 3?

A    A sewer lift station.

Q    All right.  You had these documents?

A    Yeah.

Q    It was your job to understand these documents?

A    Yeah.

Q    So, what we know you should have done, whether you did it or not, is, as you went out to this job site, before you ever stepped foot on this job, you knew that there was a sewer lift station on the back of the lot where the AT&T lines were going to be connected to some hand holes and a cabinet?

A    Yeah.  Well, since I had called 811 twice and, uh, reported that nothing had been located, there was no houses there, one would have to just assume that that was, uh, a future build project.  There was no -- nothing located on the ground, so, if there was any, uh -- if there was -- if there was something there, then it would

have been marked, so, one would have to assume that was just future construction.

Q   No, sir, that's not true.  You testified earlier that one of your jobs is to check and make sure everything has been marked by DOTTIE before you dig, because you need to make sure that you don't break them; right?

A   That's when I'm --

Q   Isn't that true, "yes" or "no", then you can explain it.

A   Yes.

Q   Thank you.  Now explain your answer if you'd like.

A   When we're drilling, I have to make sure everything has been located in the spots that we're drilling.  Like -- like I said, we would look for gas risers, we would look for, uh, sewer drains, we would look for water valves.

Q   Sewage lift stations?

A   Sewage lift station is -- is not something that's going to be in our -- our drill path.  The sewer companies locate the sewer lines that lead to the sewage

stations. So, as far as seeing a sewer station and -- and knowing that there's sewer lines, I mean, there's supposed to be sewer -- you know, they're supposed to have sewer lines everywhere.

Q   Yes, that's true. There's sewer lines everywhere; right?

A   Since there's no houses built there and there was no green marks on the ground, one would have to assume that they had not put any sewer lines in.

Q   That was your assumption?

A   That was my assumption, yes.

Q   And then it turned out that was the wrong assumption; correct? You know that to be the case?

A   No, I don't know that to be the case, because I don't know that we hit the thing, so.

Q   Did you know that there were sewer lines in the area that you were digging on this Lot 114, Meadow Gate?

A   No.

Q   You did not?

A   No.

Q    Were there any marks?

A    Absolutely no marks at all.

Q    We've gotten a little ahead of ourselves, so let's back up.

     You recognize that you have been designated as the corporate representative of the company to respond to a series of questions that I have posed in the Notice; true?

A    Yes.

Q    What work did you do in preparation for coming here today?

A    I looked over the plans a little bit, I printed off the 811 tickets to prove to you that we called 811 repeatedly, and that's about it.

Q    Okay.  Did you talk with anyone?

A    Only my lawyer.

     MR. EIDEN:

     Other than Counsel.

     MR. TAULBEE:

     Other than Counsel.  That's fine, yes.

BY MR. TAULBEE:

Q    No?

A    Uh-uh (no).

Q   What documents are generated by the company when a crew under your direction goes out to do a job such as this Sawgrass Subdivision?

A   The documents that are created on -- for -- for us to use or for us to -- are you saying, like, for billing purposes, or --

Q   I didn't limit it, all right.  That may be one of the answers.  But, what documents result from JM doing a job such as the one at Sawgrass?

A   I don't work in the office, so, the specifics of the paperwork, you -- I would have to get the secretary and the owner here.  I'm just a -- I'm the -- just a crew manager.

Q   Okay.

        MR. TAULBEE:

        Then I'm going to object to the responsiveness of the 1442 designee, and reserve my rights to require your company to provide someone who can respond to those questions, because I believe it is within the scope of the

Notice.

BY MR. TAULBEE:

Q   What documents do you generate in the field when you do this work, such as at Sawgrass, as the manager of the crew?

A   I just, uh, keep up with the time of my workers, what day we work. That's about it. And, if -- if we happen to need something, I write it down, and, you know, I'll send somebody to go get it. But other than that, I don't do a lot of paperwork. Mostly it's just materials list, you know, that's about the only paperwork that I have to do. I turn in the days and times that each worker works.

Q   Did you bring with you today the documents associated with the days worked on this job?

A   Yes, sir.

Q   Did you bring with you the documents associated with the crew members who worked the job?

A   Yes.

Q   What other documents did you bring with you?

A    I have the plans, I have 811 tickets, and
what you just mentioned, the documents of
the crew and the days that they worked,
the checks they were written, payment
records, and that's all.

Q    Would you hand me the documents that
you have dealing with the crews' hours
worked?

A    (Witness produces documents.)

Q    (Counsel reviews documents.)
     You've handed me a sequence of
documents.  The first one is summarized as
the week ending 2/14/2015?

A    Yes.

Q    What was the first day that your crew
worked in this subdivision, Sawgrass, on
any work associated with the AT&T project?

A    Let me see those (indicating).  The week
ended on 2/14, each man was paid six days.
Hmm, I'd have to look at my calendar, but
I'd have to assume we started work on
around the 8th.

Q    How do you know that for certain, not just
I have to look at my calendar, and I
assume?

A     Hmm -- (Witness reviews documents.)  Well, that -- that would have to be right.  Hmm, we don't work on Sundays, so if we paid our guys six days, so -- the week ended on 2/14, we had to start on the 8th.

Q     What day -- let's see.  Within the structure of what it is you do, when you start week ending on 2/14, what date is 2/14 every time?  Is it a Sunday, is it a Monday, is it a Saturday, is it a Friday, or you don't know?

A     Hmm, it's when she does the payroll.  Hmm, it's -- I see the -- it's here on my payment record, pay period from 2/01, 2/14.  Hmm, the secretary, I mean, she -- she does payrolls on different days, so, as far as the --

Q     What do --

A     -- as far as the reference for it, that's about all we have.

Q     What do you turn in from which she bills?

A     I just -- I send her a e-mail each week.

Q     Did you print those e-mails out for me and bring them in, so I'd know what day you actually worked out there?

A    No, I didn't.

Q    Do you have them?

A    Yeah, I --

Q    You have access?

A    Yeah, I'd have to retrieve them.  Yeah.

Q    So, what you just told me is that document that you have in front of you, that I'm going to identify as Number 6, which shows work ending 2/14/2015, covers a pay period of 2/1 to 2/14?

A    Right, correct.

Q    So, sometime in that 14 days, the men's names on that list worked six days; is that true?

A    Yeah, hmm, the second check here says pay period from 2/8 to 2/14, this one says from 2/1 to 14.  I'm thinking that's just the way she entered it in the computer. All the rest of them say 2/8 to 2/14.

Q    So, your best guess, although you don't have the source document, is your company began work around February 8, 2014 [sic], at Sawgrass?

A    Yes, sir.

Q    May I have the documents?

MR. COHEN:

Did you say --

MR. TAULBEE:

Excuse me, "2015".

If you're going to hand him documents out of your stack, let's make sure that they're in his stack (indicating), because I'm asking him as the corporate representative.

MR. EIDEN:

Yeah.

MR. TAULBEE:

May I have that?  Thank you very much.

I'll identify the one ending 2/14/15, as Number 6.

(EXHIBIT NO. 6 IDENTIFIED)

MR. TAULBEE:

The one ending 2/21/15, as Number 7.

(EXHIBIT NO. 7 IDENTIFIED)

MR. TAULBEE:

The one ending 2/28/15, as Number 8.

(EXHIBIT NO. 8 IDENTIFIED)

MR. TAULBEE:

3/7/15, as Number 9.

(EXHIBIT NO. 9 IDENTIFIED)

MR. TAULBEE:

3/14/15, as Number 10.

(EXHIBIT NO. 10 IDENTIFIED)

BY MR. TAULBEE:

Q    Now, I take it from looking at these documents you surmise, you believe, that your company worked at Sawgrass from 2/8/2015, through March 14, 2015?

A    Yes.

Q    And on the front page of Number 6, there's a series of five names. They look like first names?

A    Yes.

Q    Is that your crew?

A    Yes.

Q    Do you know their last names?

A    Yeah.

Q    All right. Why don't you tell me the last names of each -- or the names of each of the crew? If you'll go slowly, I'm going to try to write it down.

A    Some of the guys don't work for me anymore, it's a different crew. I'd have to get with the office to tell you that.

Q    Then I'm going to -- I'm going to stop

your deposition.

A    Yes.

Q    I don't think it does me any good to ask you questions that you say, "I don't know, and I can't find out, and I've got to check with the office".  Did you understand it was your responsibility to do all this before coming here, that you're the representative of the corporation?  I'm supposed to be speaking to a person that knows everything the corporation knows --

A    I'm trying to --

     MR. TAULBEE:

     Excuse me, sir.  I object to your interruption.

BY MR. TAULBEE:

Q    -- everything the corporation knows and speaking for the corporation on the points listed in this Notice; do you understand that?

A    Yes.

Q    And you're not doing that, are you?

A    I can tell you their last names.

Q    You had an epiphany in the period of time

that I was speaking?

MR. EIDEN:

I object to that.

MR. COHEN:

That's not what he said.

THE WITNESS:

I said I'll call for --

MR. COHEN:

He never said he didn't know their last names, he said he didn't know whether or not --

MR. TAULBEE:

I'd have to check with the office, is what he said.

MR. COHEN:

Not for their last names, but to see what -- where they were, is what he said.

BY MR. TAULBEE:

Q     All right.  Tell me their last names, each man's full name?

A     James B. Alexander.

Q     All right.

A     Jorge E. Garcia, that's spelled J-O-R-G-E.

Q     All right.

A       Myself, Mark L. Moore; Miguel H. Santana,

        Salvador Trejo --

        REPORTER:

        How do you spell that?

        THE WITNESS:

        His last name -- or his first name is

        S-A-L-V-A-D-O-R.  His last name,

        T-R-E-J-O.

BY MR. TAULBEE:

Q       Five crew members?

A       Yes.

Q       Is that the same crew that worked the
        entire period of time on this project?
        The other documents I have before me --
        let's ask about Document 7, ending on
        February 21, '15, was the crew the same?

A       (Witness reviews document.)  Yes.

Q       Document 8, ending February 28?

A       (Witness reviews document.)  We had a
        extra guy on this one.  Let's see.  Yeah,
        a different guy here (indicating).

Q       Who is that?

A       Hmm, his name is Noe R. Sanchez.

        REPORTER:

        What's the first name, sir?

THE WITNESS:

Noe, N-O-E, Noe R. Sanchez.

BY MR. TAULBEE:

Q    Did he replace one of the crew members or is he in addition to the previous crew members you identified?

A    Hmm, for that time he replaced Jorge.

Q    Number 9, ending on March 7, 2015, who were the crew members?  Were they changed or the same from the first week?

A    They're the same -- they're the -- different from the first week, but the same as the one I just read off.

Q    Same as February 28?

A    Yes.

Q    All right.  On March 14, who was the crew?

A    It was Everardo Bravo.

Q    Could you spell the first name?

A    E-V-E-R-A-R-D-O, last name Bravo, B-R-A-V-O.

Q    All right.

A    Second employee is James B. Alexander, myself, Mark L. Moore, and Miguel H. Santana.  Miguel is M-I-G-U-E-L.  Next was Noe, N-O-E, R. Sanchez, and Salvador

Trejo, lastly is Sixto Bautista,

S-I-X-T-O, B-A-U-T-I-S-T-A.

Q    Why were the crew members changing during

this period of time?

A    Uh, this was the last week.  Hmm, there's

different responsibilities for different

crew members; some -- some people drill.

And the last week is when we actually

install the fiber.  Before that, we

install conduit.  And the other two guys

were there to put the fiber inside the

conduit.  So, that's why there was

different -- different guys during the

last week.

Q    All right.  Sir, I want to go to Exhibit B

of the deposition notice, and ask you what

documents that you have.

     Number 3 is all documents, plans,

schematics, plats, photographs, videos,

showing the location of water, sewer, or

wastewater fluid lines at F-114 Meadow

Gate in relation to the cabinet box and

the hand hole box.  Do you have any

documents that would indicate that?

     MR. EIDEN:

He already said he had the plat.

THE WITNESS:   (CONTINUING)

A      Yeah, this is all I have (indicating).

BY MR. TAULBEE:

Q      All right.

A      That's provided by AT&T.   (Produces documents to Counsel.)

Q      And these are the contract plats that you perform the work off of?

A      Those are not really plats, those are just plans.   Plats, that's a term usually referred to -- as far as AT&T work, the plat is -- it just shows which cables are in the ground.   The plans indicate where the con... -- the new construction goes. A plat just shows old construction.

Q      I've got a -- the document you handed me, Exhibit Number 11, is it a plat or a plan?

A      It's a plan.

Q      All right.   Thanks.

(EXHIBIT NO. 11 IDENTIFIED)

BY MR. TAULBEE:

Q      Do you have any other documents regarding your work out there?

A      No.

Q    Do you have any photographs of the job?

A    No.

Q    Do you have any job tickets or job history
other than the payroll records you
provided me?

A    Just payroll and 811 tickets.

Q    What documents do you have, if any, that
would show the work that you did in any
given week?  Let's take the first week,
ending February 14, 2015.  What documents
do you have today that would show what
work was done by your crew that day --
that week?

A    None.

Q    Do you maintain any documents to show what
work is done on any given week, such as
the week ending February 14, 2015?

A    Not when it's not required by AT&T.

Q    Some people in various businesses -- I'm
familiar with the oil business -- keep a
tally book, where the guy, the supervisor
in charge, would write down, "We ran a
thousand feet of bore hole along Meadow
Gate Drive February 8 through 11"; do you
keep any kind of records --

A    No.

Q    -- like that?

A    (Witness shakes head negatively.)

Q    So, from your perspective, there's not a single document that would identify what work was done on any given day by you and your crew at this job on Sawgrass?

A    I can only tell you we worked on a job in Sawgrass on that day, but I can't tell you what street.

       MR. TAULBEE:

       I'm going to object to the responsiveness of your answer again.

BY MR. TAULBEE:

Q    I asked:  There's not a single document that would reflect what work was done on any given day in the project JM constructed at Sawgrass Subdivision for AT&T; is that true?

A    There is documents to tell you that we worked in the Sawgrass Subdivision; there is no documents to tell you exactly what street we worked on in the Sawgrass Subdivision.

Q    On any given day?

A    On any given day.

Q    Or what work was done?

A    Or what work was done on which street.  I can only tell you that we were -- we were working in Sawgrass Subdivision.

Q    So, if somebody were to say, "You were here, doing this, on a certain day", you couldn't dispute that by any document?

A    No.

Q    Sir, I'm going to show you four photographs that I'm going to identify in sequence as Number 12, 13, 14 and 15.

(EXHIBITS NO. 12, 13, 14 & 15 IDENTIFIED)

            MR. EIDEN:

            When you reach a good time for a break, let's take one, because he has his dog in the car.

            MR. TAULBEE:

            All right, let's stop.  We can take a break now.

                        (RECESS)

            MR. TAULBEE:

            Let's go back on the record.

BY MR. TAULBEE:

Q    Sir, I'm going to show you a series of

photographs marked 12 through 15.

MR. TAULBEE:

For Counsel, they're the same four we've used in other depositions.

BY MR. TAULBEE:

Q    These were taken only a few months ago, but I'm going to ask you, do you recognize these photographs as the work area associated with Lot 114 on your plat, or plan, whatever it is?

A    It looks like it corresponds with the plans.

Q    Would you look at all four photographs and tell me if it is what you remember to be the work area associated with Lot 114 at the Sawgrass Subdivision that you performed the work on?

A    I would have to drive out there to confirm.

Q    You have no memory?

A    I can't confirm it from looking at photos, no.

Q    You have no memory of the site?

A    It's a big subdivision.

Q    Yes, sir.

Tell me the scope of the work that JM was to perform at Sawgrass?

A    We put the fiber optic cables in the ground, and put them -- the ends of the cables in the hand holes.

Q    Did -- all right.  There were two hand hole boxes, according to the plans?

A    There's many hand holes.

Q    Okay.  There were two hand hole boxes on the AT&T subdivision associated with the cabinet box, that everything emanated from or went back to; correct?

A    I wouldn't say everything went into these particular hand holes.  There was a couple of different places inside the subdivision, hmm, where the cables come from and lead to.

Q    Okay.  Were there hand hole boxes at 114 Meadow Gate on the Sawgrass job?

A    Yes.

Q    There were two of them, right?

A    Yes.

Q    And there was a single AT&T cabinet box?

A    Yes.

Q    All right.  As shown in those photographs?

A    That's correct.

Q    Those photographs are consistent with what you know to have been planned and spec'd on the AT&T plans?

A    They're consistent, yes.

Q    I'm told that there's a descriptor F-1 and F-2 associated with fiber optics; one is the in-service line from some point outside the subdivision, and one is the distribution side within the subdivision; is that fair?

A    Yes.

Q    What work were you associated with?

A    Just exactly what you see here in those plans.

Q    Was it the distribution side or was it the input side from the source?

A    Hmm, there's a big cable, big fiber optic cable, that goes -- and if I may (referencing document.)  We are in charge of putting the fiber optics alongside the streets.  We didn't actually run the fiber optics into anybody's house.  We distributed it from the main boxes where there's a big fiber optic cable, and we

run it to smaller hand holes or peds alongside the street to each one's home.

Q So, the big fiber optic cable is the input side, it's the source coming from outside the subdivision; true?

A Correct, yes.

Q That big fiber optic cable terminated at 114 Meadow Gate, in one of those boxes?

A Hmm -- (Witness refers to document.)

Q Do you want to look at your entire set of plans?  I'll give you Exhibit Number 11.

A Yeah, that might help.

Q Let's be clear, your job was not to deal with the input side, the cable coming in from whatever source that was outside of that subdivision?

A That's correct.

Q Your job was to take whatever came in and then distribute it along the streets throughout the subdivision?

A That's correct, right.

Q Where did the one coming into the subdivision terminate?

A I do see a large fiber coming in from here (indicating), but that is not the -- it's

one that we put in.  So, the -- the main -- the main, uh -- the main fiber came in at a different location.  And I can maybe find it.  (Witness reviews documents.)

I would really need the cover sheet, to tell you exactly where it came in at the subdivision.  This is a -- I guess you could refer to it as a distribution area (indicating), but the main fiber that comes in to feed these boxes is one that we put in.  I would have to further study the plans to tell you which the main box is in the whole subdivision that fed this particular box (indicating); it's -- it's not the main distribution point for the fiber throughout the whole subdivision.

Q  All right, sir.  In response to my question, I estimate that you looked at Exhibit Number 11, the plans that you produced to me, for four to five minutes, and you cannot identify where the input side, the line coming from outside the subdivision to service the subdivision, terminates within the subdivision; is that

true?

A    If you allow me some time to get the cover sheet, I can retrieve it from my e-mail, and I can tell you that, maybe.

Q    Is it true that you couldn't find it in the period of time that you -- I referenced, looking at Exhibit Number 11?

A    I can't find it immediately, no.

Q    Okay.  I asked you to produce to me all the plans.  Exhibit Number 11 was represented in your earlier testimony to be just that.  You're now telling me there's something else out there?

A    Uh, the plans suggest, uh, information relative to a new construction; the input source, from whatever other job that put the, uh, the main fiber in, is -- is not part of the plans, it's -- it's old construction.

Q    Okay.  Now, I understand from other testimony that JM's job was not to bring the input side into the Sawgrass Subdivision; is that true?

A    That's correct.

Q    You were to meet that input side wherever

it terminated in Sawgrass Subdivision and then distribute it along the streets; true?

A    True.

Q    Where did you meet the input side --

A    Okay, that -- that --

Q    -- for Sawgrass?

A    I would have -- and this is a very complicated job with a bunch of cables. You would have to give me some time. If you allow me to, I could try to figure it out, but I can't immediately tell you that.

Q    So, there's two things you're telling me; one, I have no memory of where the input side was met for this job, based upon my six weeks of work out there; that's the first thing you're telling me?

A    True.

Q    Okay. And, secondly, looking at Exhibit Number 11, you can't identify where it is your company had to meet the input side, from those plans?

A    Not immediately.

Q    Why is that?

A    It's very complicated.  You can try.

Q    I can, but I'm asking you.

A    Yeah, if -- if you'll allow me the time,
I -- I can, uh --

Q    How much time do you need, sir?  You're --
how much time do you need, sir?  You are
apparently familiar with these plans,
because you did the work?

A    Yes.

Q    How much time do you need to answer my
question as to where it is your company
met the input side of the cable to begin
your work in this Sawgrass Subdivision
represented by Exhibit Number 11?

A    Hmm, maybe about 15 minutes.

Q    You got it.  The time is now 11 -- pardon
me, 10:53.  I'll give you 15 minutes.

        MR. TAULBEE:

        We'll break while the witness refers

        to the plans, and if he comes back

        early, we'll reconvene.

        I would ask that Counsel not

        discuss with the witness any

        knowledge --

        MR. EIDEN:

There's a pending question.

MR. TAULBEE:

-- regarding answer to the question.

MR. EIDEN:

It's not my first rodeo.

MR. TAULBEE:

I just asked, I didn't say anything.

(RECESS)

MR. TAULBEE:

Let's go back on the record.

BY MR. TAULBEE:

Q    Sir, we paused for about 15 minutes and you've reviewed the plans; is that true?

A    Yes.

Q    Do you have an answer to my question?

A    Yes, this is the entry point (indicating).

Q    What is?

A    The -- on page 2 of 24, Exhibit 11.

Q    All right.  So, what -- after your review of the documents, what we know is that the in-stream side, the service side, came into the subdivision and was terminated on Lot 114; correct?

A    Yes.

Q    All right.  And, from that spot, your

company's job was to do the distribution out into the subdivision?

A    That's correct.

Q    All right.  Along the streets, as you said?

A    Yeah; uh, also there was -- there's one cable that was already there, they're already -- there's two hand holes here (indicating), that was already there, existing hand holes.  We added everything that's in dark print.  There was already one cable that was there, Number 30, that was already there and went along the street --

Q    Okay.  Was that --

A    -- so that there was some already --

Q    Was that the input service side coming into the Box Number 30?

A    Uh-uh (no).

Q    You have no idea what that was for?

A    Number 30 went -- is -- if you give me a second, I'll tell you where -- where down the street it went.  (Witness reviews documents.)  It, uh, went to somebody's house.

Q   Other than Number 30, JM Drilling's job
    was to take service from 114 Meadow Gate
    and distribute it along every street of
    the subdivision; true?

A   That's correct.  Yes.

Q   To do that, JM connected one or more
    service cables, fiber optic cables, to the
    hand hole boxes shown on page 2 of Exhibit
    Number 11?

A   Correct.

Q   Sir, for the purposes of our conversation,
    I'm going to identify the two hand hole
    boxes as "Number 1" and "Number 2" on the
    Exhibit Number 5.  Do you see that, what
    I've done (indicating)?

A   Yes, sir.

Q   All right.  So, as you are standing on top
    of the AT&T cabinet box, looking toward
    Meadow Gate Drive, Number 1 Hand Hole is
    on your right, and Number 2 Hand Hole is
    on your left; correct?

A   Correct.

Q   How many cables, fiber optic cables, did
    your company attach to Hand Hole Number 1?

A   Hand Hole Number 1, on the right side,

Number 65 [sic], is one cable.

Q   That's it?

A   Yes.

Q   All right.  So, that cable came from the hand hole box out toward Meadow Gate and took a right-hand turn?

A   That's correct.

Q   What is the size of the cable in Hand Hole Box Number 1 that your company installed?

A   It's a 432.

Q   Does that have a meaning to you?

A   Yeah, there is 432 strips of fiber inside the cable.

Q   What is the general diameter of that cable?

A   Uh, generally, it's -- (indicating).  Uh, I guess you'd say the diameter is an inch, inch diameter.

Q   How did you prepare to make the right-hand turn, once the cable left Hand Hole Box Number 1 and had to make the right-hand turn to the right, for the 432 cable?

A   Hmm, we dug out, uh, a few feet before making a turn, we set the drill alongside to drill parallel along with the road, but

we had to dig maybe three or four feet -- we had to dig up under to be able to put the piece of conduit up under the hand hole. So, we had to dig with the excavator from the hand hole to the street, approximately five, six feet.

Q  So, as regards hand Hole Number 1, at some time in this project, your company dug with an excavator from Hand Hole Number 1 out toward the street, a distance?

A  Yes.

Q  And laid 432 cable --

A  That's correct.

Q  -- in the bottom of the hole?

A  That's correct.

Q  Okay. At the area where the right-hand turn was to be made, your company dug one of these bore pits we discussed earlier in Exhibit Number 2, so that you could position your boring equipment to go off to the right?

A  That's correct.

Q  So, what we know, to do the work for Hand Hole Number 1, you would have dug that trench we referred to, and nearer the

street you would have dug a bore pit to make the right-hand turn?

A   That's correct.

Q   How deep was the trench that would have been dug from Hand Hole Number 1 to the bore pit?

A   AT&T has a requirement of 36 inches.

Q   For what?

A   For all buried cable.

Q   All right.  So, the cable has to be at least 36 inches below the ground?

A   That's correct.

Q   Which means you would have dug your trench from the hand hole to the bore pit at what depth?

A   Thirty-six inches, or more, might -- we'll say thirty to -- thirty-six to thirty-eight inches.

Q   All right.  Did somebody measure it or you eyeball it?

A   Yes, we measured it.

Q   So, out toward the street, associated with Hand Hole Number 1 there would have been a bore pit, and we'll call it Bore Pit Number 1; right?

A    Yes.

Q    (Counsel labels document.)   Did I label that correctly on Exhibit Number 5?

A    (Witness reviews document.)   Yeah.

Q    Okay.   Were there any other connections that your company would have made to Hand Hole Number 1?

A    Only one.

Q    Only that one we discussed?

A    That's correct.

Q    A single 432 cable?

A    That's correct.

Q    All right.   How many cables were connected by your company to Hand Hole Number 2?   Do you want to look at a blow-up?

A    I've got it right here.

Q    All right.

A    (Witness reviews document.)   Three.

Q    What were the size of the three cables that were connected to Hand Hole Number 2?

A    A 6, a 12, and a 360.

Q    Okay.   What does "360" refer to?

A    Three hundred sixty pairs of -- or three hundred sixty fibers in the cable.

Q    What would be the general diameter of such

a cable?

A    Slightly smaller than the 432.

Q    So, near an inch?

A    Yes.

Q    The "12", what does that refer to?

A    The same.  It would be, uh, a half-inch diameter, roughly.

Q    And the 6?

A    It's about the same size.

Q    Half-inch?

A    Yes.

Q    So, those cables would have left Hand Hole Number 2 going toward the street and made a left turn --

A    Yeah.

Q    -- from our perspective earlier?

A    And there was one that was already -- already there, Number 30, a pre -- a existing cable.

Q    Do you know who laid that?

A    No, I can't tell you when -- I mean, uh, who laid it.  Sometimes it tells us when; and, in this case, it doesn't.

Q    All right.  So, the three cables that were laid by JM would have left Hand Hole

Number 2, proceeded toward the street a distance, and made a left turn; correct?

A   Correct.

Q   Would the same process have been followed for those three cables; in other words, a trench from Hand Hole Number 2 toward the street?

A   Yes.

Q   And then a bore pit, uh, nearer the street, from which the right -- the left turn could be made?

A   Yes.

Q   All right.  What would the size of the bore pit be in order to facilitate the right turn from Hand Hole Number 1?

A   Roughly three-feet by three-feet.

Q   By three-feet?

A   Yes.

Q   So, there's three dimensions, right?

A   Yeah.

Q   -- depth, width --

A   Yes.

Q   All right.  So, three-feet by three-feet by three-feet, give or take a little bit on the depth?

A    Correct.

Q    All right.  And Bore Pit Number 2 would have been three-feet by three-feet by three-feet, give a little take -- give or take a little bit on the depth?

A    That's correct.

Q    Can you tell how far away from the street the bore pits would have ended up?

A    (Witness has no response.)

Q    Do you understand my question?

A    Yes.

Q    Meadow Gate Drive was in place at the time you did this work; correct?

A    Correct.

Q    Okay.  So, how close was the bore pit to Meadow Gate Drive?

A    Approximately 34 feet from the center line of Meadow Gate Drive.

Q    And that's the dimension shown on Page 2 of Exhibit 11?

A    That's correct.

Q    And is that "34" that I'm referencing right here (indicating)?

A    Yes.

Q    Is that correct?

A      That's correct.

Q      I'm going to circle the "34", just so
we'll know that that's the distance,
approximate distance, from the center line
of the street that the center point of
your bore pit would have been?

A      Correct.

Q      So, the edge of the bore pit would have
been a little bit closer?

A      Correct.

Q      Did I label Bore Pit 1 and Bore Pit 2
correctly, and put them down on the
diagram where they should be?

A      (Witness reviews document.)   Yes.

Q      Did I correctly identify the 34-foot
number that we're referencing?

A      Yes.

Q      Thank you.   And that's all on Exhibit
Number 5; correct?

A      Correct.

Q      Within the organization of the work to
complete this job, do you have any
knowledge, direct knowledge, on this job,
as to when the connections to Hand Hole 1
was done?

A    No.

Q    Do you have any direct knowledge as to the connections between -- or to Hand Hole Number 2, when it was done?

A    I don't have any direct knowledge, any -- anything written down or anything, no.

Q    There was a word used earlier, "interduct" [sic]; do you recognize that?

A    Yes.

(NOTE: SPELLED "INNERDUCT" ON EXHIBIT DOCUMENTS)

BY MR. TAULBEE:

Q    That's a pipe that the cable can go through, sort of a chase pipe?

A    Yes.

Q    With the connection to Hand Hole Number 1, was an innerduct used from the hand hole to Bore Pit 1?

A    Yes.

Q    And as you made the right-hand turn and left Bore Pit 1, was an innerduct used?

A    Yes.

Q    Tell me the process? We talked about from the hand hole to Bore Pit 1 was a trench; right?

A    Yes.