# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

| | | |
|---|---|---|
| JOHN THIBODEAUX, ET AL., | ) | NO. 6:18-CV-501 (LEAD) |
| | ) | |
| V. | ) | |
| | ) | |
| J.M. DRILLING, LLC, ADMIRAL | ) | |
| INSURANCE COMPANY, ROCKHILL | ) | |
| INSURANCE COMPANY, AND | ) | |
| BELLSOUTH TELECOMMUNICATIONS | ) | |
| LLC | ) | |
| | ) | |
| | ) | |
| | ) | |
| ROCKHILL INSURANCE COMPANY, | ) | NO. 6:18-CV-1414 (MEMBER) |
| | ) | |
| V. | ) | |
| | ) | JUDGE ROBERT R. SUMMERHAYS |
| J.M. DRILLING, LLC | ) | MAGISTRATE JUDGE CAROL B. |
| | ) | WHITEHURST |

---

### ROCKHILL INSURANCE COMPANY'S MEMORANDUM IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (DOC. 215)

---

Plaintiff-Defendant Rockhill Insurance Company ("Rockhill"), by and through its undersigned counsel, respectfully submits this Memorandum in Support of its Cross-Motion for Summary Judgment against Defendant J.M. Drilling, LLC ("JM Drilling") and Plaintiffs John Thibodeaux, Amy Thibodeaux, Gabrielle Thibodeaux, and Emily Thibodeaux ("Plaintiffs"), and its Opposition to Plaintiffs' Motion for Summary Judgment on Insurance Coverage (Doc. 215).

## TABLE OF CONTENTS

TABLE OF AUTHORITES ................................................................................ iii

I.   INTRODUCTION ..................................................................................1

II.  SUMMARY OF UNDISPUTED FACTS .............................................2

     A.   The Rockhill Insurance Policy at Issue in this Litigation .........................2

     B.   The Underlying Lawsuit ....................................................................3

III. SUMMARY JUDGMENT STANDARD ...............................................5

IV.  ARGUMENT ........................................................................................5

     A.   The Subsidence Exclusion Bars Coverage for the Underlying
          Lawsuit...............................................................................................6

          1.   The Subsidence Exclusion Clearly and Unambiguously
               Applies to the Allegations of Injury Due to Shifting Land in
               the Underlying Lawsuit...............................................................6

               a)   The Underlying Lawsuit Alleges Liability Arising
                    out of Subsidence. ..........................................................6

               b)   The Underlying Lawsuit also Alleges Subsidence
                    that Emanated from JM Drilling's Operations................7

               c)   Plaintiffs' Interpretation of the Subsidence
                    Exclusion Is Unsupported by Unambiguous Policy
                    Language. ........................................................................8

          2.   Plaintiffs Cannot Avoid Application of the Subsidence
               Exclusion by way of the Concurrent Causation Doctrine...........8

               a)   The Subsidence Exclusion Contains Anti-
                    Concurrent Causation Language that Precludes
                    Application of the Concurrent Causation Doctrine. .......9

               b)   Subsidence Was the Predominate and Substantial
                    Factor Causing Thibodeaux's Injury. ...........................11

               c)   Plaintiffs' "Chain of Events" Theory
                    Mischaracterizes the Substantial Factor Test Used
                    by Courts Analyzing Whether the Concurrent
                    Causation Doctrine Applies. ........................................14

i

d)     Tennessee Law Does Not Require ACC Language for an Exclusion to Apply. ...............................................................15

3.     Plaintiffs' Contention that the Subsidence Exclusion is "Ambiguous" is Without Merit..................................................16

a)     The Issue of Whether the Subsidence Exclusion Has ACC Language Cannot Create an Ambiguity. ...........................16

b)     The Word "Operations" Does Not Create a Temporal Ambiguity...................................................................17

c)     The Subsidence Exclusion Is Not Overly Broad. ..........................18

B.     The Residential Construction Exclusion Also Bars Coverage for the Underlying Lawsuit...............................................................................20

C.     Rockhill Is Entitled to Summary Judgment on Plaintiffs' and JM Drillings' Long-Shot Reformation and Estoppel Theories to Avoid the Clear Applicability of the Subsidence Exclusion. ............................................22

1.     Plaintiffs and JM Drilling Cannot Meet Their Heavy Burden of Proving the Rockhill Policy Should be "Reformed" to Delete the Subsidence Exclusion. .....................................22

a)     JM Drilling and Rockhill Did Not Mutually Agree or Intend for the Rockhill Policy to Provide Coverage for Liability Arising out of Subsidence. ........................23

b)     Any Mistake Regarding the Rockhill Scope of Coverage Necessarily Resulted from JM Drilling's Gross Negligence. .........................................................26

2.     Rockhill Cannot be Estopped from Denying Coverage Because There Is No Evidence of Fraud, Misconduct, or Negligence. ..............................................................................28

D.     If the Rockhill Policy Did Provide Coverage, it Would Only Apply Excess of the Primary Admiral Policy's $2 Million Aggregate Limit..........................................................................................................29

V.     CONCLUSION..................................................................................................30

## TABLE OF AUTHORITIES

*Admiral Ins. Co. v. Joy Contractors, Inc*., 972 N.E.2d 106, 109 (N.Y. 2012) ..............................21

*Allstate Ins. Co. v. Watts*, 811 S.W.2d 883 (Tenn. 1991)....................................................12, 13, 14

*Artist Bldg. Partners v. Auto-Owners Mut. Ins. Co*., 435 S.W.3d 202 (Tenn. Ct. App. 2013) .....19

*Am. States Ins. Co. v. Delean's Tile & Marble, LLC*,
319 P.3d 38, 41 (Wash. App. Ct. 2013).................................................................................21

*Auto-Owners Ins. Co. v. England*, 3:10-CV-118,
2013 WL 3423817 (E.D. Tenn. 2013) ........................................................................11, 12, 13, 14

*Berkshire Hathaway Homestate Ins. Co. v. SQI, Inc*.,
132 F. Supp. 3d 1275 (W.D. Wash. 2015)...............................................................................21

*Blackhawk Corp. v. Gotham Ins. Co.*, 63 Cal. App. 4th 1090, 1094–95 .........................................7

*Buchholz v. Tennessee Farmers Life Co*., 145 S.W.3d 80 (Tenn. Ct. App. 2003) ........................28

*C.T. Traina, Inc. v. Sunshine Plaza, Inc*., 861 So. 2d 156, 159 (La. 2003) ...................................29

*Capital Indem. Corp. v. Braxton*, 24 Fed. Appx. 434 (6th Cir. 2001)....................................11, 13

*Cincinnati Ins. Co. v. Fred S. Post, Jr., Co.*, 747 S.W.2d 777, 781 (Tenn. 1988)........................22

*Davidson Hotel Co. v. St. Paul Fire & Marine Ins. Co.*,
136 F. Supp. 2d 901 (W.D. Tenn. 2001)...................................................................................5

*Davis v. United Services Auto. Assn*., 273 Cal. Rptr. 224 (Cal. Ct. App. 1990)...........................14

*Federal Ins. Co. v. Olawuni*, 539 F. Supp. 2d 63 (D.D.C. 2008) ....................................................7

*Garrison v. Bickford*, 377 S.W.3d 659 (Tenn. 2012) ....................................................................19

*Goodman v. Fireman's Fund Ins. Co*., 600 F.2d 1040 (4th Cir. 1979) .........................................14

*Hardy & Kelly LLC v. QBE Ins. Corp.*, 3-11-0155, 2012 WL 1744670 (M.D. Tenn. 2012)........15

*Hunters Ridge Condo. Ass'n. v. Sherwood Crossing, LLC*, 395 P.3d 896 (Or. App. 2017) .........21

*Kane v. Royal Ins. Co. of Am.*, 768 P.2d 678 (Colo. 1989) ..........................................................10

*Johnson & Assocs., LLC v. Hanover Ins. Grp., Inc.*,
572 S.W.3d 636 (Tenn. Ct. App. 2018)..............................................................................27, 28

*Merrimack Mut. Fire Ins. Co. v. Batts*, 59 S.W.3d 142 (Tenn. Ct. App. 2001) .......................5, 16

*Moore v. Moore*, 2020 WL 2511234 (Tenn. Ct. App. 2020).....................................................23, 26

*Planet Rock, Inc. v. Regis Ins. Co*., 6 S.W.3d 484 (Tenn. Ct. App. 1999) ....................................14

*Shapell Indus., Inc. v. Assoc. Int'l Ins., Inc.*, 2002 WL 31430620 (Cal. Ct. App. 2002) ...............7

*Sherwood v. Kelido, Inc.*, 2009 WL 1010988, at *4 (N.J. Ct. App. 2009) ......................................7

*Sikora v. Vanderploeg*, 212 S.W.3d 277 (Tenn. Ct. App. 2006) ....................................................22

*Ski Chalet Village Owners Club, Inc. v. Employers Mut. Cas. Co*., 3:16-CV-20-TAV-HBG, 2016 WL 6892759 (E.D. Tenn. 2016) ....................................................9

*S. Tr. Ins. Co. v. Phillips*, 474 S.W.3d 660 (Tenn. Ct. App. 2015) ...............................................17

21 Tᴇɴɴ. Pʀᴀᴄ. Cᴏɴᴛʀᴀᴄᴛ Lᴀᴡ & Pʀᴀᴄᴛɪᴄᴇ.................................................................................23

*Thibodeaux et al. v. Gulfgate Construction, LLC, et al.*, No. 2015416 (Parish of Lafayette La.) .......................................................................................1

*Tomlinson v. Bituminous Cas. Corp.*, No. 96–5944, 1997 WL 397248 (6th Cir. 1997) .............5, 8

*Tucker v. Tennessee*, 539 F.3d 526 (6th Cir. 2008) .......................................................................5

*Yogi's Primopromo LLC v. Nationwide Gen. Ins. Co.*, 1:18-CV-00313, 2020 WL 6365509 (E.D. Tenn. 2020)............................................................15

## I.      INTRODUCTION

This consolidated action concerns a dispute over whether a Rockhill excess insurance policy ("Rockhill Policy") issued to JM Drilling provides coverage for JM Drilling's liability in an underlying lawsuit captioned *Thibodeaux et al. v. Gulfgate Construction, LLC, et al.*, No. 2015416 (Parish of Lafayette La.) ("Underlying Lawsuit").   In that lawsuit, the trial and appellate courts found that JM Drilling's negligent drilling on a residential subdivision's utility lot caused the subsidence of soil (*i.e.*, a sinkhole) and that plaintiff John Thibodeaux sustained injuries when he fell into that sinkhole.   Rockhill is entitled to a declaration that it owes no coverage to JM Drilling in connection with the Underlying Lawsuit.

The Rockhill Policy contains a subsidence exclusion that unambiguously bars coverage for "any liability" on the part of JM Drilling that *directly or indirectly* arises out of, among other things, subsidence, sinking, caving in, shifting, or any other movement of land ("Subsidence Exclusion").   JM Drilling and Plaintiffs cannot reasonably dispute that the Subsidence Exclusion applies squarely to the facts alleged in the Underlying Lawsuit, which alleges JM Drilling was liable for an incident involving subsidence, sinking, caving in, shifting, or any other movement of land.   Additionally, the Rockhill Policy's residential construction exclusion, which bars coverage for any loss arising out of liability for construction "involving property intended in whole or in part for residential habitation," applies to Plaintiffs' claim, since JM Drilling was performing "residential construction" as defined by the Policy at the time of its negligence.

In an effort to circumvent the obvious application of these exclusions, particularly the Subsidence Exclusion, Plaintiffs and JM Drilling have asserted reformation and estoppel claims against Rockhill.[1]   Rockhill is entitled to summary judgment on these claims as well.   In their

---

[1] JM Drilling and Plaintiffs raised reformation and estoppel claims in their pleadings, but Plaintiffs did not move for summary judgment on these claims in their first motion for summary judgment.

1

reformation claim, Plaintiffs and JM Drilling request this Court grant the *extraordinary* relief of deleting the Subsidence Exclusion out of the Rockhill Policy.  However, Plaintiffs and JM Drilling cannot meet their high burden of demonstrating Rockhill and JM Drilling mutually intended for the policy to cover subsidence (in fact, the evidence proves the opposite).  Their estoppel claim is equally without merit, since there is no evidence of fraud, misconduct, or negligence by Rockhill or its agent.  Therefore, Rockhill is entitled to summary judgment on reformation and estoppel.

For the reasons discussed in more detail below, Rockhill is entitled to a summary judgement finding that Rockhill has no coverage obligations to JM Drilling in connection with the Underlying Lawsuit.[2]

## II.     SUMMARY OF UNDISPUTED FACTS

### A.     The Rockhill Insurance Policy at Issue in this Litigation

Rockhill issued excess insurance policies to JM Drilling incepting each year between 2011 and 2015.  (SUF at ¶¶ 1-5).[3]  The only policy at issue in this litigation is the policy that Rockhill issued to JM Drilling in 2015 (Rockhill Policy).  The Rockhill Policy provides limits of $5 million per occurrence and in the aggregate, and is excess of a primary policy issued by Admiral Insurance Company ("Admiral"), which provides policy limits of $1 million per occurrence and $2 million in the aggregate.  (*Id.* at ¶ 5).

The Rockhill Policy was issued with coverage form number RIC 3700 (12/05) ("RIC 3700 Form"), which follows the terms, conditions, and exclusions of the primary policy, <u>subject</u>

---

[2] Alternatively, should this Court grant Plaintiffs' Motion for Summary Judgment and find the Rockhill Policy provides coverage for the Underlying Lawsuit, Rockhill is entitled to a declaration that any obligation to indemnify JM Drilling can only attach excess of the primary policy's $2 million aggregate limit.

[3] "SUF" refers to Rockhill's Statement of Undisputed Facts filed contemporaneously herewith, and which is incorporated herein.

to Rockhill's own terms, conditions, and exclusions (*Id.* at ¶¶ 7-8).  Most relevantly, the Rockhill Policy contains an exclusion entitled "Subsidence" (Subsidence Exclusion), which excludes coverage for any liability directly or indirectly arising out of subsidence.  (*Id.* at ¶ 9).   In addition, the Rockhill Policy contains a Residential Contracting-Construction Defect Exclusion ("Residential Construction Exclusion") that excludes coverage for ***any loss directly or indirectly arising out of or related to*** "Residential Construction."  (*Id.* at ¶ 11).

Insight Risk Management, LLC ("Insight") was JM Drilling's insurance agent for the Rockhill policies, and Insurisk Excess and Surplus Lines, n/k/a CRC Insurance Services ("Insurisk") was the insurance broker for the Rockhill policies.  (*Id.* at ¶¶ 46, 48).  As the insurance broker, Insurisk served as an intermediary between Rockhill and Insight.  (*Id.* at ¶ 49).

### B.     The Underlying Lawsuit

AT&T contracted JM Drilling to perform drilling work in a utility lot located within a residential subdivision from February through April 2015.  (SUF at ¶ 20).  JM Drilling's work included digging a trench from certain cement/fiberglass boxes toward an easement near the roadway, and digging holes at the easement so that JM Drilling could drill underground fiber-optic cable from the utility lot to other lots and/or residences in the subdivision.  (*Id.* at ¶ 21).

On August 24, 2015, John Thibodeaux—an employee of AT&T—and Thibodeaux's wife and children (Plaintiffs) filed the Underlying Lawsuit against various entities, including JM Drilling.  (*Id.* at ¶ 24).  The fourth and final amended petition alleged that, while performing work at the lot, JM Drilling negligently struck and damaged an underground sewer main line, and that JM Drilling did not notify the utility owner of the damage but instead decided to "simply discard the pulled up section of pipe and cover up the hole."  (*Id.* at ¶¶ 31-33).

Plaintiffs further alleged that, on June 9, 2015, Thibodeaux was performing work at the lot, when the ground suddenly and without warning gave way, and Thibodeaux's right leg fell into a "void/cavern," resulting in injuries to his body. (*Id.* at ¶¶ 22-23). According to Plaintiffs, JM Drilling's negligence in "digging, trenching, and/or directional bore hole drilling" caused the pipe to leak, which caused the washout and a cavern/void underneath the ground that "gave way unexpectedly and without warning." (*Id.* at ¶ 30).

Plaintiffs ultimately moved for summary judgment, and on March 21, 2018, the court entered an Amended Judgment on Rules, which found that JM Drilling was liable for:

> 1) Negligently striking the underground sewer force main line at 114 Gate in February 2015; 2) negligently failing [t]o contact the utility owner (Water & Wastewater) to have the broken underground sewer force main line fixed before continuing any work; and, 3) J.M. Drilling LLC's negligence caused [t]he underground void/cavern near AT&T PFP box and AT&T Handhole 1 which, in turn, caused John Thibodeaux's accident on June 9, 2015.

(*Id.* at ¶ 47).

On March 29, 2018, a jury in the Underlying Lawsuit awarded $3,698,118 in damages against JM Drilling. (*Id.* at ¶ 38). JM Drilling appealed the judgment, and on March 7, 2019, the Louisiana Court of Appeals affirmed the trial court's ruling on liability. The appellate court held that the evidence demonstrated that JM Drilling damaged the pipe, <u>which ultimately caused the collapse of a sinkhole</u>. (*Id.* at ¶ 40) (emphasis added). In reaching its conclusion, the appellate court noted that the depositions and exhibits in the record "paint[ed] a clear picture of what happened to cause the sinkhole that injured Mr. Thibodeaux." (*Id.* at ¶ 51). The appellate court noted that it was "crystal clear that the void that caused Mr. Thibodeaux's injury <u>was not mere sinking of the ground, but a collapse of a roughly three-foot sinkhole</u>, as previously noted by this court." (*Id.* at 42) (emphasis added).[4]

---

[4] The appellate court reduced the damages award from $3,698,118 to $3,578,118. (*Id.* at ¶ 44).

4

III.     SUMMARY JUDGMENT STANDARD

Under the Federal Rules of Civil Procedure, a court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law.  *Tucker v. Tennessee*, 539 F.3d 526, 531 (6th Cir. 2008) (citing Fed. R. Civ. P. 56(a)).  If a movant for summary judgment meets its burden of showing the absence of a genuine issue of material fact, the nonmovant must respond by submitting evidence that sets out specific facts showing that there is a genuine issue for trial.  *Id.*  If the record taken cannot lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.  *Id.*

IV.     ARGUMENT

Under Tennessee law—which governs the interpretation of the Rockhill Policy[5]—the interpretation of an insurance contract is a matter of law to be determined by the court.  *See Davidson Hotel Co. v. St. Paul Fire & Marine Ins. Co.*, 136 F. Supp. 2d 901, 905 (W.D. Tenn. 2001).  When interpreting an insurance policy, a court should give the policy's terms their natural and ordinary meaning, give effect to the parties' intentions as reflected in the agreement itself, and construe the policy as whole in a reasonable and logical manner.  *Merrimack Mut. Fire Ins. Co. v. Batts*, 59 S.W.3d 142, 148 (Tenn. Ct. App. 2001).  Courts interpreting Tennessee law have stated that exclusions should not be "narrowly construed [so] as to defeat their evident purpose."  *Tomlinson v. Bituminous Cas. Corp.*, No. 96–5944, 1997 WL 397248, at *1 (6th Cir. 1997) (applying Tennessee law).

As set forth below, the Rockhill Policy does not provide coverage for the Underlying Lawsuit because the Policy's Subsidence Exclusion and/or the Residential Construction Exclusion apply to bar coverage.  Plaintiffs and JM Drilling cannot meet their burden of proving

---

[5] Plaintiffs agree Tennessee Law governs the insurance coverage issues in this case.  *See* Doc. 215-4 at 5.

the policy should be reformed to delete these exclusions, or that Rockhill should be estopped from denying coverage. Rockhill is entitled to summary judgment on these issues and a declaration that there is no coverage for the Underlying Lawsuit under the Rockhill.[6]

### A.  The Subsidence Exclusion Bars Coverage for the Underlying Lawsuit.

#### 1.  The Subsidence Exclusion Clearly and Unambiguously Applies to the Allegations of Injury Due to Shifting Land in the Underlying Lawsuit.

JM Drilling's liability in the Underlying Lawsuit falls squarely within the clear and unambiguous terms of the Policy's Subsidence Exclusion, which states, in relevant part, that:

> [The] [P]olicy will NOT apply . . . to <u>any liability, whether direct or indirect, arising out of,</u> caused by, resulting from, <u>contributed to, or aggravated by the subsidence,</u> settling, expansion, <u>sinking,</u> slipping, falling away, tilting, <u>caving in, shifting,</u> eroding, mud flow, rising, <u>or any other movement of land or earth</u> if any of the foregoing emanate from the operations of the insured or any other person for whose acts the insured is legally liable.

(SUF at ¶ 9) (emphasis added). Accordingly, the Subsidence Exclusion applies to "any liability" on the part of JM Drilling that directly or <u>indirectly</u> arises out of (1) subsidence, sinking, caving in, shifting, or "any other movement of land or earth"; that (2) emanates from JM Drilling's operations. The Subsidence Exclusion's two requirements are clearly met.

##### a)  The Underlying Lawsuit Alleges Liability Arising out of Subsidence.

Initially, there can be no reasonable dispute that JM Drilling's liability in the Underlying Lawsuit directly or indirectly arose out of subsidence (or one of the other enumerated types of land movement). In the Underlying Lawsuit, Plaintiffs alleged that Thibodeaux was performing work at the lot, when the ground suddenly and without warning gave way and Thibodeaux's right leg fell into a void/cavern, which resulted in his injuries. (SUF at ¶¶ 22-23). The trial court in the Underlying Lawsuit found that JM Drilling's negligent work caused the "<u>underground</u>

---

[6] Alternatively, if the Court determines there is coverage, the Rockhill Policy attaches excess of $2 million.

void/cavern . . . [that] <u>caused John Thibodeaux's accident</u>," and it found JM Drilling liable for the resulting injuries. (*Id.* at ¶ 37) (emphasis added).

In affirming the trial court's ruling, the appellate court confirmed that it was "crystal clear that the void <u>that caused</u> Mr. Thibodeaux's injury was not mere <u>sinking of the ground</u>, but a <u>collapse of a roughly three-foot sinkhole</u>." (*Id.* at ¶ 42) (emphasis added). The appellate court further noted that the record "paint[ed] a clear picture" that JM Drilling had caused "the sinkhole that injured Mr. Thibodeaux." (*Id.* at 41). It therefore cannot be reasonably disputed that JM Drilling's liability arose out of subsidence or any other movement of land or earth."[7]

**b)** **The Underlying Lawsuit also Alleged Subsidence that Emanated from JM Drilling's Operations.**

Nor can it be reasonably disputed that the subject sinkhole "emanated" from JM Drilling's "operations." It is undisputed that JM Drilling's operations entail drilling/boring. (*See* SUF at ¶¶ 21). Further, the trial court in the Underlying Lawsuit found that JM Drilling negligently struck and damaged the sewer line while it was performing its drilling operations for AT&T, which ultimately caused the sinkhole. (*Id.* at ¶¶ 22, 37, 40-41). Accordingly, the sinkhole at issue unequivocally emanated from JM Drilling's operations.

---

[7] Although Tennessee courts have yet to interpret this exact same exclusion, courts across the country have consistently interpreted similar subsidence exclusions broadly and found that they bar coverage for injuries or damage caused by earth movement resulting from the insured's acts or omissions. *See, e.g., Federal Ins. Co. v. Olawuni*, 539 F. Supp. 2d 63, 67 (D.D.C. 2008) (subsidence exclusion barred coverage for negligent excavation that resulted in the collapse of a wall); *Sherwood v. Kelido, Inc.*, 2009 WL 1010988, at *4 (N.J. Ct. App. 2009) (subsidence exclusion barred coverage for a claim alleging that negligent backfilling of excessively-watered soil caused a wall to collapse and injure the underlying plaintiff, because the insured was directly attributable for the collapse, as it had failed to take appropriate remediation action despite being aware of the dangerous condition of the foundation wall); *Shapell Indus., Inc. v. Assoc. Int'l Ins., Inc.*, 2002 WL 31430620, at *10 (Cal. Ct. App. 2002) (subsidence exclusion barred coverage for claims alleging that improper soil preparation caused subsidence damage to home); *Blackhawk Corp. v. Gotham Ins. Co.*, 63 Cal. App. 4th 1090, 1094–95 (Cal. Ct. App. 1997) (subsidence exclusions barred coverage for underlying lawsuits alleging that the insured's construction resulted in settlement of homes, earth movement, water intrusion, and defective drainage).

c)      **Plaintiffs' Interpretation of the Subsidence Exclusion Is Unsupported by Unambiguous Policy Language.**

Plaintiffs mistakenly contend that JM Drilling's "liability does not 'arise out of'" subsidence because subsidence is "not the source of JM Drilling's liability." (Doc. 215-4 at 9–10). Their argument—that the sinkhole is irrelevant because it is merely "how the accident happened"—misconstrues how the exclusion applies. In reality, the Subsidence Exclusion does <u>not</u> require that the "source" of liability be subsidence, <u>only that the liability directly or indirectly arise out of subsidence</u>. Plaintiffs' interpretation of the Subsidence Exclusion disregards the exclusion's clear and unambiguous operative language: the exclusion applies to "any liability, <u>whether direct or indirect, arising out of . . . subsidence</u> . . . or any other movement of land or earth . . . ." (SUF at ¶ 9) (emphasis added). Plaintiffs cannot and do not cite to any case law that supports a complete dismissal of the clear policy language at issue here. <u>JM Drilling's liability arose directly or indirectly out of subsidence, and that is all this required for the exclusion to apply</u>.

Not only is Plaintiffs' interpretation contradicted by the clear terms of the exclusion, but their interpretation would also lead to an absurd result. Plaintiffs are essentially arguing that the Subsidence Exclusion can only apply if JM Drilling is found liable for subsidence. Subsidence is not a cause of action, and thus an insured can never be found liable for "subsidence." Accordingly, under Plaintiffs' interpretation, the exclusion would be rendered useless, as it would not apply to any claim. *See Tomlinson*, 1997 WL 397248 at *1 (exclusions should not be "narrowly construed [so] as to defeat their evidence purpose.").

2.      **Plaintiffs Cannot Avoid Application of the Subsidence Exclusion by way of the Concurrent Causation Doctrine.**

Plaintiffs posit a variety of arguments in opposition to the Subsidence Exclusion, starting with their flawed interpretation of the Concurrent Causation Doctrine. Under that doctrine,

courts have found insurance coverage where an excluded cause of loss and a covered cause combine to cause damage, but only where the covered cause was a "substantial factor" in causing injury.  In this case, the doctrine does not allow Plaintiffs and JM Drilling to circumvent the Subsidence Exclusion for two separate, independent reasons.

First, the Subsidence Exclusion contains language that has been interpreted as anti-concurrent causation ("ACC") language, precluding application of the concurrent causation doctrine even if there is a covered concurrent cause.  Second, the concurrent causation doctrine applies only if the *covered* cause is a "substantial factor" in bringing about the injury.  But, as Plaintiffs fail to acknowledge, an alleged covered cause is *not* a substantial factor when it would *not* have caused the injury independent of the excluded cause.  In this case, the alleged covered causes would not have independently caused Thibodeaux's injury without subsidence, the excluded cause, and could not have been a "substantial factor."

        a)        **The Subsidence Exclusion Contains Anti-Concurrent Causation Language that Precludes Application of the Concurrent Causation Doctrine.**

The Rockhill Policy's Subsidence Exclusion contains ACC language, precluding application of the concurrent causation doctrine.  *See Ski Chalet Village Owners Club, Inc. v. Employers Mut. Cas. Co.*, 3:16-CV-20-TAV-HBG, 2016 WL 6892759, at *3 (E.D. Tenn. 2016) ("An insurer may contract around that possibility, however, through use of an 'anti-concurrent cause provision,' such that there is no coverage for damage that is caused in any manner by an excluded cause regardless of any other concurring or contributing causes.").

In this case, the Subsidence Exclusion excludes coverage for "any liability, whether direct or indirect, arising out of, caused by, resulting from, contributed to, or aggravated by the subsidence . . . ."  (SUF at ¶ 9) (emphasis added).  The phrase "any liability, whether direct or

indirect" is followed by the phrases "arising out of," "contributed to," and "or aggravated by"—all of which call for a broader causation requirement than proximate or direct causation.   In particular, the phrase "contributed to, or aggravated by" indicates that the exclusion applies <u>even if other concurring causes exist</u>.

Under basic principles of contract interpretation, the Subsidence Exclusion can only be reasonably and logically interpreted as applying to injury or damage caused by subsidence—even if subsidence is not a <u>substantial</u> factor, or even if the subsidence only "contributed to" in small part, or merely "aggravated," an injury that was primarily caused by a separate covered event (such as negligently damaging the pipe).   Courts interpreting the phrases "contributed to" and "aggravated by" in other exclusions have held that such terms effectively preclude application of the concurrent causation doctrine.   *See Kane v. Royal Ins. Co. of Am.*, 768 P.2d 678, 685–86 (Colo. 1989) (holding that language to the effect of "caused by, resulting from, <u>contributed to</u>, or <u>aggravated by</u>" precluded application of the efficient proximate cause doctrine) (emphasis in original).

Plaintiffs contend that the Subsidence Exclusion does not contain ACC language without citation to any authority addressing the specific language in the Rockhill Policy.   Instead, Plaintiffs rely on a Colorado appellate case that supposedly sets forth "model ACC" language. (Doc. 215-4 at 15–16).   While the Subsidence Exclusion's ACC language is not identical to the "model" language set forth in Plaintiffs' cited Colorado appellate case, it is clear that the Supreme Court of Colorado has held that language similar to the language in Rockhill's exclusion constitutes ACC language.   *See Kane*, 768 P.2d at 685–86.

          **b)**      **Subsidence Was the Predominate and Substantial Factor Causing Thibodeaux's Injury.**

Notwithstanding the Subsidence Exclusions' ACC language, the concurrent causation doctrine <u>also</u> does not apply here because subsidence was the predominate and substantial factor causing Thibodeaux's alleged injury.  The concurrent causation doctrine applies only if (1) a covered cause was a "substantial factor" in causing the injury, and (2) if the excluded cause "was only merely connected with or only contributed in some small part" to the injury.  *Capital Indem. Corp. v. Braxton*, 24 Fed. Appx. 434 (6th Cir. 2001).  However, <u>an alleged covered cause is not a substantial factor when it would not have caused the injury independent of the excluded cause</u>. *Auto-Owners Ins. Co. v. England*, 3:10-CV-118, 2013 WL 3423817, at *3 (E.D. Tenn. 2013) (the concurrent causation doctrine has "no application when the alleged [non-excluded] cause would not—independent of the excluded cause—have caused the injuries.").

Subsidence was the predominate and substantial factor causing Thibodeaux's injury, as the trial court and appellate court made abundantly clear in the Underlying Lawsuit.  Specifically, the trial court found that the "underground void/cavern . . . caused John Thibodeaux's accident," and the appellate court confirmed it was "crystal clear that the void that caused Mr. Thibodeaux's injury was not mere sinking of the ground, but a collapse of a roughly three-foot sinkhole."  (SUF at ¶¶ 41-42) (emphasis added).  The appellate court further noted that the record "paint[ed] a clear picture" that JM Drilling had caused "the sinkhole that injured Mr. Thibodeaux."  (*Id.*)  Even Plaintiffs' own expert, Randall King, concluded that the sinkhole caused Thibodeaux's accident, and he agreed that Thibodeaux's injury would not have occurred without the subsidence.  (*Id.* at ¶¶ 130-132).[8]

---

[8] Plaintiffs' attempt to use Randall King's post-disclosure affidavit to formulate a new theory of causation is improper, and the conclusion set forth in his affidavit is baseless.   In his original report, King concluded that the primary cause of Thibodeaux's accident was JM Drilling's failure to report.  (SUF at ¶ 122).  Plaintiffs now submit

In light of this evidentiary record, Plaintiffs and JM Drilling cannot reasonably dispute subsidence actually and directly caused Thibodeaux to injure himself, <u>because in the absence of subsidence, Thibodeaux would not have been injured</u>.  Subsidence was not "merely connected with" and did not just "merely contribute in some small part to" the injury—as would be required for the doctrine to apply.  *Cf. Allstate Ins. Co. v. Watts*, 811 S.W.2d 883, 888 (Tenn. 1991).[9] Further, to the extent any covered causes played a role in causing Thibodeaux's injury—such as damaging the pipe or failing to report it—<u>such causes could not have independently caused Thibodeaux to injure himself</u>.

The *Auto-Owners Insurance Co. v. England* demonstrates this principle.  In that case, the insured company hosted a holiday party, at which one of its employees became intoxicated, drove home, and crashed into a van.  *Id.* at *1.  Thereafter, the injured individuals sued the company, alleging their injuries resulted from the employee driving while intoxicated and the insured's negligence in serving alcohol.  *Id.*  The insurer argued it had no coverage obligation

---

an affidavit—drafted by Plaintiffs' counsel, after the disclosure deadline—wherein King reverses his original opinion and concludes (1) JM Drilling was not negligent for failing to report, and (2) the substantial factor was JM Drilling negligently hitting the water main.  (*Id.* at ¶¶ 122-23).  This attempt to produce a completely new *de facto* expert report (under the guise of an affidavit) after the expert disclosure deadline is untimely and improper, and the basis of King's new opinion is inherently faulty. During his deposition, King testified that Plaintiffs' counsel had drafted the affidavit, and that King's opinion was based on a definition of "substantial factor" provided by Plaintiffs' counsel.  (*Id.* at ¶¶ 124-26).  According to King, the definition of "substantial factor"—as provided by Plaintiffs' counsel—was the "chain of events" test that Tennessee has expressly rejected. (*Id.* at 126).  King testified that he had no opinion on the concurrent causation doctrine, and had never even heard the phrase "substantial factor" until he was asked to opine on the issue by Plaintiffs' counsel.  (*Id.* at ¶¶ 127-29).  The Court should therefore disregard King's affidavit.

[9] In *Watts*, a homeowner's policy excluded for coverage "arising out of the ownership, maintenance, use, occupancy ... loading or unloading of any [] vehicle . . ." *Id.* at 884.  The claimant was using a torch attempting to remove lug nuts from a truck in the insured's garage, which ignited a fire an injured him.  *Id.*  Allstate argued there was no coverage, since the incident arose from the maintenance of a vehicle—an excluded cause.  However, the court disagreed, finding the covered causes of the accident—the homeowner's "placement of the flammable substance, [his] purported failure to warn of the substance upon specific inquiry, and the negligence in dropping and kicking the burning liquid"—formed the basis of the claim and played substantial factors in causing the injury.  *Id.* at 888.  It recognized that "[t]he same harm could have resulted had [claimant] been cutting any number of objects in [homeowner's] garage with the torch completely unrelated to the truck. [] Coverage is not vitiated because the truck, or the area around it, was merely the situs of the purported negligence." *Id.*

based on an auto exclusion for bodily injury "arising out of" the "use or entrustment to others of any . . . 'auto'" owned or operated by the insured.  *Id.* at *2.  The court rejected the insured's argument that the concurrent causation doctrine applied because the injuries stemmed from the insured's negligence at the holiday party.  *Id.* at *3.  The court reasoned the doctrine has "no application" where the <u>covered cause couldn't have independently caused the injuries,</u> and it held that the doctrine did not apply because, according to the court, the injuries would not have occurred had it not been for the employee's driving.  *Id.*; *see also Braxton*, 24 Fed. Appx. at 437. By contrast, in *Watts*, the court applied the doctrine and found coverage, reasoning that the same harm could have resulted had claimant been performing any number of other activities not related to the excluded cause.  811 S.W.2d at 888.

Similarly, in *Braxton*, an employee of the insured day care center was tasked with transporting children to-and-from a day care center in a van.  *Id.* at 437.  An employee failed to remove one of the children from the van, who stayed in the van all day and ultimately died as a result of extreme heat.   *Id.* at 438.  The family sued the insured for wrongful death, alleging, among other things, that the insured and its employee had failed to take roll, count heads, inspect the van, or make any inquiry to ascertain whether the decedent had been removed from the van. *Id.*  The Sixth Circuit Court of Appeals agreed and concluded the covered causes were not a substantial factor in causing the decedent's death.  *Id.* at 443.  The Sixth Circuit reasoned that it was the employee's use of the van that caused the decedent's death.  *Id.*  The employee's failure to take roll, count heads, or ascertain whether the children had been removed from the van all related to the employee's failure to remove the decedent from the van, and it was the van that was the instrumentality of the injury.  *Id.*  Further, the use of the van was the predominate cause of the injury because the covered causes <u>would not have caused the decedent's death</u>

13

independent of the use of the van.  *Id.*  Similarly, in this case, Thibodeaux would not have been injured independent of the sinkhole, the excluded cause.

Here, like in *England* and *Braxton*—and unlike in *Watts*—any injury resulting from JM Drilling's negligent acts was entirely dependent on the subsidence, <u>since Thibodeaux would not have been injured independent of the sinkhole</u>.  Accordingly, Plaintiffs' proffered covered causes are not "substantial factors" in bringing about his injury, and the concurrent causation doctrine does not negate the Subsidence Exclusion.

c)    **Plaintiffs' "Chain of Events" Theory Mischaracterizes the Substantial Factor Test Used by Courts Analyzing Whether the Concurrent Causation Doctrine Applies.**

Plaintiffs present a skewed and inaccurate description of how the substantial factor test should be applied by a court interpreting Tennessee law, by wrongly implying that any covered cause that sets into a motion a "chain of events" that ends in injury is a "substantial factor."  This is not the law in Tennessee.  Notably, Plaintiffs do not and cannot cite to a single Tennessee case supporting this "chain of events" proposition.[10]  On the other hand, Tennessee courts have rejected the "chain of events" analysis urged by Plaintiffs.

For example, in *Watts*, 811 S.W.2d at 887, the Tennessee Supreme Court found that an excluded peril—maintaining the insured's vehicle—would have "set in motion the chain of events that produced the eventual result," but was not a substantial factor.  The court reasoned:

> <u>Arguably, at least, maintaining the vehicle would have set in motion the chain of events that produced the eventual result</u>. That is, but-for the difficulty encountered in maintaining the brakes on the truck, Watts would not have been inside of the home when he fell in order to obtain the tool. The problem with this approach is that cause and effect extend to near infinity. <u>It is for this reason that we reject the</u>

---

[10] The only cases that Plaintiffs cite are non-binding, inapposite cases from other jurisdictions that do not even specifically adopt Plaintiffs' "chain of events" proposition.  *See Goodman v. Fireman's Fund Ins. Co.*, 600 F.2d 1040, 1042 (4th Cir. 1979); *Davis v. United Services Auto. Assn.*, 273 Cal. Rptr. 224, 230 (Cal. Ct. App. 1990).

14

<u>"chain of events" theory of application which appears to hinge on a "but-for" theory of causation</u> . . .

*Id.* (emphasis added); *see also Planet Rock, Inc. v. Regis Ins. Co.*, 6 S.W.3d 484, 486 (Tenn. Ct. App. 1999) (although the insured's patron's injuries were initially caused by an excluded peril of assault and battery, the insured's subsequent negligence in failing to provide medical treatment was the substantial factor); *England*, WL 3423817 at *2 (rejecting the insured's argument that an auto exclusion did not bar coverage for an auto accident because, according to the insured, the accident stemmed from the insured's previous negligence in providing alcohol to its employee at a holiday party).   This Court should decline Plaintiffs' invitation to depart from the reality of Tennessee law and reject the argument that a "substantial factor" includes any covered peril in the "chain of events" that results in an otherwise excluded injury.

### d)   Tennessee Law Does Not Require ACC Language for an Exclusion to Apply.

Plaintiffs' premise that the concurrent causation doctrine automatically applies if an exclusion does not contain specific ACC language is a blatant misstatement of Tennessee law. Indeed, Plaintiffs cite <u>zero</u> Tennessee cases that actually stand for that proposition, and instead flatly mischaracterize Tennessee case law.[11]

ACC language is meant to ensure that the concurrent causation doctrine cannot under any circumstances be applied.  Importantly, however, if an exclusion does not have ACC language, that simply means that the concurrent causation doctrine may potentially apply, but only if the substantial factor test is met.  It does not mean—as Plaintiffs' incorrectly suggest—that the

---

[11] First, Plaintiffs cite to *Yogi's Primopromo LLC v. Nationwide Gen. Ins. Co.*, 1:18-CV-00313, 2020 WL 6365509 (E.D. Tenn. 2020), which did not recognize any such requirement.  Instead, that case found a policy's ACC clause did not apply because the defendant had failed to establish the loss was caused by the excluded cause in the first place.  *Id.* at *6.  Similarly, *Hardy & Kelly LLC v. QBE Ins. Corp.*, 3-11-0155, 2012 WL 1744670, at *3 (M.D. Tenn. 2012) considered a policy with ACC language and found the exclusion applied, but did not find or reason the ACC clause was required.

absence of ACC language automatically means that the exclusion provides coverage.  (*See* Doc. 215-4, at 17).  Rockhill is not required to have ACC language in the Subsidence Exclusion in order to avoid the concurrent causation test.

### 3. Plaintiffs' Contention that the Subsidence Exclusion is "Ambiguous" is Without Merit.

In a final attempt to circumvent the application of a clear and unambiguous exclusion, Plaintiffs ask the Court to find that the Subsidence Exclusion is ambiguous based on multiple baseless grounds.  Plaintiffs' ambiguity arguments would read out of existence simple and clear policy language and fail to read the policy as a whole—in direct contradiction with Tennessee's well-established canons of insurance policy interpretation.  As such, Plaintiffs do not and cannot offer this Court a <u>reasonable</u> interpretation of the Subsidence Exclusion that reads the policy language as a whole and gives effect to all of its <u>relevant</u> parts.

### a) The Issue of Whether the Subsidence Exclusion Has ACC Language Cannot Create an Ambiguity.

First, Plaintiffs contend that the Subsidence Exclusion is ambiguous because it does not contain ACC language while other exclusions in the Policy do.  (Doc. 215-4, at 20–21).  Again, even if the Court were to find that the Subsidence Exclusion does not have ACC language, the absence of ACC language cannot automatically result in coverage, and thus any ambiguity with respect to the ACC language cannot be reasonably interpreted as resulting in coverage.  The contention that the Subsidence Exclusion should not apply simply because another exclusion has ACC language is illogical and is legally meritless.  Indeed, Plaintiffs cannot cite to a single case from any jurisdiction supporting such a radical departure from the most basic principles of contract interpretation—that courts should give intent to the parties' intentions as reflected in the agreement itself.  *See Merrimack*, 59 S.W.2d at 148.

16

**b)**   **The Word "Operations" Does Not Create a Temporal Ambiguity.**

Plaintiffs next attempt to impose a temporal limitation on the word "operations" that simply does not appear in the Policy.  The Subsidence Exclusion applies to earth movement taking place at any time and cannot be reasonably interpreted, as Plaintiffs urge, to apply only to land movement taking place during "ongoing, current operations."  (Doc. 215-4, at 21).  Indeed, the Subsidence Exclusion states that it excludes coverage for liability arising out of subsidence or any other movement of land that "emanate from the operations of the insured."   (SUF at ¶ 9).  The phrase "emanate from the operations of the insured" can only be reasonably interpreted as referencing land movement that emanates from (or arises out of) the insured's operations/work, regardless of whether said operations are ongoing or completed.  If the exclusion was meant to limit its reach to *ongoing* operations, it would have defined "operations" as "ongoing operations."   Or the Subsidence Exclusion itself would have used a qualifying phrase such as "emanate[s] from <u>ongoing</u> operations" or "emanate[s] from <u>current</u> operations" or "<u>during</u> the insured's operations." <u>It does not</u>.  In fact, there is not a single word in the exclusion that can be reasonably interpreted as providing any kind of temporal limitation as to when the subsidence must take place.  (*See id*.)

In the absence of any such qualifying language or a definition of "operations" limiting its reach, the word "operations" must be assigned its ordinary meaning, which has no temporal limitation.[12]  To otherwise assign such a limitation would require the reader to ignore the plain meaning of the operative terms and to insert meaning that is simply not supported by the policy

---

[12] The word "operation" is commonly defined as "performance of a practical work or of something involving the practical application of principles or processes." *See* Meriam Webster Online Dictionary, <u>https://www.merriam-webster.com/dictionary/operation</u>.

language itself. *See S. Tr. Ins. Co. v. Phillips*, 474 S.W.3d 660, 667 (Tenn. Ct. App. 2015) (Tennessee courts "interpret an insurance contract according to its plain terms as written, and the language used is taken in its <u>plain, ordinary, and popular sense</u>") (emphasis added).

Plaintiffs' attempt to assign any import to the testimony of Rockhill claims handler Kelli Kasal—that she viewed Thibodeaux's claim as falling under the "products-completed operations hazard"—demonstrates a fundamental misunderstanding of basic policy structure.  A claim initially falls within the "products-completed operations hazard" if it involves <u>bodily injury or property damage</u> taking place after the insured's work has been completed.  (*See* SUF at ¶ 13). The Subsidence Exclusion applies to <u>subsidence</u> taking place during or after the insured's operations.  Therefore, Ms. Kasal was correct. Both the subsidence and Thibodeaux's injury took place after the insured's work/operations were completed, and thus the claim falls within the "products-completed operations hazard" and the Subsidence Exclusion.  <u>These are **_not_** mutually exclusive</u>.

In addition, it is illogical to assign a temporal limitation to the word "operations" based on the definition of "products completed operations hazard," given that "products-completed operations hazard"  concerns the timing of injury/damage, as opposed to the timing of the event (subsidence) that caused the injury/damage.  There simply is no case law that supports Plaintiffs' interpretation, and Plaintiffs do not even attempt to rely on any case law.

### c)      The Subsidence Exclusion Is Not Overly Broad.

Plaintiffs contend that the Subsidence Exclusion is ambiguous because it can be interpreted broadly enough to exclude all claims for liability arising out JM Drilling's drilling operations because such work involves "moving dirt."  (Doc. 215-4 at 22).   Plaintiffs'

interpretation completely ignores the full and relevant text of the exclusion itself, which clearly contradicts Plaintiffs' interpretation.

The Subsidence Exclusion applies to liability arising out of "subsidence . . . sinking . . . caving in . . . shifting . . . eroding, mud flow, rising, or any other movement of land or earth . . ." (SUF at ¶ 9). The terms "subsidence," "sinking," "caving in," and "mud flow" are immediately followed by the phrase "<u>or any other</u> movement of land or earth," which clearly means that "any other movement of land" is a reference to movement of land that is similar to subsidence, sinking of land, caving in of land, shifting land, mud flow, etc. Accordingly, if the entire sentence is taken into account, the phrase "movement of land" cannot be reasonably interpreted to encompass all drilling operations.

Further, the exclusion states that the movement of land must emanate from the insured's "operations"—*i.e.*, drilling/boring. Accordingly, to interpret the phrase "movement of land" as including drilling is simply illogical, as this would mean that the exclusion applies to liability arising out of <u>drilling</u> that emanates from <u>drilling</u>.[13] *See Garrison v. Bickford*, 377 S.W.3d 659, 664 (Tenn. 2012) (Tennessee courts will not place a "strained" construction on language in insurance policies "to find ambiguity where none exists."); *Artist Bldg. Partners v. Auto-Owners Mut. Ins. Co.*, 435 S.W.3d 202, 216 (Tenn. Ct. App. 2013) (language in an insurance policy is unambiguous unless it is susceptible to more than one <u>reasonable</u> interpretation).

Moreover, the general claim that an exclusion is overly broad is not a basis for finding that an exclusion is ambiguous. Plaintiffs are applying an overly broad interpretation of the

---

[13] At no point did Rockhill claims handler Kelli Kasal state that she agreed with Plaintiffs' interpretation, and Plaintiffs' contention that she did is a gross mischaracterization of her testimony.

exclusion that does not apply to the specific facts of this case, and that would not result in coverage here.

**B.      The Residential Construction Exclusion Also Bars Coverage for the Underlying Lawsuit.**

The Rockhill Policy's Residential Construction Exclusion also applies to bar coverage for Plaintiffs' claims in this case.  That exclusion provides that "This Policy does not apply to <u>any loss, cost or expense, directly or indirectly arising out of or related to</u> the liability of 'Contractors' for 'Residential Construction.'"  (SUF at ¶ 11) (emphasis added).  As defined in the Rockhill Policy, "Contractors" are "all developers, general contractors, subcontractors, trade persons, organizations, or any other person or entity involved in 'Residential Construction.'" (*Id.*) "Residential Construction," in turn, is defined as follows:

> <u>all development, design, building or other construction, improvements, site selection, surface or subsurface site preparation, or any work</u>, products or component parts thereof or services provided in relation to any of the foregoing, <u>involving property intended in whole or in part for residential habitation</u>.

(*Id.*) (emphasis added).

In other words, the Residential Construction Defect Exclusion bars coverage to JM Drilling for liability "directly or indirectly arising out of or related to" its work as an "entity" involved in "construction, improvements . . . or any work . . . involving property intended in whole or in part for residential habitation."  (*Id.*)  In this matter, there is no question JM Drilling's liability arises out of, or is related to, work "involving property intended in whole or in part for residential habitation."

As Plaintiffs correctly indicate, at the time of JM Drilling alleged negligence, JM Drilling was performing drilling and excavation work to install fiber optic cable on a "utility lot."  That the "utility lot" was located within a residential subdivision.  (*Id.* at ¶¶ 19-23).  In fact, JM Drilling had contracted with AT&T to place fiber optic lines that were to service a residential

20

development where the utility lot was located.  (*Id.*) Since the fiber optic lines being installed in the utility lot by AT&T were going to service homes in the residential subdivision, JM Drilling's drilling and excavation work clearly "involved" property that was "intended, in part, for residential habitation."  There is no question JM Drilling's work in a residential subdivision falls under the exclusion under a plain reading of its terms.

Contrary to Plaintiffs' contention, it is irrelevant that JM Drilling was not actually constructing a residence, and it is irrelevant that the utility lot on which the accident took place was not itself intended for residential habitation.   That is simply not what the language of the exclusion requires.  Instead, the exclusion applies if JM Drilling's liability arises out of, or is related to, work "involving property intended in whole or in part for residential habitation."  Again, since JM Drilling's work *involved* property intended, in part, for residential habitation, the exclusion applies and bars coverage for JM Drilling's liability.

The cases Plaintiffs rely on are all inapposite cases from other jurisdictions, and they do not involve exclusions containing the operative "*involving* property intended in whole or in part for residential habitation" language found in the Rockhill Policy.[14]   Accordingly, since these cases are non-controlling and inapposite, they can be easily disregarded.  Plaintiffs' contention that the exclusion is "ambiguous" simply because it is supposedly broad is equally meritless, and Plaintiffs offer no legal support for this contention.

---

[14] *See Am. States Ins. Co. v. Delean's Tile and Marble, LLC*, 319 P.3d 38, 41 (Wash. App. Ct. 2013); *Admiral Ins. Co. v. Joy Contractors, Inc.*, 972 N.E.2d 106, 109 (N.Y. 2012); *Berkshire Hathaway Homestate Ins. Co. v. SQI, Inc.*, 132 F. Supp. 3d 1275, 1280 at n. 5 (W.D. Wash. 2015); *Hunters Ridge Condo. Assn. v. Sherwood Crossing, LLC*, 395 P.3d 892, 896 (Or. App. 2017).

**C.** **Rockhill Is Entitled to Summary Judgment on Plaintiffs' and JM Drillings' Long-Shot Reformation and Estoppel Theories to Avoid the Clear Applicability of the Subsidence Exclusion.**

Faced with the obvious applicability of the Subsidence and Residential Construction Exclusions, Plaintiffs and JM Drilling assert two theories—reformation and estoppel—that essentially ask the court to ignore the plain language of the Rockhill Policy and find coverage anyway. These theories lack any legal merit and are unsupported by any evidence that would allow Plaintiffs and JM Drilling to meet their burden of proving these theories. As a result, Rockhill is entitled to summary judgment on the reformation and estoppel claims.

**1.** **Plaintiffs and JM Drilling Cannot Meet Their Heavy Burden of Proving the Rockhill Policy Should be "Reformed" to Delete the Subsidence Exclusion.**

First, Plaintiffs and JM Drilling request an extraordinary remedy from this Court: a finding that the Rockhill Policy should be "reformed" by operation of law to delete the Subsidence Exclusion, based on an alleged "mutual mistake" of the parties. (Doc. 97 at ¶ 31A; Doc. 70 at ¶ 26). Rockhill is entitled to summary judgment on these reformation claims.

Under Tennessee law, reformation requires a showing of mutual mistake in the drafting of the policy such that the terms of the policy are different from those agreed upon. *Cincinnati Ins. Co. v. Fred S. Post, Jr., Co.*, 747 S.W.2d 777, 781 (Tenn. 1988). To demonstrate a mutual mistake, the party seeking reformation has the burden of proving, <u>by clear and convincing evidence</u>, that (1) the parties reached a prior agreement regarding some aspect of the bargain, (2) the parties intended the prior agreement to be included in the written contract, (3) the written contract materially differs from the prior agreement, and (4) the variation between the prior agreement and the written contract is not the result of gross negligence on the party seeking reformation. *Sikora v. Vanderploeg*, 212 S.W.3d 277, 287–88 (Tenn. Ct. App. 2006).

22

As set forth below, however, JM Drilling and Plaintiffs fall well short of meeting their burden.  The undisputed evidence establishes the <u>opposite</u> conclusion as a matter of law: that Rockhill and JM Drilling did not mutually intend for the policy to cover subsidence, and that any alleged mistake in coverage resulted solely from the gross negligence of JM Drilling in failing to read the Rockhill policies for five straight years.

> **a)   JM Drilling and Rockhill Did Not Mutually Agree or Intend for the Rockhill Policy to Provide Coverage for Liability Arising out of Subsidence.**

<u>JM Drilling and Plaintiffs cannot prove—by clear and convincing evidence—that ***both*** Insight/JM Drilling *****and***** Rockhill agreed or intended for the Rockhill Policy to provide coverage for subsidence liability</u>.  <u>As such, their reformation claim fails as a matter of law</u>.  *See* 21 Tenn. Prac. Contract Law & Practice § 6:64 (under Tennessee law, the key question in mistake/reformation cases is what the parties <u>intended at the time of contracting</u>, not what they would have agreed to had they been better informed) (emphasis added); *Moore v. Moore*, 2020 WL 2511234, at *6 (Tenn. Ct. App. 2020) (reformation does not make a new contract by bringing a document "into conformance with an intent arising after contract formation" or to "create a more reasonable bargain.").

The parties in this Action have taken numerous depositions and produced over 50,000 pages of documents relating to the underwriting and negotiation of the 2011–2015 Rockhill Policies—including insurance applications, insurance proposals, and communications relating to the procurement of the 2011–2015 Rockhill Policies.  At the conclusion of discovery, there is no evidence whatsoever indicating that any of the parties even *contemplated* subsidence coverage with respect to the Rockhill Policy, let alone that they mutually *agreed* or *intended* for the policy to provide such coverage.  Nor is there any evidence indicating that Insight/JM Drilling and

Rockhill agreed or intended for the Rockhill Policy to provide "complete" follow form coverage (*i.e.*, the exact same coverage as the primary policy).

To the contrary, the uncontroverted testimony and documents produced prove JM Drilling (or anyone acting on its behalf) never indicated it wanted coverage for subsidence, nor that it wanted "complete" follow form coverage. (SUF at ¶¶ 83-86, 88-90). The evidence also shows that Rockhill (or anyone acting on its behalf) never indicated that the Rockhill Policy would provide such coverage. (*Id*. at ¶¶ 102, 104, 110). All of the persons involved in procuring the Rockhill Policy testified that no one asked for any of the 2011–2015 Rockhill policies to provide subsidence coverage, no one asked for the subsidence exclusion to be removed from any of these policies, and no one ever indicated that any of these policies would provide coverage for such risk. (*Id.* at ¶¶ 83-86, 88-107, 110). Further, all of the persons involved in procuring the Rockhill Policy who were asked and had knowledge of this issue—including Brenda Johnson (Insight, the agent) and Dianna Farish (Insurisk, the broker)—testified that no one asked for "complete" follow form coverage, and no one ever indicated that any of the Rockhill policies would provide such coverage. (*Id.* at ¶ 105, 108).

Further, the evidence demonstrates that Rockhill affirmatively intended for the subsidence exclusion to be included in the Rockhill Policy and intended for the Rockhill Policy to follow the primary policy subject to its own terms and exclusions. Indeed, it is undisputed that Rockhill issued the 2011–2015 Rockhill Policies with the exact same RIC 3700 Coverage Form and Subsidence Exclusion each year. (*Id.* at ¶ 6). Further, the Rockhill underwriter responsible for all underwriting decisions on the 2011–2015 Rockhill Policies, Mike Towell, testified that Rockhill probably had one other coverage form (other than the RIC 3700 form) that was available to use, and that coverage form also had a subsidence exclusion and also used the

24

same follow-form language ("subject to [its] own terms, conditions, and exclusions") as the RIC 3700 Form.  (*Id.* at ¶ 112).   In other words, the Subsidence Exclusion was standard on all of Rockhill's excess policies at the time, and there is simply no evidence demonstrating that in 2015, Rockhill intended to break with the Company's standard protocol by issuing a policy that did not have a subsidence exclusion, without JM Drilling asking for the exclusion to be removed.

In fact, none of the documents or communications generated during the procurement of any of the policies even mention the word "subsidence."   Moreover, the underlying primary policies issued by Colony Insurance to JM Drilling for the 2012 and 2013 policy years also contained subsidence exclusions similar to the Rockhill policies.  (*Id.* at ¶¶ 14-17).  JM Drilling and Insight never requested that Colony remove the subsidence exclusions from those 2012 and 2013 policies.  (*Id.* at ¶ 18).  If JM Drilling intended to obtain subsidence coverage in their excess policies, surely it would have obtained subsidence coverage in their underlying policies. Under these circumstances, there is simply no evidence demonstrating that Insight, JM Drilling, or Rockhill intended for the Rockhill Policy to provide coverage for subsidence (or "complete" follow form coverage) at the time of contract formation.

Plaintiffs' own retained expert on the issue of reformation, Akos Swierkiewicz, essentially conceded that JM Drilling (along with its agent, Insight) and Rockhill did not mutually intend for the Rockhill policies to cover subsidence in 2011–2015 or to provide "complete" follow form coverage.  In that regard, Swierkiewicz testified that:

- He did not know Insight's intent because the documents and depositions did not "reveal what was in the head of the personnel of Insight."  (*Id.* at ¶ 116).

- He did not know whether at the time of contracting Insight intended for the Rockhill Policy to provide compete follow-form coverage (*Id.* at ¶ 117).

- He was not aware of any evidence from 2015 or earlier demonstrating that Insight intended for the policy to provide coverage for subsidence (*Id*. at ¶ 118).

- He agreed that Rockhill did not intend for the 2015 Rockhill Policy to provide "true" or "complete" follow form coverage. (*Id*. at ¶ 119).

- Rockhill put the Subsidence Exclusion in the policy and this was not an accident. (*Id*. at ¶ 120).

- Rockhill provided JM Drilling with a follow form policy and was not asked to provide anything specific other than an umbrella/excess policy (*Id*. at ¶ 121).

Overall, there is no evidence—not a single document or communication exchanged or created during the negotiation or procurement of any of the 2011–2015 Rockhill Policies—showing that JM Drilling or the agent or the broker ever conveyed to anyone that JM Drilling wanted any of the 2011–2015 Rockhill policies to provide coverage for subsidence, or showing that anyone believed this to be the case.  Further, it is undisputed that neither JM Drilling, nor Insight, nor Insurisk ever indicated to anyone that JM Drilling objected to the Subsidence Exclusion in any of the 2011–2015 Rockhill Policies, despite having the opportunity to object every single year, for five consecutive years.  Thus, JM Drilling and Plaintiffs cannot meet their burden of demonstrating that, at the time of contracting in 2015, JM Drilling intended for the Rockhill Policy to provide coverage for subsidence liability. The undisputed evidence proves the opposite.  Rockhill is therefore entitled to summary judgment on reformation.

> **b)    Any Mistake Regarding the Rockhill Scope of Coverage Necessarily Resulted from JM Drilling's Gross Negligence.**

Even if Plaintiffs and JM Drilling could prove mutual intent, JM Drilling and Plaintiffs would not be entitled to reformation of the policy unless they could also demonstrate that JM Drilling's mistake—in obtaining a policy that did not cover subsidence—was <u>not</u> the result of its own gross negligence.  JM Drilling and Insight, of course, never read the Rockhill Policy to

notice it contained a Subsidence Exclusion.  (SUF at ¶¶ 75-80, 96).  As Tennessee courts have recognized, the complete failure to even read a contract amounts to "gross negligence" in the reformation context.  *See, e.g.*, *Moore*, 2020 WL 2511234 at *9 ("mistakes are not excused when caused by one party's failure to read a writing.").

   JM Drilling and Plaintiffs simply cannot demonstrate that any mistake did not result from JM Drilling's gross negligence.  JM Drilling and Insight never indicated to anyone that they wanted any of the 2011–2015 Rockhill Policies to provide coverage for subsidence liability or to provide the exact same coverage as the primary policy, and they never reviewed the policies to ensure such coverage was provided.  Every single one of the 2011–2015 Rockhill Policies had the very same coverage form, and every year both JM Drilling and Insight were provided a copy of the Rockhill policy.  (*See* SUF at ¶¶ 1-9, 73).  Accordingly, every single year JM Drilling and Insight had an opportunity to review the policy and request any changes.  However, JM Drilling and Insight never reviewed any of the policies, because it was standard practice for Insight to only read the insurance quotes (which do not set forth any policy language or list exclusions in the actual coverage form).  (*Id.* at ¶¶ 75-80).

   The Subsidence Exclusion is a two-paragraph-long exclusion that is titled "**Subsidence**" in bold lettering.  (*See id.* at ¶ 9).   A simple review of the policy would have led JM Drilling and/or Insight to discover that the policy had a conspicuous subsidence exclusion and/or did not provide "complete" follow-form coverage.  (*See id.* at ¶ 82).  JM Drilling and Insight, however, did not know that a conspicuous exclusion was in any of the 2011–2015 policies because they did not review any of the contents of the policies.  (*See id.* at ¶ 96).

   JM Drilling and Plaintiffs are asking the Court to shift the burden of JM Drilling's liability to Rockhill by reforming an insurance policy to provide coverage for a risk the parties

never agreed to cover, even though JM Drilling and Insight never requested that the Rockhill Policy provide coverage for such risk, and even though JM Drilling and Insight never even bothered to read any of their policies to see if they provided such coverage.  JM Drilling and Insight would have easily discovered the Subsidence Exclusion had they simply reviewed the exclusions section of the policy in 2011, or 2012, or 2013, or 2014, or 2015.  Their failure to do so constitutes gross negligence, and thus JM Drilling and Plaintiffs are not entitled to reformation of the Rockhill Policy.

      **2.**      **Rockhill Cannot be Estopped from Denying Coverage Because There Is No Evidence of Fraud, Misconduct, or Negligence.**

JM Drilling and Plaintiffs' estoppel claim is equally meritless.  An insurer may only be estopped from denying coverage for a matter not covered by its policy if there is fraud, misconduct, or negligence of by the insurer or its agent.  *Johnson & Assocs., LLC v. Hanover Ins. Grp., Inc.*, 572 S.W.3d 636, 645 (Tenn. Ct. App. 2018).  For example, an insurer could be estopped from denying coverage if the insurer or its agent represents that requested coverage has or will be provided.  *Id.*   Under Tennessee law, estoppel is "particularly appropriate" where "the insured instructed his insurance agent to make a change in the insured's insurance coverage, and the agent made a mistake in carrying out the instruction.  *Id.*  However, "estoppel is not favored and it is the burden of the party seeking to invoke the doctrine to prove each and every element thereof."  *Buchholz v. Tennessee Farmers Life Co*., 145 S.W.3d 80, 85 (Tenn. Ct. App. 2003).

For the same reasons discussed in the preceding section, JM Drilling and Plaintiffs cannot meet their burden of proving estoppel: Rockhill never represented that subsidence would be covered.  Specifically, it is undisputed that no one ever indicated to anyone that the Rockhill Policy would provide coverage for subsidence or would provide "complete" follow form coverage.  (SUF at ¶¶ 83-107).  It is also undisputed that neither JM Drilling, Insight, or anyone

else ever indicated to anyone that they wanted any specific type of coverage, let alone that they wanted the Rockhill Policy to provide coverage for subsidence or to provide complete follow-form coverage.   (*Id.*)   Further, no one ever made any misrepresentations to Insight or JM Drilling, and neither Rockhill nor any of its purported agents made any mistakes in carrying out specific instructions regarding the coverage sought.

JM Drilling and Plaintiffs cannot point to any evidence demonstrating that Rockhill or its agents engaged in any wrongful conduct that would give rise to estoppel, nor can they demonstrate reasonable reliance on any Rockhill conduct.   Accordingly, Rockhill is entitled to summary judgment on the estoppel claim.

### D.   If the Rockhill Policy Did Provide Coverage, it Would Only Apply Excess of the Primary Admiral Policy's $2 Million Aggregate Limit.

For the reasons set forth above, the Rockhill Policy does not provide coverage for JM Drilling's liability to Plaintiffs in the Underlying Lawsuit.   But if the Court were to find the Rockhill Policy does provide coverage, Rockhill is entitled to a declaration that it would only apply excess of the primary Admiral Policy's $2 million aggregate limit.   In that regard, The Rockhill Policy only applies to the extent <u>all</u> underlying insurance, including the full limits of the Admiral Policy, have been exhausted.   (SUF at ¶ 5).   The primary Admiral Policy provides policy limits of $1 million per occurrence and $2 million in the aggregate.   (*Id.* at ¶ 19).

Plaintiffs argue the Admiral Policy has been exhausted following Admiral's $1 million payment (plus interest) following the underlying jury trial, premised on the assumption that only one "occurrence" took place, and that Admiral, the primary insurer, should only have paid one per-occurrence limit of $1 million.   But this argument is inconsistent with Plaintiffs' position that Plaintiffs' injuries resulted from two or more "concurrent" causes (negligently striking the sewer line, failing to report, and subsidence).

29

Yet Plaintiffs take the opposite position and argue only one "occurrence" (as defined in the Admiral Policy) took place, meaning only one $1 million per-occurrence limit under the Admiral Policy should have applied.   If Plaintiffs' multiple "concurrent" cause theory is correct, then clearly multiple "occurrences," or "accidents," took place to cause Plaintiffs' injuries. Accordingly, the Admiral Policy has not been exhausted.  If the Rockhill Policy is determined to provide coverage for Plaintiffs' judgment against JM Drilling, then it only covers the portion of that judgment in excess of $2 million, *i.e.*, the full available limits of the Admiral Policy.

Plaintiffs also argue that Admiral's payment of $1 million plus judicial interest to Plaintiffs after the jury trial in the underlying case constitutes a judicial admission that its "one" per-occurrence limit was exhausted, and therefore that only "one" occurrence occurred. However, as the case law cited by Plaintiffs provides, "an admission by a party in a pleading constitutes a judicial confession and is full proof *against the party who made it*."  *C.T. Traina, Inc. v. Sunshine Plaza, Inc*., 861 So. 2d 156, 159 (La. 2003) (emphasis added).  Admiral/JM Drilling's supposed judicial admission would only operate as proof against JM Drilling; it would not constitute a judicial admission by Rockhill since Rockhill did not make the statement.

## V.     CONCLUSION

WHEREFORE, for the reasons set forth above, Rockhill prays that this Court enter an order denying Plaintiffs' motion for summary judgment and granting Rockhill's cross-motion for summary judgement.

Respectfully submitted,

JUNEAU DAVID, APLC
 /s/ *Robert J. David, Jr.*
ROBERT J. DAVID, JR. (#21554)
rjd@juneaudavid.com

30

1018 Harding Street, Suite 202
Post Office Drawer 51268
Lafayette, LA 70505-1268
Ph: (337) 269-0052
Fax: (337) 269-0061

Adam H. Fleischer (*Pro hac admission*)
    AFleischer@BatesCarey.com
David M. Alt (*Pro hac admission*)
    DAlt@BatesCarey.com
Gustavo A. Otalvora (*Pro hac admission*)
    GOtalvora@BatesCarey.com
BatesCarey LLP
191 N. Wacker Drive, Suite 2400
Chicago, IL 60606
Ph: (312)-762-3130
Fax: (312) 762-3100

***Counsel for Rockhill Insurance Company***

2715855

## CERTIFICATE OF SERVICE

I hereby certify that on April 5, 2021, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all known counsel of record who are participants.

   */s/ Gustavo A. Otalvora.*
    Gustavo A. Otalvora

31