**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

| | | |
|---|---|---|
| **JOHN THIBODEAUX, ET AL** | * | **NO.:  6:18-CV-00501-RRS-CBW** |
| | | **NO.:  6:18-CV-01414-RRS-CBW** |
| | * | |
| **VERSUS** | | **JUDGE:** |
| | * | **ROBERT R. SUMMERHAYS** |
| | * | **MAGISTRATE JUDGE:** |
| **J.M. DRILLING, LLC, ET AL** | | **CAROL B. WHITEHURST** |
| | * | |

**CRC INSURANCE SERVICES, INC.'S**
**MEMORANDUM IN SUPPORT OF**
**OMNIBUS MOTION FOR SUMMARY JUDGMENT**

**NOW INTO COURT**, through undersigned counsel, comes Defendant, CRC Insurance Services, Inc. ("CRC") which files this Omnibus Motion for Summary Judgment on the issues of agency, estoppel, standing, duty, punitive damages and negligence.

For clarity, CRC submits that on July 2, 2018, Regions Insurance, Inc. (including its trade name, Insurisk Excess and Surplus Lines ("Insurisk")) became part of CRC. During the time periods at issue in this litigation, Insurisk and CRC were two independent and unrelated entities which, as a result of the July 2, 2018 transaction, were combined into one surviving entity – CRC. For purposes of this litigation, the claims set forth relate to the alleged errors or omissions of Insurisk prior to the July 2, 2018 transaction, and not claims for independent negligence of CRC prior to the July 2, 2018 transaction.  Consequently, CRC, as successor in interest to the entity identified as Insurisk, shall be referenced herein as **Insurisk**.

Insurisk respectfully requests that this Court grant its motion and find that:

1

(i)     Rockhill Insurance Company ("Rockhill"), as the principal of Insurisk is vicariously liable for the acts of Insurisk in this case;

(ii)    JM Drilling, LLC ("JM Drilling") is estopped from bringing negligent procurement claims against Insurisk under *Parveen v. ACG South Insurance Agency, LLC*;[1]

(iii)   JM Drilling and the Plaintiffs lack standing to pursue negligent procurement of insurance coverage claims against Insurisk;

(iv)    Insurisk did not owe the Plaintiffs or JM Drilling a fiduciary duty;

(v)     Punitive damages are not recoverable in this matter; and

(vi)    Insurisk is not liable in a failure to procure claim if Rockhill's denial of coverage is based on either the Residential Contracting exclusion or a determination that Thibodeaux's injury resulted from two "Occurrences" as defined under the primary insurance policy.

## FACTUAL AND PROCEDURAL OVERVIEW

All of the various parties to this dispute have previously filed Motions for Summary Judgment on the issue of coverage and all have extensively set forth the facts this dispute.  In the interest of judicial economy, Insurisk will not recite all of the relevant facts here, and instead directs the Court to its Statement of Undisputed Material Facts for the facts related to the coverage issue (Rec. Doc. 270), as well as any supplemental facts outlined within this memorandum.

---

[1] 2020 WL 7086157, ---S.W.3d --- (Tenn. 2020).

At all times relevant hereto, Insurisk was an operating division and trade name for Regions Insurance Inc.[2] a Tennessee licensed Business Entity Producer[3] which was an intermediary or a conduit between the independent agent, in this case Insight Risk Management, LLC ("Insight"), and the specialty insurance markets."[4]   One of those markets was with Rockhill Insurance Company.[5]

During the relevant times at issue in this litigation, Insight was an independent insurance agent located in Tennessee.[6]  Insight served as the retail agent for JM Drilling and sought quotes from Insurisk on behalf of JM Drilling.[7] JM Drilling relied on Insight for "its expertise in placing insurance coverage … and procuring insurance coverage to determine what coverage JM Drilling needed."[8]  No one at JM Drilling ever questioned the coverage secured by Insight nor told Insight that JM Drilling did not want a subsidence exclusion or residential contracting exclusion on any of its liability policies.[9]  Rather, JM Drilling simply paid the premiums in full.[10]  JM Drilling relied so heavily upon Insight that it never read its insurance policies.[11]

As it pertained to procurement of excess liability coverage for Rockhill's insured, JM Drilling, Insurisk's  agent, Stephen Hoffmann,[12] a licensed insurance producer and surplus lines agent, received an application package from Insight, submitted it to the insurer, Rockhill, and

---

[2]   Exhibit 1 - National Association of Insurance Commissioners proof of licensure - Regions Insurance Inc. was licensed by the Tennessee Department of Insurance under License Number: 3559; R. Doc. 146; Exhibit 3 – Affidavit of Stephen Hoffmann , paragraphs 4 and 5.
[3]   Exhibit 2 - Deposition excerpts of Stephen Hoffmann, Volume I, p. 10, lines 4-5.
[4]   Exhibit 2 -  Deposition excerpts of Stephen Hoffmann, Volume I, p. 10, line 1 - p. 12, line 13.
[5]   Exhibit 3 - Affidavit of Stephen Hoffmann, paragraph 6.
[6]   Third Party Demand, R. Doc.112; Exhibit 2- Deposition excerpts of Steve Hoffmann, p.122, line19.
[7]   Exhibit 2 - Deposition excerpts of Stephen Hoffmann, p. 12, lines 14-25; Exhibit 4 - Deposition excerpts of JM Drilling, p. 33, lines 7-14; Exhibit 5 - Deposition excerpts of Joe Evans, p. 92, line 19 – p. 93, line 9.
[8]   Exhibit 4 - Deposition excerpts of JM Drilling, p. 46, lines 5-14.
[9]   Exhibit 4 - Deposition excerpts of JM Drilling, p. 47 lines 12-25 and p. 53, lines 9-25.
[10]   Exhibit 4 - Deposition excerpts of JM Drilling, p. 116, line 24 – p. 117, line 4.
[11]   Exhibit 4 - Deposition excerpts of JM Drilling, p. 105, line 18 – p. 106, line 4.
[12]   *See* Exhibit 1 - National Association of Insurance Commissioners proof of licensure, License Number: 849415.

Rockhill would then reserve the right to quote and bind.[13]  Customarily, Insurisk would send Rockhill a copy of the insurance application, copies of quotes for the primary layer of coverage, and loss information.[14]

Beginning in 2011, and through the 2015-2016 policy term of the Rockhill Policy, Rockhill quoted proposed excess liability coverage for JM Drilling under its RIC 3700 policy form.[15]  In each year that Insurisk received a quote from Rockhill, Insurisk gave the quote to Insight, who ultimately requested and Insurisk bind coverage under that policy for JM Drilling.[16]  Insurisk made no changes to the 2015-2016 Rockhill Policy that were not specifically approved by Rockhill, nor made any representations to Insight regarding the coverage available under the Rockhill Policy for that year that were not contained within the quote or policy documents.[17]  JM Drilling relied on Insight for its "expertise in placing insurance coverage to – and procuring insurance coverage to determine what coverage J.M. Drilling needed."[18]

No one from JM Drilling had any communications, written or verbal, with anyone at Insurisk regarding the procurement of insurance and no representations were made by Insurisk as to whether the Rockhill commercial excess policy provided adequate insurance coverage for JM Drilling.[19] Insurisk did not provide any advice, guidance, or recommendations to JM Drilling with regard to insurance coverage.[20]  Insurisk did not provide any advice or guidance to JM Drilling as to whether any insurance policies issued to JM Drilling should provide coverage for subsidence.[21]

---

[13]  Exhibit 2, page 12, line 14 – p. 13, line 12.
[14]  Exhibit 2, page 17, lines 3-13.
[15]  Exhibit 3 – Affidavit of Stephen Hoffmann, paragraph 7.
[16]  Exhibit 3 – Affidavit of Stephen Hoffmann, paragraph 8.
[17]  Exhibit 3 – Affidavit of Stephen Hoffmann, paragraph 9.
[18]  Exhibit 4 - Deposition excerpts of JM Drilling, p. 46, lines 5-14.
[19]  Exhibit 4 - Deposition excerpts of JM Drilling, p. 131, lines 14 – p. 134, line 10.
[20]  Exhibit 4 - Deposition excerpts of JM Drilling, p. 132, line 5 – p. 134, line 9.
[21]  Exhibit 4 - Deposition excerpts of JM Drilling, p. 132, lines 10 – 14.

Insurisk did not make any representations to JM Drilling about any expertise Insurisk might have with regard to procurement of insurance coverage for JM Drilling.[22]  Additionally, there was no contract between JM Drilling and Insurisk to provide any services to JM Drilling.[23]  JM Drilling had no expectation that anyone other than Insight would provide advice on whether JM Drilling should accept the insurance quotes.[24]

The insurance policy at issue in this litigation, an Excess Commercial Follow Form Policy issued by Rockhill Insurance Company, under policy no. R XSL RU 000621-03, effective May 2, 2015 to May 2, 2016, was executed in Tennessee and delivered to a Tennessee insured as a surplus lines coverage pursuant to the Tennessee insurance statutes.[25]

On June 9, 2015, Plaintiff, John Thibodeaux suffered an accident on a utility lot located at 114 Meadowgate in Sawgrass Subdivision in Lafayette Parish, Louisiana.[26]  At no time prior to, on the day of, or after the accident did the Plaintiff, his immediate family members (hereinafter collectively referred to as the "Plaintiffs"), or his counsel contact Insurisk regarding this loss.[27]  Additionally, at no time prior to the instant litigation, did anyone from JM Drilling contact Insurisk regarding the loss, claim, coverage, or the litigation.

On August 24, 2015, the Plaintiffs filed a Petition for Damages in the 15th Judicial District, for the Parish of Lafayette, State of Louisiana, asserting tort claims against numerous defendants (the "State Court action").[28]  The Petition was amended numerous times in the State Court action

---

[22]  Exhibit 4 - Deposition excerpts of JM Drilling, p. 132, line 15 – p.133, line 1.
[23]  Exhibit 4 - Deposition excerpts of JM Drilling, p. 140, lines 7-14.
[24]  Exhibit 4- Deposition excerpts of JM Drilling, p. 165, line 22 – p. 166, line 1.
[25]  Exhibit 6, the Rockhill Insurance Policy.
[26]  R. Doc. 215-1, No. 1.
[27]  Exhibit.7, Plaintiffs' Responses to Interrogatories and Requests for Production of Documents, Answer to Interrogatory Nos. 1 and 5.
[28]  R. Doc. 1-2, Petition for Damages, Civil Action 2015-4167.

to include claims against JM Drilling.[29]  On March 2, 2017, Rockhill received notice of the Plaintiff's accident claims from Admiral Insurance Company.[30]  Prior to trial in the State Court action, on May 10, 2017, Rockhill denied JM Drilling's claim for insurance coverage.[31]  On March 29, 2018, a Jury Verdict was entered in favor of the Plaintiffs and against JM Drilling.[32]

On January 22, 2020, Plaintiffs amended their lawsuit to name Insurisk as an additional defendant on the grounds that Insurisk failed to "obtain full insurance for [JM Drilling's] business operations and activities, including excavation and digging, for the time period covering the events involved in Plaintiff's accident which is the subject of the outstanding judgment seeking to be enforced in this matter."[33]  Thereafter, Insurisk was sued by JM Drilling in its First Amended Third Party Demand and by Insight in its Amended Cross Claim.[34]  JM Drilling and the Plaintiffs subsequently amended their pleadings on March 4, 2021 and on March 11, 2021 respectively, with the Plaintiffs having filed their Fifth Supplemental and Amended Complaint and JM Drilling filing its Second Amended Third Party Demand.[35]  In both amendments JM Drilling and the Plaintiffs alleged that Insurisk failed to procure adequate insurance coverage for JM Drilling, failed to act in accordance with industry standards, failed to seek removal of the subsidence exclusion, failed to review the Rockhill policy, and failed to advise JM Drilling and/or Insight that the Rockhill insurance policy failed to follow form the Admiral Insurance Policy.[36]  JM Drilling also requested that the court award "punitive damages where applicable."[37]

---

[29] R. Docs. 1-3, 1-4, and 1-5.
[30] Exhibit 8 - Deposition excerpts of Kelli Kasal, p. 19, lines 13-20.
[31] Exhibit 9 -  Rockhill's Denial of Insurance Coverage; Exhibit 8 - Deposition of Kelli Kasal, p. 19, line 23- p. 21, line 22.
[32] R. Doc. 1-8 -  Jury Verdict.
[33] Fourth Amended Complaint -  R. Doc. 152, Paragraph 42D.
[34] First Amended Third Party Demand -  R. Doc.  155 and Amended Cross Claim -  R. Doc. 160.
[35] R. Docs.  214 and 226.
[36] R. Docs.  214 and 226.
[37] R. Doc. 155

## LAW AND ARGUMENT

### I.    THE CLAIMS ARE RIPE FOR SUMMARY DISPOSITION

Federal Rule of Civil Procedure 56(a) provides that "a party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought."  The court "shall grant summary judgment if the movant shows that there is no general dispute as to any material fact and the movant is entitled to judgment as a matter of law."[38]  The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for the motion and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."[39] However, if the movant satisfies its burden, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial."[40]

A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party.[41]  Rule 56 "mandates the entry of summary judgment… against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof."[42]

In this case, all issues are joined, discovery has concluded, and there are no factual issues in dispute which are relevant to this motion.  As such, these issues are ripe for summary disposition in advance of trial.

---

[38] Fed. R. Civ. P. 56(a).
[39] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323; 106 S.Ct. 2547, 2553; 91 L.Ed.2d 265 (1986).
[40] *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).
[41] *Quality Infusion Care, Inc. v. Health Care Service Corp.*, 628F.3d 725, 728 (5th Cir. 2010).
[42] *Patrick v. Ridge*, 394 F.3d 311, 315 (5 th Cir. 2004)(quoting *Celotex c. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## II.      ROCKHILL IS VICARIOUSLY LIABLE FOR THE ACTS OF ITS AGENT, INSURISK.

Under Tennessee law, an insurance producer who solicits or negotiates an application for insurance **shall be regarded**, in any controversy arising from the application for insurance or any policy issued in connection with the application between the insured or insured's beneficiary and the insurer, **as the agent of the insurer** and not the insured or insured's beneficiary.[43] "The purpose of §56-6-115(b) is to prevent an insurance company from denying responsibility for the representations and actions of its agent from whom an application for insurance is voluntarily accepted and to protect an applicant who relies upon the such representations and actions of the insurer's agent."[44]

Tennessee law is clear that a principal is liable for the negligence or wrongful acts of its agent acting within the actual or opponent scope of his employment in the principal's service.[45]  In addition, the agent's conduct must be "actuated at least in part, by a purpose to serve the master."[46]  In Tennessee, the doctrine of respondeat superior permits the master/principal to be held liable for the negligent actions of his servant/agent.[47]  To hold the master/principal vicariously liable, "it is enough that the servant or agent was acting in the business of his superior."[48]

---

[43] *See*, Tenn. Code Ann. § 56-6-115(b).

[44] *Acuity Mut. Ins. Co., v. Frye*, 699 F.Supp.2d 975, 986 (E.D. Tenn. 2010).

[45] *As You Sow v. AIG Fin. Advisors, Inc.*, 584 F. Supp. 2d 1034, 1047 (M.D. Tenn. 2008), citing, *Willis v. Settle*, 162 S.W.3d 169, 182 (Tenn.App.2004) ("respondeat superior liability exists when the principal has the right to control the agent"). *Tennessee Farmers Mut. Ins. Co. v. Am. Mut. Liab. Ins. Co.*, 840 S.W.2d 933, 937–38 (Tenn.Ct.App.1992).

[46] *As You Sow, a*t 1047, citing *Tenn. Farmers*, 840 S.W.2d at 938 (citing Restatement (Second) of Agency 5228 (1957)). *See also Smith v. Keyport Self–Storage*, 2000 WL 558604, *4, 2000 Tenn.App. LEXIS 301, *11 (Tenn.Ct.App. May 5, 2000).

[47] *Johnson v. LeBonheur Children's Med. Ctr.*, 74 S.W.3d 338, 343 (Tenn. 2002); *Smith v. Henson,* 214 Tenn. 541, 551, 381 S.W.2d 892, 897 (1964).

[48] *Johnson,* at 343; *White v. Revco Discount Drug Centers, Inc.,* 33 S.W.3d 713, 725 (Tenn. 2000), (quoting *Kinnard v. Rock City Const. Co.,* 39 Tenn.App. 547, 551, 286 S.W.2d 352, 354 (1955)).

In the instant matter, it is undisputed that Insurisk was acting as a wholesale insurance broker for the insurance policies at issue in this litigation for JM Drilling.  Specifically, Insurisk acted as a conduit between JM Drilling's retail insurance agent, Insight, and the excess insurer, Rockhill.

Moreover, in this case Insurisk, as agent for Rockhill, acted at all times within the scope of its agency for Rockhill.  In fact, there have been no allegations in this case that Insurisk exceeded the scope of its authority as agent of Rockhill.  To the contrary, Insurisk delivered the Rockhill policy that was provided to it directly by Rockhill, to JM Drilling's retail agent, Insight.  Ultimately, Insight requested that Insurisk bind coverage under the policy for each of the years in question, and that is exactly what Insurisk did.  In so doing, Insurisk acted precisely within the scope of its agency for Rockhill.

In this litigation, both the Plaintiffs and JM Drilling have alleged in their pleadings that Insurisk (or as set forth in the pleadings, CRC) is the agent of Rockhill.  Plaintiffs and JM Drilling further allege that Rockhill should therefore be estopped from denying coverage due to the misrepresentations, bad acts, and negligence of CRC/Insurisk.[49]  To the extent that claims against Insurisk include negligence, negligent misrepresentation, failure to procure appropriate and adequate insurance coverage, and/or breach of fiduciary duty, Rockhill, as the principle of Insurisk, is vicariously liable for any such alleged negligent acts of Insurisk.

### III.    JM DRILLING IS ESTOPPED FROM ASSERTING A FAILURE TO PROCURE CLAIM UNDER TENNESSEE CODE ANNOTATED 56-7-135(b).

JM Drilling's claims for negligent procurement are barred by Tennessee Code Annotated section 56-7-135(b) which provides that "the payment of premium for an insurance contract, or

---

[49]   Rec. Doc. 222, paragraph 31(D); Rec. Doc. 228, paragraph 20(A); and Rec. Doc. 231, paragraph 25(A).

9

amendment thereto, by an insured shall create a rebuttable presumption that the coverage provided has been accepted by all insureds under the contract."[50]  T.C.A §56-7-135(b) serves as a burden shifting statute.  It creates a rebuttable presumption that, by paying the insurance premium, an insured has accepted the coverage provided under the contract.[51]

The Tennessee Supreme Court has held that "a presumption is prima facie proof of the fact presumed, and unless the fact thus established, prima facie, by the legal presumption of its truth is disproved, it must stand as proved."[52]  Furthermore, under Tennessee law, acquiescence is "conduct from which may be inferred an assent" or a "person's tacit or passive acceptance, or an implied consent to an act."[53]  Acquiescence arises "where a person knows or ought to know that he or she is entitled to enforce his or her right to impeach a transaction and neglects to do so for such a time as would imply that he or she intended to waive or abandon his or her right."[54]  "If a plaintiff acquiesces to a particular contractual agreement, that plaintiff cannot later challenge the arrangement or term."[55]

In *Parveen v. ACG South Insurance Agency, LLC*, the Tennessee Supreme Court evaluated whether the rebuttable presumption contained in T.C.A §56-7-135(b) applies to insurance agents.[56]  The Court noted that the appellants "would be entitled to summary judgment because the Insureds presented to evidence to rebut the presumption."[57]  The Court posited that "when Mr. Shaukat paid

---

[50] *Parveen v. ACG South Insurance Agency, LLC*, 2020 WL 7086157, --- S.W.3d--- (Tenn. 2020). Parveen is the most recent application of Tennessee statutory authority to negligent procurement matters with the decision issued on December 12, 2020.  Such decision was rendered in favor of the insurance agent who was represented by firm colleagues of undersigned counsel.

[51] *Harris v. Nationwide Mut. Fire Ins. Co.*, 92 F.Supp.3d 736, 746 (M.D. Tenn. 2015).

[52] *Braswell v. Tindall*, 294 S.W.2d 685, 689 (Tenn. 1956).

[53] *Harris v. Nationwide Mut. Fire Ins. Co.*, 92 F.Supp.3d 736, 745-46 (M.D. Tenn. 2015)(citing *Keith v. Jackson*, 2013 Tenn. App. LEXIS 120, 2013 WL 672491, *5 (Tenn. Ct. App. 2013)).

[54] *Id.*

[55] *Id.*

[56] 2020 WL 7086157, --- S.W.3d--- (Tenn. 2020).

[57] *Id.* at 4.

10

the annual premium, the rebuttable presumption was triggered that "the coverage provided ha[d] been accepted by all insureds… under the contract."[58]   In issuing its decision, the Court held that,

> We reiterate that the plain language of Section 56-7-135(b) creates a rebuttable presumption that the insureds have accepted the terms of the insurance contract.  It does not leave insureds without redress against a negligent agent who fails to procure the coverage requested.  The language of the statute still permits such an insured to present evidence to rebut the presumption that, by paying their premiums, they accepted the insurance as written.  The insureds in the case before us have not done so.[59]

As in the *Parveen* case, the insured in this matter likewise failed to rebut the presumption that it accepted the insurance as written.  In reviewing the facts of this case, it is clear that no one at JM Drilling ever questioned the coverage secured by Insight nor told Insight that JM Drilling did not want a subsidence exclusion or residential contracting exclusion on any of its liability policies.[60]  John Moore testified that JM Drilling would "always question the price, but we never questioned the coverage."[61]  Rather, JM Drilling simply paid the premiums and accepted the insurance as written.[62]  In fact, JM Drilling's management team never read JM Drilling's insurance policies.[63]   Instead, JM Drilling relied on Insight for its "expertise in placing insurance to – and procuring insurance coverage to determine what coverage J.M. Drilling needed."[64]

Additionally, JM Drilling's principal, John Moore, testified that no one from JM Drilling had any communications, written or verbal, with anyone at Insurisk noting that, "[n]o, no one ever

---

[58]  *Id*. at 5.
[59]  *Id*. at 6.
[60]  Exhibit 4 - Deposition excerpts of JM Drilling, p. 47 lines 12-25 and p. 53, lines 9-25.
[61]  Exhibit 4 - Deposition excerpts of JM Drilling, p. 53, lines 9-25.
[62]  Exhibit 4 - Deposition excerpts of JM Drilling, p. 116, line 24 – p. 117, line 4.
[63]  Exhibit 4- Deposition excerpts of JM Drilling, p. 105, line 18 – p. 106, line 4; See also *Atl. Cas. Ins. Co. v. Norton*, 2015 U.S. Dist. LEXUS 35731 at 20 (E.D. Tenn. Mar 23, 2015) holding that the insured was conclusively presumed to have read, understood and assented to all provisions of the policy.
[64]  Exhibit 4 - Deposition excerpts of JM Drilling, p. 46, lines 5-14.

talked to them."[65] Moore acknowledged that no one from JM Drilling contacted Insurisk regarding the procurement of insurance and no representations were made by Insurisk as to whether the Rockhill commercial excess policy provided adequate insurance coverage for JM Drilling.[66] Further, Moore agreed that there were no misrepresentations made by Insurisk (or CRC) to JM Drilling. Additionally, Moore testified that there was no contract between JM Drilling and Insurisk to provide any services to JM Drilling.[67] Moore posited that JM Drilling had no expectation that anyone other than Insight would provide advice on whether JM Drilling should accept the insurance quotes.[68]

While JM Drilling may maintain it may rebut the *Parveen* presumption, it simply cannot do so in these circumstances because no communications or representations were ever made by Insurisk upon which JM Drilling could have reasonably relied. John Moore and JM Drilling have already conceded these facts.

Consequently, JM Drilling is deemed to have accepted the coverage that was procured which included exclusions for subsidence and residential contracting. Further, with the sole exception of Rockhill, the parties all agree that the coverage purchased by JM Drilling and placed with Rockhill, provided coverage for the loss in this case. JM Drilling purchased a policy that, in its agent's (Insight) opinion, provided coverage for all potential hazards. The accident which forms the basis for the claims at issue, was not a result of subsidence but rather the negligence of JM Drilling in conducting its cabling/drilling services. Accordingly, while JM Drilling is estopped

---

[65] Exhibit 4 - Deposition excerpts of JM Drilling, p. 131, lines 14 - 23.
[66] Exhibit 4 - Deposition excerpts of JM Drilling, p. 131, lines 14 – p. 134, line 10..
[67] Exhibit 4 - Deposition excerpts of JM Drilling, p. 140, lines 7-14.
[68] Exhibit 4 - Deposition excerpts of JM Drilling, p. 165, line 22 – p. 166, line 1.

from arguing negligent procurement under the Tennessee statutory scheme, it can still pursue a remedy against Rockhill for insurance coverage for this loss.

## IV.     UNDER TENNESSEE LAW AND THE LAW OF THE SIXTH CIRCUIT, THIRD-PARTIES, SUCH AS PLAINTIFFS AND JM DRILLING, HAVE NO CAUSE OF ACTION AGAINST INSURISK FOR FAILURE TO PROCURE INSURANCE COVERAGE.

The gravamen of a failure to procure claim, or negligent procurement, is the insured's reliance on the insurance agent's promise to procure the proper insurance coverage.[69] "A cause of action for failure to procure insurance is separate and distinct from any cause of action against an insurer or a proposed insurer; in a failure to produce claim, 'the agent rather than [the] insurance company is independently liable.'"[70] "'Insurance agents, like other professionals, owe a duty to their client to perform consistent with the standards of care of their profession.'"[71]  The Tennessee Supreme Court adopted the elements of the cause of action as laid out in *American Jurisprudence 2d:*[72]

1.  an undertaking or agreement by the agent or broker to procure insurance;

2.  the agent's or broker's failure to use reasonable diligence in attempting to place the insurance and failure to notify the client promptly of any such failure; and

3.  that the agent's or broker's actions warranted the client's assumption that he or she was properly insured.[73]

---

[69] *Parveen v. ACG South Ins. Agency*, <u>613 S.W.3d 113, 118</u> (<u>Tenn. 2020</u>).
[70] *Littleton v. TIS Ins. Serv., Inc.*, <u>2019 WL 141517</u> at 3 (Tenn. Ct. App. 1/9/2019) quoting *Morrison v. Allen*, <u>33 S.W.3d 417, 426</u> (<u>Tenn. 2011</u>).
[71] *Id.*
[72] 43 Am. Jur. 2d *Insurance* § 163 (2003).
[73] *Morrison v. Allen*, <u>338 S.W.3d 417, 426</u> (<u>Tenn. 2011</u>); *Parveen v. ACG South Ins. Agency*, <u>613 S.W.3d 113</u> (<u>Tenn. 2020</u>).

The focus of this cause of action is on the dealings that take place between the parties and the detriment to the client.[74] Tennessee law does not allow an independent third-party to bring a negligent procurement claim against an insured's insurance broker.[75]  Rather, Tennessee law only permits the named insured and legally recognized beneficiaries of an insurance contract to bring a claim against the agent or broker.[76]

Here, the Plaintiffs neither the named insured nor a legally recognized beneficiary of the Rockhill policy.  Moreover, Insurisk is not the agent of JM Drilling; rather, Insurisk is the agent of Rockhill, and the claims of both Plaintiffs and JM Drilling must fail.

Tennessee recognizes that "[m]embers of a civil society, as a general rule, must refrain from committing affirmative acts that a reasonable person should recognize as subjecting another to an unreasonable risk of harm or posing an unreasonable risk of invasion to another's interests."[77] Tennessee courts also recognize the "economic loss" doctrine, which is "a general principle that prohibits the recovery of purely economic damages for negligence when the plaintiff lacks privity of contract with the defendant."[78] Tennessee has, however, adopted an exception to the economic loss rule.[79] This exception allows liability – despite the absence of privity – when a third party justifiably and foreseeably relies on a professional's misrepresentation and suffers economic damages as a result.[80]

---

[74] *Id.* at 427.
[75] *Waddell v. Davis*, 571 S.W.2d 844, 848.
[76] *Id.*
[77] *Marla H. v. Knox Cnty.*, 361 S.W.3d 518, 531 (Tenn. Ct. App. 2011).
[78] *John Martin Co. v. Morse/Diesel, Inc.*, 819 S.W.2d 428, 430, 431 (Tenn. 1991).
[79] *Cadence Bank, N.A. v. DLO Title, LLC*, No. 3:17-CV-01170, 2018 WL 1399584 (M.D. Tenn. Mar. 20, 2018).
[80] *John Martin Co.*, 819 S.W.2d at 430, 431 (Tenn. 1991); see also *Stinson v. Brand*, 738 S.W.2d 186, 190 (Tenn. 1987) (explaining that the Tennessee Supreme Court adopted "the principles later approved by the American Law Institute in [the] Restatement (Second) of Torts 2d, § 552 (1977) in connection with the liability of business or professional persons who negligently supply false information for the guidance of others in their business transactions," which "could apply to attorneys as well as to land surveyors, accountants, or title companies")).

Specifically, in *Morrison v. Allen*, the Tennessee Supreme Court allowed the intended beneficiary of a life insurance policy to sue the insurance agents whom the decedent had retained for failure to procure.[81]  In so ruling, the Court relied on the beneficiary's direct connection to the policy to support its decision.

The United States Sixth Circuit Court of Appeals also addressed negligent procurement claims head on in two separate cases that arose from the same incident. Both cases involved claims that arose after an inflatable slide collapsed at a Cleveland Indians' event. The incident injured one patron and killed another, and in the aftermath, the parties discovered that the event producer's insurance broker had failed to procure the right liability coverage.

In the first case, the Cleveland Indians baseball team brought claims for negligence and negligent misrepresentation against the event producer's insurance broker for failing to procure the insurance that the producer – not the baseball team – had requested.[82]  The Court held that the baseball team could bring a negligent procurement claim because the broker owed the baseball team a duty of reasonable care to procure the requested insurance.[83]  While recognizing that "the law should not allow the insurance broker to be held liable to a virtually limitless class of claimants who are total strangers to the relationship between the insurance agency and the insured, or parties who were unknown to the insurance broker before the filing of a suit," the Court determined the facts at bar were distinguishable.[84] The baseball team was an additional insured under the producer's liability policy, and it was reasonably foreseeable that an additional insured like the baseball team would be harmed if an insurance agency or other intermediary failed to procure the

---

[81]  338 S.W.3d 417, 420 (Tenn. 2011).
[82]  *Cleveland Indians Baseball Co., L.P. v. New Hampshire Ins. Co.*, 727 F.3d 633, 638 (6th Cir. 2013).
[83]  *Id.* at 639.
[84]  *Id.* at 641.

intended coverage, just as the primary insured would be.[85] The broker understood it was procuring insurance for the Indians' baseball team as well as the producer, knew exactly what dates and events the insurance was for, and was aware that the team had paid the premium.[86] Moreover, the broker had issued a certificate of insurance to the team indicating that the policy was in effect.[87] In short, the broker had specific knowledge that the baseball team could be harmed if proper insurance was not procured.[88] The Court held that, given these facts, the baseball team did have an independent cause of action against the broker.

In contrast, when the widow of the deceased patron sued the same insurance broker for acting negligently and in breach of contract by failing to procure the appropriate liability policy, the Court held that the insurance broker was not liable to the patron's estate.[89] The Court held that the event producer's insurance broker owed no independent tort duty to the patron, reasoning that the patron was not the intended third-party beneficiary of the producer's contract with baseball team.[90] Thus, the patron's estate could not recover for the producer's insurance broker's breach of contract because patrons were not directly referred to in contract and the third-party beneficiary class to contract was public at large.[91]

In evaluating the facts to the cases cited herein, it is apparent that neither the Plaintiffs nor JM Drilling are the types of parties to which Tennessee Courts and the United States Sixth Circuit Court of Appeals affords a cause of action for negligent procurement.  In the instant case, Insurisk

---

[85] *Id.* at 642.
[86] *Id.*
[87] *Id.*
[88] *Id.*
[89] *Johnson v. Doodson Ins. Brokerage, LLC*, 793 F.3d 674, 679 (6th Cir. 2015).
[90] *Id.*
[91] *Id.*

was the wholesale broker.  As discussed in detail above, Insurisk was the agent of Rockhill – not the agent of JM Drilling.

The record is clear that neither the Plaintiffs nor JM Drilling had contact with Insurisk prior to, at the time of, or following the Accident.[92]  There was no privity of contract between the Plaintiffs, JM Drilling, and Insurisk.[93]  Further, having reviewed the declarations page and the Rockhill policy, it is clear that the Plaintiffs were not additional named insureds under the Rockhill insurance policy.[94]

Instead, the Plaintiffs and JM Drilling are exactly the sort of parties "unknown to the insurance broker before the filing of a suit" that the Courts acknowledged would "allow the insurance broker to be held liable to a virtually limitless class of claimants who are total strangers to the relationship between the insurance agency and the insured."[95]  Furthermore, in evaluating Plaintiffs' and JM Drilling's claims, all claims are purely economic in nature and are not recoverable under a negligence theory.  Since Insurisk (the broker) made no representations to either the Plaintiffs or JM Drilling, they cannot avail themselves of an exception to the economic loss rule. As such, summary disposition of the Plaintiffs' and JM Drilling's claims for negligent procurement is just and proper.

## V.   INSURISK DID NOT OWE A FIDUCIARY DUTY TO EITHER JM DRILLING OR THE PLAINTIFFS

After an insurance agent agrees to obtain insurance for a client, he or she is acting as the client's agent.[96]  Thus, because the agent is generally operating in a representative capacity, the

---

[92]  Exhibit 7 - Plaintiffs Answer to CRC Interrogatory Nos. 1 and 5; Exhibit 4- Deposition excerpts of JM Drilling, p. 131, line 24 – 134, line 10.
[93]  Exhibit 4 - Deposition excerpts of JM Drilling, p. 140, lines 7-14.
[94]  Exhibit 6 - the "Rockhill Policy".
[95]  *Cleveland Indians Baseball Co., L.P. v. New Hampshire Ins. Co.*, <u>727 F.3d 633, 638</u> (6th Cir. 2013).
[96]  *New Appleman on Insurance Law* § 2.03[2], at 2–11 to –12.

rights, powers, and responsibilities of the agent are governed and controlled by the rules and laws of agency.[97] Agency is a fiduciary relationship that arises when the principal manifests assent to the agent that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests or otherwise consents to act on the principal's behalf.[98] The fiduciary nature of the agent's obligations requires the agent to act loyally in the principal's interest, as well as on the principal's behalf.[99]

Tennessee common law recognizes "a distinction between an insurance broker and an insurance agent."[100]  In order to prevail on a breach of fiduciary duty claim, the "Plaintiff bears the burden to present sufficient facts to support a judgment that a confidential relationship existed and was breached."[101]  "For a *prima facia* showing of the existence of a fiduciary relationship, a plaintiff must demonstrate that he reposed confidence in the agent who exercised dominion and influence whereby the plaintiff was to act for the plaintiff's benefit."[102]  "'It is not merely a relationship of mutual trust and confidence, but rather a confidential relationship is one where confidence is placed by one in the other and that recipient of that confidence is a dominant personality, with ability, because of that confidence, to exercise dominion and control over the weaker or dominated party.'"[103]

---

[97]   *Knox–Tenn Rental Co. v. Jenkins Ins., Inc.,* 755 S.W.2d 33, 36 (Tenn.1988) ("An agent is a fiduciary with respect to the matters within the scope of his agency."); *Miller v. Ins. Co. of N. Am.,* 211 Tenn. 620, 625, 366 S.W.2d 909, 911 (1963) (quoting Bouvier's Law Dictionary's definition of an agent as "[o]ne who undertakes to transact some business, or to manage some affair, for another, by the authority and on account of the latter, and to render an account for it."); However, Contracts between sophisticated commercial entities, negotiated at arm's length, do not create fiduciary duties between the parties. *Notredan, LLC v. Old Republic Exchange Facilitator Co.*, 2012 WL 3049941 (W.D. Tenn. 2012).
[98]   Restatement (Third) of Agency § 1.01, at 17.
[99]   Restatement (Third) of Agency §§ 1.01 cmt. e, at 23; 8.01, at 249.
[100]  *Watkins v. HRRW LLC,* 2006 WL 3327659 at 7 (M.D. Tenn. 2006).
[101]  *Id.* at 8.
[102]  *Id.*
[103]  *Id.* at 9 quoting *Iacometti v. Frassinelli*, 494 S.W.2d 496, 499 (Tenn.Ct. App.  1973).

In the instant case, Insurisk was neither the agent for the Plaintiffs nor of JM Drilling. Indeed, prior to the initiation of this litigation, the Plaintiffs and JM Drilling had <u>no</u> relationship with Insurisk, much less a confidential relationship of mutual trust.[104]  There was no such agent-insured relationship as Insurisk was the broker for Rockhill, nor the agent of the Plaintiffs or of the insured, JM Drilling.  Lacking such a relationship, neither the Plaintiffs nor JM Drilling can establish that a fiduciary relationship existed between themselves and Insurisk or that a fiduciary duty was owed by Insurisk to the Plaintiffs or JM Drilling.  Consequently, JM Drilling and the Plaintiffs' claims for breach of fiduciary duty must be dismissed.

## VI.   JM DRILLING HAS FAILED TO STATE A CLAIM FOR PUNITIVE DAMAGES.

### A. Tennessee Code Annotated § 56-8-113 provides the sole and exclusive statutory remedy and sanction for an insurer, person or licensed entity.

In raising its claim for punitive damages, JM Drilling did not identify the legal theory or statutory scheme which would provide for the recovery of punitive damages.  In fact, it is evident that there is no such legal basis.

Since the causes of action alleged in the third-party demand arise from the insurance policy, JM Drilling's claims are limited by Tennessee Code Annotated § 56-8-113 – Statutory remedies and sanctions.  Under Tennessee Code Annotated § 56-8-113,

> title 50 and this title shall provide the sole and exclusive statutory remedies and sanctions applicable to an insurer, person, or entity licensed, permitted, or authorized to do business under this title for alleged breach of, or alleged unfair or deceptive acts or practices in connection with, a contract of insurance as such term is defined in § 56-7-101(a).  Nothing in this section shall be construed to eliminate or otherwise affect any:
>
> (1) Remedy, cause of action, right to relief or sanction available under common law;

---

[104]   Exhibit 7 - Plaintiffs' Answers to Interrogatories No. 1 and 5; Exhibit 4 - Deposition excerpts of JM Drilling, p. 131, line 14 – p. 134, line 9.

      (2) Right to declaratory, injunctive or equitable relief, whether provided under title 29 or the Tennessee Rules of Civil Procedure; or

      (3) Statutory remedy, cause of action, right to relief or sanction referenced in title 50 or this title.

In enacting this statute, the legislature limited causes of action arising from insurance agreements to titles 50 and 56 of Tennessee's code. In applying the statute, courts construe the statute as applying to "any actions arising from insurance agreements"[105] and private causes of action are prohibited.[106]

      Alternatively, should JM Drilling seek to pursue a statutory claim for punitive damages under the Tennessee Consumer Protection Act ("TCPA"), such claims would be prohibited and subject to immediate dismissal. While the TCPA provides for the recovery of punitive damages, it is contained at Title 47 of the Tennessee Code[107], and not Titles 50 or 56.

      As noted in the Factual Background, Insurisk and its agent, Stephen Hoffmann, were a person, or entity licensed, permitted, or authorized to do business under this title.[108] The claims brought by JM Drilling relate to the breach of, or alleged unfair or deceptive acts or practices in connection with, a contract of insurance.[109] Consequently, JM Drilling is prohibited by § 56-8-113 from seeking punitive damages under the TCPA.[110] Accordingly, since JM Drilling's "TCPA claim arises from an insurance agreement, it fails as a matter of law and [must] be dismissed."[111]

---

[105] *Brown v. Genworth Life & Annuity Ins. Co.*, No.3:18-cv-506, 2020 WL 7646413, at *13 (E.D. Tenn. Aug. 28, 2020).

[106] No private right of action exists for violating Tennessee's Insurance Trade Practices Act. *Lindsey v. Allstate Ins. Co.*, 34 F. Supp. 2d 636 (W.D. Tenn. 1999).

[107] Tennessee Code Annotated § 47-18-101, *et seq.*

[108] Exhibit 1, *in globo* - Proof of Licensure from the Tennessee Department of Insurance; Exhibit 3 Affidavit of Stephen Hoffmann, paragraphs 4 and 5.

[109] R. Doc. 155.

[110] *Murphy v. Allstate Indem. Co.*, No. 1:13-cv-108, 2014 WL 1024165 at 4 (E.D. Tenn. Mar. 17, 2014).

[111] *Brown v. Genworth Life & Annuity Ins. Co.*, No.3:18-cv-506, 2020 WL 7646413, at *13 (E.D. Tenn. Aug. 28, 2020).

**B. JM Drilling failed to establish a claim for punitive damages under Tennessee common law.**

While Tennessee Code Annotated § 56-8-113 prohibits JM Drilling from pursuing statutory claims for punitive damages against Insurisk, it does not foreclose recovery under the common law.  Nevertheless, JM Drilling cannot satisfy the criteria for such a claim.

In evaluating claims for common law punitive damages the Tennessee Supreme Court emphasized that awards of punitive damages should not be liberally imposed.[112]  Rather, punitive damages should be reserved for only "the most egregious cases."[113]  In order to seek punitive damages, JM Drilling must prove that Insurisk acted "(1) intentionally, (2) fraudulently, (3) maliciously, or (4) recklessly….by clear and convincing evidence."[114]  "Evidence is clear and convincing when it leaves 'no serious or substantial doubt about the correctness of the conclusions drawn.'"[115]

In the instant case, there was no contract between JM Drilling, the insured, and Insurisk, the wholesale broker.[116] Contrary to the common law requisite elements, JM Drilling did not allege that Insurisk acted intentionally, fraudulently, maliciously or recklessly.  Rather, the record is replete with testimony establishing that JM Drilling had no communications with Insurisk and that Insurisk never misrepresented anything to JM Drilling.[117]  JM Drilling's principal noted that JM Drilling had no expectation that anyone other than Insight would provide advice on whether JM Drilling should accept the insurance quotes.[118]  Without requisite proof of misrepresentation or

---

[112] *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn. 1992).
[113] *Id.*
[114] *Id.*
[115] *Flax v. DaimlerChrysler Corp.*, 272 S.W.3d 521, 531 (Tenn. 2008).
[116] Exhibit 4 Deposition of excerpts JM Drilling, p. 140, lines 7-14.
[117] Exhibit 4 -  Deposition excerpts of JM Drilling, p. 131, lines 14- p.134, line 10.
[118] Exhibit 4 - Deposition excerpts of JM Drilling, p.  165, line 22 – p. 166, line 1.

21

other acts or omissions beyond mere negligence, JM Drilling cannot sustain a claim of punitive damages against Insurisk.

These are no facts to establish wanton or reckless conduct on the part of Insurisk. Consequently, because JM Drilling's claims do not rise to the level of egregious misconduct for which Tennessee common law imposes punitive damages, JM Drilling's punitive damages claims should be dismissed.

## VII.   INSURISK IS NOT LIABLE TO PLAINTIFFS OR JM DRILLING FOR FAILURE TO PROCURE AS TO TWO ISSUES OF COVERAGE.

As outlined in Rockhill's pleadings, including the motion for summary judgment it recently filed on the coverage issue (Rec. Doc. 254), Rockhill has effectively raised three coverage defenses:

1. There is no coverage under the Rockhill Policy due to a subsidence exclusion;
2. There is no coverage under the Rockhill Policy due to a Residential Contracting-Construction Defect exclusion; and
3. There were two "occurrences" thus the Rockhill Policy only attaches in excess of the underlying liability policy's $2 Million aggregate limit, instead of the $1 Million per occurrence limit.[119]

Based on the undisputed material facts of this case, should the Court conclude that there is no coverage under the Rockhill Policy due to the Residential Contracting exclusion, Insurisk cannot be found liable to either Plaintiffs or JM Drilling as there are no facts to support any claims of negligence of Insurisk with regard to the presence of the Residential Contracting exclusion in the Rockhill Policy.

Further, should the Court conclude that there were two "occurrences," thereby triggering the $2 Million aggregate limit of the underlying policy for which Rockhill is attempting to take a

---

[119] There are motions for summary judgment filed by the Plaintiffs (Rec. Doc. 215) and JM Drilling (Rec. Doc. 234) addressing these same coverage issues.

22

credit (versus the $1 Million actually paid), Insurisk cannot be found liable to Plaintiffs or JM Drilling as Insurisk was not a party to that settlement, nor was Insurisk asked to participate in or otherwise approve the voluntary settlement of JM Drilling and Plaintiffs with Admiral for the $1 Million per occurrence limit of the Admiral Policy.  Thus, there are no facts to support any claims of negligence of Insurisk with regard to the "Two Occurrence" argument.

Under Tennessee law, the requisite elements of a cause of action for failure to procure against an insurance agent are as follows:

(1) An undertaking or agreement by the agent or broker to procure insurance;
(2) The agent's or broker's failure to use reasonable diligence in attempting to place the insurance and failure to notify the client promptly of any such failure; and
(3) That the agent's or broker's actions warranted the client's assumption that he or she was properly insured.[120]

A cause of action for failure to procure insurance is separate and distinct from any cause of action against an insurer or a proposed insurer; in a failure to procure claim, the agent, rather than the insurance company, is independently liable.[121]  An agent or broker is liable for failure to procure 'on the theory that he or she is the agent of the insured in negotiating for a policy, and owes a duty to the principal to exercise reasonable skill, care, and diligence in effecting the insurance.'[122]  Situations wherein an insured may recover damages include both a complete failure to procure insurance as well as "instances where coverage was acquired, but was inadequate in light of the agreement between the insured and the agent."[123]

---

[120] *Morrison v. Allen*, 338 S.W.3d 417, 426 (Tenn. 2011).
[121] *Id.*
[122] *Id.*
[123] *Id.* at 426–27 (citing *Bell v. Wood Insurance Agency*, 829 S.W.2d 153 (Tenn. Ct. App. 1992).  See also, *Littleton v. TIS Ins. Servs., Inc.*, No. E2018-00477-COA-R3-CV, 2019 WL 141517, at *3 (Tenn. Ct. App. Jan. 9, 2019).
[124] Exhibit 4 – Deposition of JM Drilling, page 19, lines 4-8.

Notwithstanding the above, one of the recently raised issues in this case is whether Insurisk, under Tennessee law, is the agent of Rockhill.  Assuming the Court determines Insurisk is the agent of Rockhill, this standard of care for procurement would not apply to Insurisk as it requires that Insurisk be "the agent of the insured" as per the *Morrison* decision, and the liability of Insurisk could be based only on ordinary negligence.  Regardless, Insurisk should be absolved of liability in the event that the Court concludes that the Residential Contracting exclusion precludes coverage, and relieved of some or all liability to extent that the court finds two occurrences excludes coverage or results in a "deduction" in the amount of coverage owed for the second occurrence.

**A. No party to this litigation has disputed the residential contracting exclusion being included on the Rockhill policy, therefore there is no claim against Insurisk.**

Multiple witnesses have been deposed in this case, and one common theme among them is that at no time, did anyone ever request that Insurisk (or anyone else) take any steps to remove the Residential Contracting exclusion from the Rockhill Policy, or otherwise procure insurance coverage for JM Drilling that did not have this exclusion.  This is undisputed, and as a result, should the Court find that the Residential Contracting exclusion bars coverage under the Rockhill Policy (whether any other provision bars coverage or not), Insurisk is entitled to a judgment as a matter of law that the claims of Plaintiffs and JM Drilling against it must fail, and Insurisk should be dismissed from this lawsuit.

As an initial matter, JM Drilling testified that it absolutely does not do residential construction, and only performs commercial work.[124]  This fact alone strongly suggests that JM Drilling would not have an issue with the Residential Contracting exclusion on its insurance policy.

---

[124]   Exhibit 4 – Deposition of JM Drilling, page 19, lines 4-8.

However, JM Drilling also very clearly testified that JM Drilling never discussed a residential contracting or residential construction exclusion with anyone with regard to JM Drilling, at any time during the years JM Drilling has been in business.[125]  From the years 2010 to 2016, no one at JM Drilling communicated to Insight that it did not want an exclusion for residential construction or residential contracting on its liability insurance policies,[126] all the while, JM Drilling knew exactly what a residential exclusion was, and that it would exclude coverage for work it did on residential projects.[127]

Testimony of representatives of Insight confirms these facts.  Specifically, Brenda Johnson, the account manager for Insight for the JM Drilling account for multiple years, testified that no one at JM Drilling ever requested that Insight have the Residential Contracting-Construction Defect exclusion removed from the Rockhill Policy.[128]  This testimony was echoed by Joe Evans, one of the owners of insight, who confirmed the lack of such a request to Insurisk.[129]

As to communications between JM Drilling and Insurisk, there were none.  JM Drilling confirmed that no one at JM Drilling ever had communications with Insurisk (or CRC) regarding the procurement of insurance coverage.[130]  Further, no one at Insurisk ever made representations to JM Drilling about the scope of coverage under the Rockhill Policy for the years 2011-2016.[131]  Similarly, no one at Insurisk (or CRC) ever provided advice, or guidance or recommendations to JM Drilling with regard to insurance coverage.[132]  JM Drilling also confirmed there was no contract

---

[125]  Exhibit 4 - Deposition of JM Drilling, page 39, lines 8-13.
[126]  Exhibit 4 - Deposition of JM Drilling, page 47, lines 18-25.
[127]  Exhibit 4 - Deposition of JM Drilling, page 38, lines 17-25.
[128]  Exhibit 10 - Deposition of Brenda Johnson, page 249 line 15 – page 250 line 22.
[129]  Exhibit 5 - Deposition of Joe Evans, page 81, lines 1-11.
[130]  Exhibit 4 - Deposition of JM Drilling, page 131, lines 9-23.
[131]  Exhibit 4 - Deposition of JM Drilling, page 131, line 24 – page 132, line 4.
[132]  Exhibit 4 - Deposition of JM Drilling, page 132, lines 10 – page 133, line 22-14.

between JM Drilling and either Insurisk or CRC to provide any services to JM Drilling,[133] and that JM Drilling was not claiming that Insurisk or CRC acted fraudulently with regard to the procurement of the insurance coverage for JM Drilling.[134]  Neither Insurisk nor CRC made any representations nor misrepresentations to JM Drilling about the procurement of insurance coverage or the scope of coverage for JM Drilling.[135]

Further, there were no representations made by Insurisk to the Plaintiffs regarding insurance coverage as Plaintiffs were not parties to this process,[136] and in fact Plaintiffs have not had any direct communication with Insurisk either regarding the incident or the losses sustained.[137] Plaintiffs were also not parties to any contract with Insurisk.[138]  Plaintiffs were also not parties to the application, negotiation, and agreement for excess/umbrella liability policies for JM Drilling.[139]

Even Akos Swierkiewicz, the expert witness of Plaintiffs and JM Drilling, confirmed that he is not giving an opinion as to whether Insurisk had an obligation to have the Residential Contracting-Construction Defect exclusion removed from the Rockhill Policy and in fact has seen no evidence that anyone ever asked Insurisk to remove that exclusion from the Rockhill Policy.[140]

In light of the facts of this case, there was simply no failure to procure on the part of Insurisk, and there are no facts to support any negligence with regard to the procurement of the Rockhill Policy as to the Residential Contracting exclusion.  Insurisk cannot be held liable for something it was never asked to do, whether by JM Drilling, or by the retail agent, Insight, both

---

[133]   Exhibit 4 - Deposition of JM Drilling, page 140, lines 7-14.
[134]   Exhibit 4 - Deposition of JM Drilling, page 140, lines 2-6.
[135]   Exhibit 4 - Deposition of JM Drilling, page 133, line 2 – page 134, line 10.
[136]   Exhibit 7 – Plaintiffs' Answers to Interrogatories, interrogatory 1.
[137]   Exhibit 7 – Plaintiffs' Answers to Interrogatories, interrogatory 5.
[138]   Exhibit 7 -  Plaintiffs' Answers to Interrogatories, interrogatory 2.
[139]   Exhibit 7 – Plaintiffs' Answers to Interrogatories, interrogatory 7.
[140]   Exhibit 11 - Deposition of Akos Swierkiewicz, page 212, lines 3-16.

of whom possessed far greater knowledge of the insurance needs of JM Drilling.  Should the Court conclude that the Residential Contracting exclusion bars coverage in this case, all claims against Insurisk should be dismissed as a matter of law.

**B. Any coverage issue created by the voluntary settlement among Plaintiffs, JM Drilling and Admiral cannot give rise to claims against Insurisk.**

The Plaintiffs previously entered into a settlement agreement with JM Drilling and Admiral to settle claims under the primary liability policy of Admiral related to this incident.[141]  The settlement of that claim was for a $1 Million per occurrence limit under the Admiral Policy. Rockhill, in its pleadings and including its summary judgment under Rec. Doc. 254, has alleged that the incident which gave rise to the Plaintiffs' injuries was not one, but two occurrences.  Thus, Rockhill claims, it is entitled to a credit of $2 Million as opposed to the $1 Million actually paid by Admiral in the settlement before the Rockhill Policy is triggered (subject to other coverage defenses raised by Rockhill).

Though it is not entirely clear from the pleadings of Plaintiffs and JM Drilling as to its claims against Insurisk in negligence, Insurisk submits that should the Court determine that there were two occurrences such that Rockhill is entitled to a credit of an additional $1 Million before its policy is triggered, Insurisk cannot and should not be held liable for that $1 Million shortfall. The reasons for this are very simple:  Insurisk was not a party to the settlement agreement among Admiral Insurance Company, JM Drilling and the Plaintiffs,[142] and Insurisk was not involved in and was not asked to participate in or otherwise approve the June 29, 2018 settlement among Admiral Insurance Company, JM Drilling and the Plaintiffs.[143]

---

[141]   Exhibit 12 – Receipt, Release and Indemnity Agreement (Rec. Doc. 58).
[142]   Exhibit 3 - Affidavit of Stephen Hoffmann, paragraph 13.
[143]   Exhibit 3 - Affidavit of Stephen Hoffmann, paragraph 14.

Neither the Plaintiffs nor JM Drilling have identified any legal duty of Insurisk, nor is there any such legal duty of Insurisk to the Plaintiffs or JM Drilling as to the repercussions that the settlement with Admiral had upon coverage under the Rockhill Policy.  If anything, as the parties who voluntarily entered into that settlement agreement, any liability for any shortage created by Rockhill receiving a $1 Million credit should be borne either by JM Drilling, the Plaintiffs, or both. Insurisk cannot and should not be held liable for any amounts deemed not to be owed by Rockhill due to the issue of two occurrences.

## CONCLUSION

CRC Insurance Services, Inc. (Insurisk) respectfully requests that this Court grant its motion and find that:

(i)     Rockhill Insurance Company ("Rockhill"), as the principal of Insurisk is vicariously liable for the acts of Insurisk in this case;

(ii)    JM Drilling, LLC ("JM Drilling") is estopped from bringing negligent procurement claims against Insurisk under *Parveen v. ACG South Insurance Agency, LLC*;[144]

(iii)   JM Drilling and the Plaintiffs lack standing to pursue negligent procurement of insurance coverage claims against Insurisk;

(iv)    Insurisk did not owe the Plaintiffs or JM Drilling a fiduciary duty;

(v)     Punitive damages are not recoverable in this matter; and

(vi)    Insurisk is not liable in a failure to procure claim if Rockhill's denial of coverage is based on either the Residential Contracting exclusion or a determination that

---

[144]   2020 WL 7086157, ---S.W.3d --- (Tenn. 2020).

Thibodeaux's injury resulted from two "Occurrences" as defined under the primary insurance policy.

Respectfully submitted
**ADAMS AND REESE LLP**


*/s/William D. Shea*_____
William D. Shea (#29419)
Susan N. Eccles (#29847)
Adams and Reese LLP
450 Laurel Street, Suite 1900
Baton Rouge, LA  70801
Telephone:  225.336.5200
Facsimile:  225.336.5220
Email:  william.shea@arlaw.com
Email:  susan.eccles@arlaw.com

***Attorneys for Defendant***
***CRC Insurance Services, Inc.***


<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to all counsel of record via the Court's electronic filing system.


*/s/ William D. Shea*
William D. Shea