# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA
### LAFAYETTE DIVISION

| | | |
|---|---|---|
| JOHN THIBODEAUX, ET AL., | ) | NO. 6:18-CV-501 (LEAD) |
| | ) | |
| V. | ) | |
| | ) | |
| J.M. DRILLING, LLC, ADMIRAL | ) | |
| INSURANCE COMPANY, ROCKHILL | ) | |
| INSURANCE COMPANY, AND | ) | |
| BELLSOUTH TELECOMMUNICATIONS | ) | |
| LLC | ) | |
| | ) | |
| | ) | |
| | ) | |
| ROCKHILL INSURANCE COMPANY, | ) | NO. 6:18-CV-1414 (MEMBER) |
| | ) | |
| V. | ) | |
| | ) | JUDGE ROBERT R. SUMMERHAYS |
| J.M. DRILLING, LLC | ) | MAGISTRATE JUDGE CAROL B. |
| | ) | WHITEHURST |

---

## ROCKHILL INSURANCE COMPANY'S OMNIBUS RESPONSE IN OPPOSITION TO THE MOTIONS FOR SUMMARY JUDGMENT FILED BY PLAINTIFFS, J.M. DRILLING, LLC, AND INSIGHT RISK MANAGEMENT, LLC

---

Plaintiff-Defendant Rockhill Insurance Company ("Rockhill"), by and through its undersigned counsel, respectfully submits this Omnibus Response in Opposition to the Motions for Summary Judgment filed by the Thibodeaux Plaintiffs ("Plaintiffs"), J.M. Drilling, LLC ("JM Drilling"), and Insight Risk Management, LLC ("Insight") (Docs. 234, 238, 245, and 251).

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... iii

I.     INTRODUCTION ..................................................................................1

II.    SUMMARY JUDGMENT STANDARD ...........................................................1

III.   RESPONSE TO JM DRILLING'S MOTION FOR SUMMARY
JUDGMENT (DOC. 234).................................................................................2

     A.    JM Drilling Does Not and Cannot Raise Any Arguments That
Would Preclude the Inevitable Application of the Subsidence
Exclusion..................................................................................................2

          1.    The Subsidence Exclusion Applies to Subsidence Taking
Place During and After JM Drilling's Operations ......................3

          2.    The Contractors Limitation Endorsement Does Not Amend
the Subsidence Exclusion. ...........................................................4

     B.    The Residential Construction Exclusion Bars Coverage for the
Underlying Lawsuit. ...............................................................................6

     C.    If There Were Multiple "Concurrent" Causes of Plaintiffs' Injury,
Then the Underlying Lawsuit Triggered Two Separate $1 Million
Per-Occurrence Limits of the Primary Admiral Policy. .........................8

IV.   RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT ON ESTOPPEL/WAIVER (DOC. 238).....................................9

     A.    Rockhill Did Not Misrepresent its Policy by Calling it a "Follow
Form" Policy, and JM Drilling Could Not Have Reasonably Relied
on the Title of the Coverage Form to Assume the Policy Did Not
Have a Subsidence Exclusion. ...............................................................10

     B.    Rockhill Disclosed All of the Exclusions in the Rockhill Policy,
and JM Drilling Did Not Reasonably Rely on Rockhill to Notify
JM Drilling or Insight of the Subsidence Exclusion..............................12

     C.    The Fact that Rockhill Did Not Issue a Copy of the Sample
Coverage Form *Directly to* JM Drilling or Insight Does Not Allow
JM Drilling to Avoid the Application of the Subsidence Exclusion. ...................15

V.    RESPONSE TO JM DRILLING'S ALTERNATIVE MOTION FOR
SUMMARY JUDGMENT THAT THE ROCKHILL EXCESS POLICY
IS ILLUSORY IF THE SUBSIDENCE EXCLUSION IS APPLIED
(DOC. 245) ....................................................................................................17

i

A.   JM Drilling Never Asserted a Claim for Illusory Coverage in its Pleadings, and Therefore Cannot Move for Summary Judgment on this Recently Concocted Claim............................................................17

B.   The Subsidence Exclusion Does Not Negate Coverage for All Potential Claims Under the Rockhill Policy, and therefore Coverage Is Not "Illusory." ..................................................18

VI.   RESPONSE TO INSIGHT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON INSURANCE COVERAGE (DOC. 251) ............................................21

A.   It Cannot Be Reasonably Disputed that Thibodeaux's Injury Was Caused by Subsidence..............................................................21

B.   The Subsidence Exclusion Contains ACC Language. ..........................................22

C.   The Subsidence Exclusion Is Not Ambiguous......................................................22

VII.   CONCLUSION............................................................................................................23

## TABLE OF AUTHORITIES

*Am. Gen. Life Ins. Co. v. Underwood*, 85 F. Supp. 3d 944 (E.D. Tenn. 2015) ........................9, 11

*Atlantic Cas. Ins. Co. v. Norton*, 3:12-CV-650-PLR,
2015 WL 1293666 (E.D. Tenn. Mar. 23, 2015) .............................................19

*Bill Brown Const. Co., Inc. v. Glens Falls Ins. Co.*, 818 S.W.2d 1 (Tenn. 1991) ........................15

*Broom v. Wilson Paving & Excavating, Inc.*, 356 P.3d 617 (Okla. 2015)................................6, 19

*Buchholz v. Tennessee Farmers Life Co*., 145 S.W.3d 80 (Tenn. Ct. App. 2003) ........................9

*Dow Chem. Co. v. Royal Indem. Co*., 635 F.2d 379 (5th Cir. 1981) ............................................22

*Free v. Bland*, 369 U.S. 663 (1962)............................................................................................17

*Garrison v. Bickford*, 377 S.W.3d 659 (Tenn. 2012) .....................................................................8

*Harris v. Wal-Mart Stores E., LP*, No. 1:11-CV-03406-CC,
2013 WL 6795973 (N.D. Ga. Dec. 23, 2013).................................................17

*Johnson & Assocs., LLC v. Hanover Ins. Grp., Inc.*,
572 S.W.3d 636 (Tenn. Ct. App. 2018);.........................................................9

*Lineberry v. State Farm Fire & Cas. Co*., 885 F. Supp. 1095 (M.D. Tenn. 1995) ................18, 19

*Merrimack Mut. Fire Ins. Co. v. Batts*, 59 S.W.3d 142 (Tenn. Ct. App. 2001) ........................6, 8

*St. Paul Fire & Marine Ins. Co. v. Ford Motor Co*., No. 95 C 3920,
1996 WL 33683809 (N.D. Ill. 1996) ..............................................................17

*Thomas v. White Birch Lakes Recreation*, 2015 WL 3604781 (Mich. App. 2015)........................8

*Tucker v. Tennessee*, 539 F.3d 526 (6th Cir. 2008) ......................................................................1

*United Nat. Ins. Co. v. Assurance Co. of Am*., 2:10-CV-01086-MMD,
2012 WL 1931521 (D. Nev. 2012) ..............................................................6, 19

*Webber v. State Farm Mut. Auto. Ins. Co*., 49 S.W.3d 265 (Tenn. 2001) .....................................9

*Winters v. Charter Oak Fire Ins. Co.*, 4 F. Supp. 2d 1288 (D.N.M. 1998) ..................................21

## I.      INTRODUCTION

Rockhill is entitled to a declaration that it owes no coverage to JM Drilling for its liability in the Underlying Lawsuit.   As fully discussed in Rockhill's Memorandum in Support of Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment (Doc. 254-1) (hereinafter "Rockhill's Cross-Motion"), the Rockhill Policy contains a Subsidence Exclusion and Residential Construction Exclusion that both unambiguously apply to bar coverage for the Underlying Lawsuit.

Plaintiffs, JM Drilling, and Insight have filed four motions for summary judgment that are addressed in this omnibus response.  In general, Plaintiffs' and JM Drilling's motions seek to avoid application of the Rockhill Policy's Subsidence Exclusion and Residential Construction Exclusion through a variety of unusual and extraordinary remedies that are simply not justified by the facts of this case and under applicable Tennessee law.  For its part, Insight primarily reiterates the same arguments as JM Drilling and/or Plaintiffs in favor of coverage.

For the reasons discussed in more detail below, the Court should deny the motions for summary judgment by Plaintiffs, JM Drilling, and Insight, and grant summary judgment in favor of Rockhill.

## II.     SUMMARY JUDGMENT STANDARD

Under the Federal Rules of Civil Procedure, a court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law.  *Tucker v. Tennessee*, 539 F.3d 526, 531 (6th Cir. 2008) (citing Fed. R. Civ. P. 56(a)).  If a movant for summary judgment meets its burden of showing the absence of a genuine issue of material fact, the nonmovant must respond by submitting evidence that sets out specific facts showing that there is a genuine issue for trial.  *Id.*  If the record taken cannot lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.  *Id.*

III.   **RESPONSE TO JM DRILLING'S MOTION FOR SUMMARY JUDGMENT (DOC. 234)**

A.   **JM Drilling Does Not and Cannot Raise Any Arguments That Would Preclude the Inevitable Application of the Subsidence Exclusion.**

JM Drilling's first Motion repeats or adopts a number of arguments regarding the applicability of the Rockhill Policy's Subsidence Exclusion that were previously raised by Plaintiffs in their Motion for Summary Judgment on Insurance Coverage. (S*ee* Doc. 215-4). Specifically, JM Drilling repeats the illogical and plainly erroneous arguments that (1) subsidence did not cause JM Drilling's liability, and (2) the Rockhill Policy does not contain anti-concurrent causation language ("ACC language").  (Doc. 234-4 at 15-16).  Since Rockhill fully addressed these arguments in its Cross-Motion, in the interest of efficiency, Rockhill responds to JM Drilling's arguments on these issues by incorporating the arguments set forth in Rockhill's Cross-Motion.  (*See* Doc. 254-1 at 8-10).

In addition to raising the above arguments, JM Drilling attempts to avoid the clear application of the Subsidence Exclusion by adopting and supplementing Plaintiffs' argument that the Subsidence Exclusion applies only to bodily injury taking place during JM Drilling's ongoing operations.  (Doc. 234-4 at 17-18).  JM Drilling then argues that an unrelated endorsement in the Rockhill Policy—which adds unrelated exclusions to the policy—somehow amends the Subsidence Exclusion to apply only to property damage claims.  (*Id*.)  As set forth below, these tortured arguments have no basis in law and are wholly unsupported by the operative language of the Rockhill Policy.[1]

---

[1] Tellingly, JM Drilling does not make any arguments regarding the concurrent causation doctrine—which Plaintiffs erroneously contend applies here—other than to summarize part of the substantial factor test.  (Doc. 234-4 at 16).

2

1.    **The Subsidence Exclusion Applies to Subsidence Taking Place During and After JM Drilling's Operations**

The Subsidence Exclusion applies to "any liability" on the part of JM Drilling that directly or indirectly arises out of  subsidence or "any other movement of land or earth" that emanates from JM Drilling's operations.  (*See* SUF[2] at ¶ 9).  As set forth in Rockhill's Cross-Motion, there is nothing in the Subsidence Exclusion (or the Rockhill Policy) that can be interpreted as assigning a temporal limitation to the exclusion, and the exclusion can only be reasonably interpreted as applying to subsidence or any other type of land movement that emanate from (or arise out of) the insured's operations/work, ***regardless of whether said operations are ongoing or completed***. (Doc. 254-1 at 17).

JM Drilling, however, adopts Plaintiffs' argument that the Subsidence Exclusion should be interpreted as applying only to ***injury*** taking place during JM Drilling's "ongoing operations." (*See* Doc. 234-4 at 17-18).  For the multiple reasons set forth in Rockhill's Cross-Motion (which are adopted and incorporated herein), this interpretation is illogical and unsupported by the clear and unambiguous language of the operative policy language itself.  (Doc. 254-1 at 17-18).

JM Drilling raises no new arguments on this issue other than to summarily conclude that its interpretation is supported by the fact that the Rockhill Policy contains a Pollution Exclusion that applies to premises on which any "***insureds are*** performing operations."  (Doc. 234-4 at 18) (emphasis added).[3]   Essentially, JM Drilling argues that the Pollution Exclusion contains qualifying language limiting the exclusion to pollution taking place during the insured's

---

[2] "SUF" refers to Rockhill's Statement of Facts in Support of its Cross-Motion, Doc. 254-3, which is incorporated herein by reference.

[3] JM Drilling's brief misquotes the Pollution Exclusion as applying to operations the insured "*is* performing," when it actually uses the phrase "*are* performing." (*See* Doc. 234-4 at 18; Rockhill Policy, Ex. 2 to JM Drilling's Mot. Summ. J., Doc. 234-6, at INSIGHT 009076).

operations, and thus the Subsidence Exclusion should be interpreted the same. *Id.* However, even if JM Drilling's interpretation of the Pollution Exclusion were true, the noted distinction in the exclusions would only further prove Rockhill's argument on this point. As set forth in Rockhill's Cross-Motion, if the Subsidence Exclusion was meant to limit its reach to *ongoing* operations, it would have used qualifying language to this effect. (Doc. 254-1 at 17). The fact that the Subsidence Exclusion does not contain such qualifying language—while the Pollution Exclusion allegedly does—conclusively establishes that the Subsidence Exclusion does not, and is not intended to, limit its reach to ongoing operations.

### 2. The Contractors Limitation Endorsement Does Not Amend the Subsidence Exclusion.

JM Drilling next summarily concludes—without providing any explanation or supporting case law—that the Rockhill Policy's Contractors Limitation Endorsement amends the Subsidence Exclusion to apply only to property damage claims. (Doc. 234-4 at 18–20). The Contractors Limitation Endorsement provides in part as follows:

1.      This insurance does not apply to any liability arising from:

   a.      any project insured under a "wrap up" or similar rating plan;

                    *        *        *

2.      Except insofar as coverage is available to the insured in valid and collectible Underlying Insurance as listed in the Schedule of Underlying Insurance for the full limit shown, and then only for such liability for which coverage is afforded under said insurance, this insurance shall not apply to:

   a.      any liability assumed by the insured under any contract or agreement.

   b.      any liability for property damage to property leased by, used by, or in the care, custody or control of the insured or as to which the insured is for any purposed exercising physical control; or

   c.      for property damage arising out of:

       (1)     blasting or explosion other than the explosion of air or steam vessels, piping under pressure, prime movers, machinery or power transmitting equipment; or

       (2)     the collapse of or structural injury to any building or structure due to (a) grading of land, excavation, burrowing, filling or back-filling, tunneling, pile driving, cofferdam work or caisson work, or moving, shoring, underpinning, raising or demolition of any building or structure, or removal of rebuilding of any structural support thereof; or

       (3)     injury to or destruction of wires, conduits, pipes, mains, sewers, tank, tunnels, any similar property and any apparatus in connection therewith, beneath the surface of the ground or water, caused by and occurring during the use of mechanical equipment for the purpose of grading land, excavating, drilling, borrowing, filing, back-filling or pile driving.

(*See* Rockhill Policy, Ex. 2 to JM Drilling's Mot. Summ. J., Doc. 234-6, at INSIGHT 009103).

The Contractors Limitation Endorsement does ***not*** amend any existing exclusions in the Rockhill Policy, but instead adds exclusions to the policy. (*Id.*) For example, paragraph 1.a provides that the Policy excludes coverage for any project that is insured under a "wrap-up" plan. (*Id.*) In addition, Paragraph 2 of the Endorsement lists exclusions that apply to certain claims if they are covered by the primary policy (and not ***already excluded*** by the Rockhill Policy).[4] (*See id.*)

JM Drilling's contention that the Contractors Limitation Endorsement amends the Subsidence Exclusion to apply only to "property damage" claims is unsupported by any language anywhere in the Rockhill Policy. The Endorsement does not say that it amends any exclusions in the policy, let alone the Subsidence Exclusion. In fact, the Endorsement does not even reference subsidence or the Subsidence Exclusion. (*See id.*) If the Endorsement amended the Subsidence

---

[4] For example, under paragraph 2.a, if the primary policy provides coverage for a contractual liability claim, then the Rockhill Policy excludes coverage for contractual liability. (*See id.*)

Exclusion—or any other exclusion—the Endorsement would specifically state as much.  Indeed, there is **one** endorsement in the Rockhill Policy that does, in fact, amend an already-existing exclusion in the Policy (Exclusion No. 4).  That endorsement clearly and unambiguously conveys the intention to amend Exclusion No. 4, by stating: "Item 4.  In Section V. Exclusions is deleted and replaced with the following. . . ."  (*See* Rockhill Policy, Ex. 2 to JM Drilling's Mot. Summ. J., Doc. 234-6, at INSIGHT 009123).  The Contractors Limitation Endorsement contains no such language.  (*See id*. at INSIGHT 009103).

There is simply nothing in the Contractors Limitation Endorsement that can be remotely construed as supporting JM Drilling's interpretation.  Indeed, JM Drilling does not even identify what specific language in the Endorsement (or elsewhere) allegedly supports its position.  Nor does JM Drilling cite to any case law applying such a radical interpretation or supporting such a blatant dismissal of basic contract interpretation principles.  *See Merrimack Mut. Fire Ins. Co. v. Batts*, 59 S.W.3d 142, 148 (Tenn. Ct. App. 2001) (when interpreting an insurance policy, a court should give the policy's terms their natural and ordinary meaning, give effect to the parties' intentions as reflected in the agreement itself, and construe the policy as whole in a reasonable and logical manner).[5]

**B.      The Residential Construction Exclusion Bars Coverage for the Underlying Lawsuit.**

Like Plaintiffs, JM Drilling misconstrues the Residential Construction Exclusion in an effort to find coverage, ignoring its plain language to imply the exclusion only bars coverage for

---

[5] Notably, JM Drilling relies on two cases from outside Tennessee in support of its argument that the Subsidence Exclusion does not apply.  Not only are those cases non-controlling, but they are also inapposite because they involve different policy language, different underlying facts, and different legal issues.  *See United Nat. Ins. Co. v. Assurance Co. of Am*., 2:10-CV-01086-MMD, 2012 WL 1931521, at *5 (D. Nev. 2012) (addressing whether a different subsidence exclusion barred coverage for a construction defect claim that did ***not*** involve subsidence); *Broom v. Wilson Paving & Excavating, Inc*., 356 P.3d 617, 632 (Okla. 2015) (interpreting an earth movement exclusion).

liability arising from a construction defect.  JM Drilling's focus on the term "construction defect" is misleading.  The exclusion is not limited to construction "defects" simply because the word "defect" appears in the exclusion's heading.  Instead, as the exclusion plainly reads, it excludes coverage for liability "directly or indirectly arising out of or related to" JM Drilling's work as an "entity" involved in "construction, improvements . . . or any work . . . involving property intended in whole or in part for residential habitation." (SUF at ¶ 11).  JM Drilling also argues the exclusion does not apply because it was not found "liable" for residential construction.  (Doc. 234-4 at 10).  Setting aside that "residential construction" is not a cause of action, this again misconstrues the plain language of the Residential Contracting Exclusion.  In response to these arguments, Rockhill respectfully refers the Court to and adopts its arguments addressing same in Rockhill's Cross-Motion.  (*See* Doc. 254-1 at 20–21).

JM Drilling also argues, erroneously, that the Residential Construction Exclusion should not apply because the utility lot where the accident took place was not, itself, intended for residential habitation.  (Doc. 234-4 at 11-14).  Once again, this interpretation misreads the plain language of the exclusion.  The exclusion does not require the insured to be working in or on a residential property intended for habitation in order to apply.  Instead, the exclusion applies if JM Drilling's liability arises out of, or is related to, work "involving property intended in whole or in part for residential habitation."  JM Drilling's work on the utility lot in the Sawgrass Subdivision meets this definition for the reasons discussed in Rockhill's Cross-Motion.  (*See* Doc. 254-1 at 20–21).

JM Drilling also cites to the fact that the primary Admiral Policy contains a similar residential contracting exclusion.  However, the impact of a residential contracting exclusion in a separate policy (or Admiral's interpretation of it) is completely irrelevant to whether or not the

7

Rockhill Policy's Residential Construction Exclusion applies.  The Court should disregard JM Drilling's efforts to compare the Rockhill Policy to a separate and independent policy with its own separate language and application.  Next, JM Drilling cites to a Michigan court of appeal case, *Thomas v. White Birch Lakes Recreation*, 2015 WL 3604781 (Mich. App. 2015), which does not discuss the definition of "residential" in the context of a residential construction exclusion (or, for that matter, even in an insurance context).  This case is inapposite and non-controlling and offers no persuasive value.

Lastly, JM Drilling argues that the Residential Construction Exclusion is ambiguous, relying solely on the deposition testimony of Rockhill underwriter Mike Towel and Rockhill claims handler Kelli Kasal.  (Doc. 234-4 at 14).  This argument should be disregarded because a witnesses' understanding of a policy provision does not impact the construction of the policy as whole; instead, the meaning of an insurance policy is reflected by the agreement itself.  *Merrimack*, 59 S.W.3d at 148.  The cited deposition testimony was based on hypothetical scenarios posed to the witnesses, and does not operate to change or alter the plain language of the Rockhill Policy. Therefore, the plain language of the Residential Construction Exclusion clearly excludes coverage for the Underlying Lawsuit.  *See Garrison v. Bickford*, 377 S.W.3d 659, 664 (Tenn. 2012) (Tennessee courts will not place a "strained" construction on language in insurance policies "to find ambiguity where none exists.").

### C.   If There Were Multiple "Concurrent" Causes of Plaintiffs' Injury, Then the Underlying Lawsuit Triggered Two Separate $1 Million Per-Occurrence Limits of the Primary Admiral Policy.

JM Drilling echoes Plaintiffs' inconsistent arguments that only one "occurrence" took place, despite the fact that Plaintiffs' injuries allegedly resulted from two or more "concurrent" causes.  JM Drilling also cites to policy language in the ***Rockhill*** Policy (Doc. 234-4 at 22), which

is irrelevant to the question of whether multiple occurrences took place under the ***Admiral*** Policy. In response to JM Drilling's arguments on this issue, Rockhill adopts and incorporates the arguments set forth in its Cross-Motion, Doc. 254-1 at 29.

## IV.  RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON ESTOPPEL/WAIVER (DOC. 238)[6]

To succeed on the alleged estoppel claim, Plaintiffs have the burden of proving that Rockhill made a misrepresentation on which JM Drilling reasonably relied to its detriment. *Johnson & Assocs., LLC v. Hanover Ins. Grp., Inc.*, 572 S.W.3d 636, 645 (Tenn. Ct. App. 2018); *Buchholz v. Tennessee Farmers Life Co*., 145 S.W.3d 80, 85 (Tenn. Ct. App. 2003) ("estoppel is not favored and it is the burden of the party seeking to invoke the doctrine to prove each and every element thereof.").   Under Tennessee law, one of the essential elements that a party claiming estoppel must show is the "[l]ack of knowledge and of the ***means of knowledge of the truth*** as to the facts in question." *Am. Gen. Life Ins. Co. v. Underwood*, 85 F. Supp. 3d 944, 953–54 (E.D. Tenn. 2015) (emphasis added) (citations omitted).   Further, in the context of estoppel claims, in the absence of fraud or mutual mistake, "the insured is conclusively presumed to have knowledge of, and to have assented to, all the terms, conditions, limitations, provisions or recitals in the policy, irrespective of whether the insured actually read, or could read, the insurance contract." *Id.* (quoting *Webber v. State Farm Mut. Auto. Ins. Co*., 49 S.W.3d 265, 274 (Tenn. 2001)).

Plaintiffs contend that Rockhill should be estopped from denying coverage based on the Subsidence Exclusion because (1) Rockhill misrepresented the terms of the Rockhill Policy by calling it a "follow form" policy and by allegedly failing to disclose "non-standard" exclusions in

---

[6] JM Drilling filed a motion to join Plaintiffs' motion on estoppel/waiver (Doc. 249), which the Court granted (Doc. 257).  JM Drilling's joinder merely adopted Plaintiffs' motion without asserting any additional arguments. (*See* Doc. 249).  Accordingly, this response also applies to JM Drilling's joinder.  In addition, Rockhill also incorporates the arguments on estoppel set forth in Rockhill's Cross-Motion, Doc. 241-1 at 28–29.

the Rockhill Policy including the Subsidence Exclusion, and/or (2) Rockhill failed to provide its sample policy form directly to Insight and/or JM Drilling.  (Doc. 238-1 at 14, 20).   As set forth below, Rockhill did not make any misrepresentations or engage in any wrongful conduct that could in any way be subject to the doctrine of equitable estoppel.  Moreover, Plaintiffs do not and cannot allege any reasonable reliance resulting in detriment.  The Court should therefore deny Plaintiffs' Motion for Summary Judgment on estoppel, and grant summary judgment to Rockhill on the estoppel claims.

### A.   Rockhill Did Not Misrepresent its Policy by Calling it a "Follow Form" Policy, and JM Drilling Could Not Have Reasonably Relied on the Title of the Coverage Form to Assume the Policy Did Not Have a Subsidence Exclusion.

There is not a single piece of evidence indicating that Rockhill ever made any false representations to anyone concerning the Rockhill Policy.  In fact, JM Drilling itself conceded that Rockhill did not make any misrepresentations regarding the Rockhill Policy.  (SUF at ¶ 109).  Plaintiffs' sole allegation of "misrepresentation" is the fact that the Rockhill Policy's coverage form is titled "Commercial Follow Form."   Plaintiffs' contention that this constitutes a "misrepresentation" is premised on the incorrect notion that the Rockhill Policy is not a follow form policy.  Plaintiffs, however, cannot reasonably dispute that the Rockhill Policy is, in fact, a follow form policy that follows the terms and exclusions of the primary policy, subject to its own exclusions.  Indeed, representatives from both Insight and Insurisk testified that the Rockhill Policy was a follow form policy that did not provide the exact same coverage as the primary policy (Evans Dep., Ex. 1 at 37:17–38:4; Farish Dep., Ex. 2 at 30:4–30:10, 127:8–128:4), and Plaintiffs' own expert similarly agreed that Rockhill issued a follow form policy (*see* Swierkiewicz Dep., Ex. 3 at 231:8–231:17).

Not only is the title of Rockhill's coverage form not a "misrepresentation," Plaintiffs and JM Drilling cannot demonstrate that JM Drilling **reasonably** relied on the coverage form's title to conclude that the Rockhill Policy provided the exact same coverage as the primary policy for two independent reasons.

First, both Insight and JM Drilling admittedly received a copy of the same Rockhill policies every single year for five straight years, yet neither JM Drilling nor Insight ever even bothered to read any of the Rockhill Policies. (SUF at ¶¶ 75–82). All JM Drilling or Insight had to do was open the Rockhill Policy to see that it does not provide the exact same coverage as the primary policy. Their respective failure to do so automatically bars estoppel, as a matter of law. *See Underwood*, 85 F. Supp. 3d at 953–54 (explaining that a party claiming estoppel must demonstrate a lack of means of knowledge of truth as to the fact in question, and the insured "is conclusively presumed to have knowledge of, and to have assented to, all the terms, conditions, limitations, provisions or recitals in the policy, irrespective of whether the insured actually read, or could read, the insurance contract.").

Second, putting aside JM Drilling's and Insight's neglect to review any of the Rockhill policies, any purported reliance on the coverage form's title is simply unreasonable. Initially, the insurance summary proposal that Insight provided to JM Drilling for the 2015 period noted that the excess policy was "***typically*** follow form"—as opposed to a "complete" follow form coverage—and then set forth the notable exclusions in the Rockhill Policy (*See* Ex. 5). Further, as Plaintiffs' and Insight's own experts opined, the most common type of follow form policy is a "follow form with exceptions" policy—*i.e.*, a policy such as Rockhill's that follows the primary policy subject to Rockhill's own terms and exclusions.[7] In fact, JM Drilling's prior excess carrier

---

[7] Insight's expert, James Mahurin, testified that "complete" follow forms are uncommon and that most follow forms are follow forms with exceptions. (Mahurin Dep., Ex. 4 at 58:11-58:13, 155:5-155:12). This is consistent with

also issued a "follow form with exceptions" policy to JM Drilling that was similarly titled "Commercial Follow Form Excess Insurance Policy" and that also contained 26 exclusions in the policy's coverage form.  (*See* Ex. 9).  Therefore, it would have been wholly unreasonable for JM Drilling or Insight to assume that the Rockhill Policy provided the exact same coverage as the primary policy based solely on the policy's title, particularly in light of the fact that no one ever bothered to even read any of the Rockhill Policies for five consecutive years.  (*See* SUF at ¶¶ 75–82).

### B.   Rockhill Disclosed All of the Exclusions in the Rockhill Policy, and JM Drilling Did Not Reasonably Rely on Rockhill to Notify JM Drilling or Insight of the Subsidence Exclusion

The argument that Rockhill did not "disclose" its non-standard exclusions including the Subsidence Exclusion is wholly unsupported by any evidence.  Rather, it is undisputed that prior to binding coverage, Rockhill provided to Insurisk a copy of the Rockhill coverage form, which contained all of the exclusions at issue (including the Subsidence Exclusion).  (SUF at ¶¶ 70–72). It is further undisputed that Insight and JM Drilling were provided a copy of the Rockhill policies for five consecutive years, all of which contained the exact same coverage form and Subsidence Exclusion.  (*Id.* at ¶¶ 75–80, 96).  Simply put, ***Rockhill fully disclosed the existence of the Subsidence Exclusion***.  In fact, the expert on which Plaintiffs' rely (James Mahurin) agreed that the terms and exclusions of the Rockhill Policies were not omitted from Insight.  (Mahurin Dep., Ex. 4 at 66:17–66:20).

Further, as Rockhill's designated underwriting expert (Marilyn L. Schultz) opined, under the applicable standard industry practice, Rockhill's only obligation was to provide the policy to

---

Plaintiffs' expert's testimony that most follow form policies are subject to their own terms and exclusions. (Swierkiewicz Dep., Ex. 1 at 20:13-20:21).

the broker (which Rockhill did), and Rockhill had no obligation to explain any differences in coverage between the Rockhill Policy and JM Drilling's primary policy. (Ex. 6 at 5-6).[8] Therefore, Rockhill did not commit a misrepresentation or wrongful act that would even potentially give rise to equitable estoppel.

Moreover, Plaintiffs cannot demonstrate reasonable reliance because, as discussed above, JM Drilling's and Insight's refusal to even read any of the Rockhill policies—which contained the coverage form and the conspicuous Subsidence Exclusion—for five consecutive years, by itself precludes a showing of reasonable reliance.

Further, any contention that Rockhill had an obligation to notify Insight or JM Drilling that its policy contained a Subsidence Exclusion—or that JM Drilling reasonably relied on Rockhill to do so—is wholly unsupported by any evidence. There is simply not a ***single document or any testimony*** from any person deposed in this case—indicating that anyone at Insight or JM Drilling expected, much less ***reasonably*** relied on, ***Rockhill*** to notify JM Drilling or Insight of the Subsidence Exclusion or any other exclusions. Quite the opposite, the undisputed evidence demonstrates that it was only Insight (and maybe Insurisk) that was expected to identify and note the Subsidence Exclusion. Indeed, the undisputed evidence demonstrates as follows:

- During the procurement of the Rockhill Policy, Rockhill did ***not*** have any direct communications with Insight or JM Drilling, because Insurisk served as the intermediary between Rockhill and Insight. (SUF at ¶¶ 49–50).

---

[8] Ms. Schultz is the only expert retained in this litigation qualified and experienced enough to opine on the expected conduct and the expected disclosures/communications between the excess insurer, the broker, and the agent in this setting, as she has over 40 years of practical experience as a casualty underwriter and underwriting manager for various insurance companies, including thirty years specializing in underwriting the type of policies at issue here. (*Id.* at 2 and Ex. attached thereto). In contrast, Insight's expert (James Mahurin) has not worked as an underwriter in 36 years. (Ex. 4 at 163:4-163:15). Similarly, Plaintiffs' expert (Akos Swierkiewicz) has not worked as an underwriter in over 20 years, and even that experience was primarily limited to working in the distinguishable, reinsurance setting. (*See* Ex. 7 at 51-52).

- No one ever asked for the Rockhill Policy to provide coverage for Subsidence or for the Rockhill Policy to provide the exact same coverage as the primary policy, and no one ever indicated to anyone that either such coverage would be provided.  (*Id.* at ¶¶ 83-86, 88-90, 102, 104, 105, 108–110).

- The Insight account manager for the Rockhill Policy, Brenda Johnson, testified that it was a function and task of ***Insight*** to provide advice and recommendations to JM Drilling regarding which policies are suitable, why they are suitable, and how they would provide coverage.  (*Id.* at ¶ 53).

- Brenda Johnson (Insight) testified that ***Insight*** was tasked with explaining the potential coverage of each policy.  (*Id.* at ¶ 54).  Roy Wood and Brenda Johnson of ***Insight*** would do an overview of the coverage with JM Drilling, they would explain any significant exclusions of the policies, and they would ultimately recommend one policy over another.  (*Id.* at ¶ 55, 56).

- Insight provided an insurance summary and proposal to JM Drilling that provided a summary of the Rockhill coverage and notable exclusions set forth therein.  (*See* Ex. 5).

- Brenda Johnson (Insight) testified that Insurisk does not advise Insight or have any input on the coverage that is being provided to JM Drilling, and that Insurisk only tries to place the insurance based on what the request was from Insight.  (SUF at ¶¶ 62–63).

- Joe Evans of Insight testified that Insight relied on ***Insurisk's*** knowledge of the policy form, and that Insight relied on ***Insurisk*** to provide information to Insight regarding aspects of that form that were important to the coverage that was being placed for JM Drilling.  (Evans Dep., Ex. 1 at 14:19-15:3).

- Joe Evans (Insight) further testified that the process of determining what terms are agreeable for the insured was based on Insight's initial conversation with the insured and Insight's conversations with the wholesale broker, "because since [Insight does not] have direct contact with the insurance company, we have to ***rely on the wholesale broker to be ours and the insured's advocate in that regard*** . . . ."  (*Id.* at 58:5-59:21) (emphasis added).

- Insight's expert, James Mahurin, testified that ***none*** of the Insight employees who were deposed in this case testified that they expected Rockhill to identify all non-standard exclusions.  (Mahurin Dep., Ex. 4 at 166:13–166:18).

- Insight's expert, James Mahurin, testified that Insight never indicated to anyone that they wanted to know if there were any exclusions in the Rockhill Policy that were not standard.  (*Id.* at 91:4–91:8).

- Rockhill underwriter Mike Towell testified that he would simply submit an insurance quote and a copy of the coverage  form to the broker, and then it was up to the broker

and the retail agent to assess whether it met the needs of the insured.  (SUF at ¶¶ 66–68).

Plaintiffs do not and cannot cite to any factual evidence indicating that JM Drilling or Insight relied on *Rockhill* to notify Insight or JM Drilling of the existence of the Subsidence Exclusion.  Instead, Plaintiffs rely on the conclusory and unreliable opinions of Insight's and Plaintiffs' experts, James Mahurin and Akos Swierkiewicz, which the Court should disregard as improper legal arguments and improper mental-state opinions that are speculative and unsupported by the record evidence.  (*See* Rockhill's *Daubert* Motions to Exclude Testimony of Mahurin and Swierkiewicz, Docs. 262 and 263).  Plaintiffs further rely on cases that are wholly inapposite, as those cases involved situations wherein the agent specifically advised the insured that it would provide coverage for the risk at issue.  *See Bill Brown Const. Co., Inc. v. Glens Falls Ins. Co*., 818 S.W.2d 1 (Tenn. 1991).

Improper expert opinions and inapposite case law do not overcome the overwhelming amount of evidence demonstrating no wrongful act on the part of Rockhill and no reasonable reliance on the part of JM Drilling.  Plaintiffs therefore cannot meet their burden of proving estoppel.

**C.    The Fact that Rockhill Did Not Issue a Copy of the Sample Coverage Form *Directly to* JM Drilling or Insight Does Not Allow JM Drilling to Avoid the Application of the Subsidence Exclusion.**

Plaintiffs' contention that Rockhill should be estopped from denying coverage simply because it did not provide a copy of its sample coverage form ***directly to*** Insight or JM Drilling is absurd.  Tellingly, Plaintiffs do not and ***cannot*** explain how this would even amount to a misrepresentation or wrongful act giving rise to equitable estoppel.  Indeed, it is undisputed that during the procurement of the Rockhill Policy, Rockhill did ***not*** have any direct communications with Insight or JM Drilling, because Insurisk served as the intermediary between Rockhill and

15

Insight (and only Insight had communications with JM Drilling).  (SUF at ¶¶ 49–50).  It is further undisputed that Rockhill provided Insurisk with a copy of its sample coverage form, the insurance quote, and ultimately a copy of the Rockhill Policy; and per standard practice, ***it was not Rockhill's obligation to provide any of these materials directly to Insight or JM Drilling***.  (*Id.* at ¶¶ 66–68.) Therefore, Rockhill did not commit a misrepresentation or wrongful act that would even potentially give rise to equitable estoppel.

In addition, Plaintiffs cannot demonstrate reasonable reliance resulting in detriment. Initially, as discussed above, JM Drilling's and Insight's refusal to even read any of the Rockhill policies by itself precludes a showing of reasonable reliance.

Moreover, there is not a single piece of evidence indicating that JM Drilling reasonably (or even subjectively) relied on Rockhill to provide the sample coverage form directly to Insight or JM Drilling.   Quite the opposite, the Insight account manager for the Rockhill Policy, Brenda Johnson, testified that Insight never bothered to ask Insurisk for a copy of the sample coverage form because it was up to Insurisk to review and know what was in the form, and not Insight; and that ***Insurisk*** should have provided the coverage form if it was something Johnson needed to see. (Johnson Dep., Ex. 25 to Plaintiffs' Mot. Summ. J. on Waiver/Estoppel, Docs. 238-32 to 238-35, at 203:19–204:13.)

Moreover, the evidence indicates that JM Drilling and Insight would not have even bothered to read the sample coverage form had they received a copy of it.  Again, JM Drilling and Insight received a copy of the ***actual*** Rockhill policies for five consecutive years and did not review any of the policies for any reason.  (SUF at ¶¶ 75-80, 96).  As Brenda Johnson (Insight) testified, Insight did not review any of the Rockhill policies or coverage forms, because it was standard practice for Insight to only read the insurance quotes and schedule of forms and endorsements, and

16

nothing else.  (SUF at ¶ 80).  In fact, Insurisk did provide a copy of the coverage form to Insight in 2014 (Ex. 8 at CRC_000502, 000534), and when asked if it would have been standard protocol for Insight to review the coverage form, Johnson stated "*we were not to do that, so the answer would probably be no*."  (Johnson Dep., Ex. 25 to Plaintiffs' Mot. Summ. J. on Waiver/Estoppel, Docs. 238-32 to 238-35, at 152:15–153:9) (emphasis added).

For Plaintiffs to suggest that receiving a copy of the sample coverage form would have somehow alerted Insight or JM Drilling to the existence of the Subsidence Exclusion is simply speculation that is contradicted by JM Drilling and Insight's own conduct and established protocol of not reviewing any policy forms.  Indeed, Plaintiffs do not in any way even attempt to explain how or why this is a wrongful act arising to the level of estoppel, nor they do attempt to explain what exactly JM Drilling allegedly relied on to its detriment.

## V.   RESPONSE TO JM DRILLING'S ALTERNATIVE MOTION FOR SUMMARY JUDGMENT THAT THE ROCKHILL EXCESS POLICY IS ILLUSORY IF THE SUBSIDENCE EXCLUSION IS APPLIED (DOC. 245)

In its alternative Motion for Summary Judgment, JM Drilling argues—for the very first time in this litigation—that if the Subsidence Exclusion applies to exclude coverage, then the Rockhill Policy is "illusory."  (Doc. 245).  As set forth below, JM Drilling cannot now, at this late stage of litigation, raise a completely new claim.  Moreover, JM Drilling's "illusory" claim is factually and legally meritless.  The Court should therefore deny this motion.

### A.   JM Drilling Never Asserted a Claim for Illusory Coverage in its Pleadings, and Therefore Cannot Move for Summary Judgment on this Recently Concocted Claim.

JM Drilling never raised illusory coverage as a claim or defense anywhere in its pleadings, and therefore should be barred from seeking summary judgment based on a novel legal theory raised for the first time in this case.  JM Drilling has never plead illusory coverage as a claim or defense, and may not do so for the first time in this case in a motion for summary judgment.  Under

17

well-established federal precedent, this Court cannot grant summary judgment to JM Drilling on a claim it has never put before the Court in its pleadings.  The Court should therefore reject JM Drilling's last-minute attempt to assert a completely new claim for the first time on a motion for summary judgment (which, notably, was filed long after expert designations and the close of discovery).  *See Free v. Bland*, 369 U.S. 663, 671 (1962) (where there is no direct allegation of a claim in a pleading, that claim cannot be decided on summary judgment); *St. Paul Fire & Marine Ins. Co. v. Ford Motor Co*., No. 95 C 3920, 1996 WL 33683809, at *3 (N.D. Ill. 1996) ("Obviously, a motion for summary judgment cannot be decided based upon issues not raised in the pleadings. If the complaint does not set out a prayer for recovery, summary judgment cannot be granted"); *Harris v. Wal-Mart Stores E., LP*, No. 1:11-CV-03406-CC, 2013 WL 6795973, at *10 (N.D. Ga. Dec. 23, 2013) (a claim not mentioned in a complaint is not properly before the court on summary judgment).

**B.      The Subsidence Exclusion Does Not Negate Coverage for All Potential Claims Under the Rockhill Policy, and therefore Coverage Is Not "Illusory."**

JM Drilling fails to provide any definition or legal argument as to what "illusory coverage" is, or why the Rockhill Policy is supposedly "illusory" other than claiming JM Drilling expected for all of its risks to be covered and making the conclusory statement that the Subsidence Exclusion applies to exclude "coverage for its drilling/excavation business operations whi[c]h is all it does." (Doc. 245-3 at 8).  JM Drilling's contention that the Rockhill Policy provides illusory coverage is factually and legally meritless.

Initially, JM Drilling's alleged expectation of coverage is irrelevant.  An insured's disappointment that a policy does not cover all of its potential risks does not make coverage illusory.  Rather, Tennessee courts have found a policy to be "illusory" when an exclusion applies to coverage afforded under the policy in ***all circumstances***.  For example, in *Lineberry v. State*

18

*Farm Fire & Cas. Co.*, 885 F. Supp. 1095, 1099 (M.D. Tenn. 1995), a court interpreting Tennessee law held that a policy's "expected or intended injuries" exclusion rendered the policy's coverage for invasion of privacy illusory because claims for invasion of privacy are inherently intentional torts.

In contrast, in *Atlantic Cas. Ins. Co. v. Norton*, 3:12-CV-650-PLR, 2015 WL 1293666, at *7 (E.D. Tenn. Mar. 23, 2015), the court found a dram shop exclusion did not render liability coverage to a tavern illusory. In reaching this conclusion, the court rejected the insured's argument that the policy would not apply under any reasonably expected set of circumstances (the same argument advanced by JM Drilling). The court reasoned the dram shop exclusion was not an "absolute" liquor exclusion that would have negated coverage in ***every circumstance***.

Like in *Norton*—and unlike in *Lineberry*—the Subsidence Exclusion does not exclude coverage for ***all*** potential claims against JM Drilling. Nor does it categorically eliminate specific grants of coverage in all circumstances. JM Drilling's argument that the coverage is illusory appears to be based on Plaintiffs' incorrect notion that that the Subsidence Exclusion would broadly apply to bar coverage for ***any*** liability that arises from JM Drilling's operations because JM Drilling's operations necessarily involve "moving dirt." (*See* Doc. 215-4 at 22). As set forth in Rockhill's Cross-Motion, however, this interpretation is unsupported by the clear language of the exclusion itself and can only be reached by taking certain sections of the exclusion out of context. (*See* Doc. 254-1 at 18–20).

The Subsidence Exclusion only excludes coverage for liability arising from or relating to subsidence or other similar types of land movement—it does not apply to all of JM Drilling's liability. Contrary to JM Drilling's assertion, the Subsidence Exclusion does not apply to exclude a wide variety of losses stemming from JM Drilling's drilling/boring operations. For example, the

Subsidence Exclusion would not bar coverage for negligent drilling work that resulted in "property damage" or "bodily injury" that did not involve subsidence.  Nor would the exclusion bar coverage for JM Drilling's auto liability, which was one of the primary risks for which JM Drilling sought coverage.  (*See* 30(b)(6) Dep. of JM Drilling, Ex. 23 to JM Drilling's Mot. Summ. J., Doc. 234-19, at 41:23-41:25).  There are a lot of risks associated with JM Drilling's operations that are not in any way affected by the Subsidence Exclusion. [9]  JM Drilling, however, cannot provide a single example of a type of claim that would be excluded by the Subsidence Exclusion simply because it arose out of JM Drilling's drilling/boring operations.

JM Drilling fails to acknowledge the wide variety of risks that are covered by the Rockhill Policy, and instead focuses on how the policy failed to meet its expectations for what the policy *should* have covered after the fact and what Rockhill supposedly knew about JM Drilling's business.  But JM Drilling's retroactive expectations and Rockhill's knowledge of JM Drilling's business activities are not relevant factors to the question of illusory coverage under Tennessee law.  Moreover, JM Drilling's contention that it expected coverage for all risks associated with its drilling operations is belied by the fact that at least two of JM Drilling's primary policies contained a subsidence exclusion and multiple insurance proposals submitted to JM Drilling contained "earth movement exclusions," and no one ever objected to same.  (SUF at ¶¶ 14–18).

JM Drilling simply cannot meet its burden of demonstrating that the Rockhill Policy provides illusory coverage, and the non-Tennessee cases[10] it relies on as "persuasive authority" do

---

[9] In fact, the Insight account manager that procured the Rockhill Policy for JM Drilling (Brenda Johnson) testified that **she did not believe a subsidence exclusion was a big or major risk for JM Drilling** and that subsidence is something you typically see in insured's doing foundation work.  (Johnson Dep., Ex. 25 to Plaintiffs' Mot. Summ. J., Doc. 238-32 at 93:24-94:12), which is not the type of work performed by JM Drilling.

[10] *See Broom*, 356 P.3d at 629 and *United Nat. Ins. Co.*, 2012 WL 1931521 at *5.

not even discuss illusory coverage, and should therefore be disregarded.  The Court should therefore deny JM Drilling's Motion on illusory coverage.

## VI.   RESPONSE TO INSIGHT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON INSURANCE COVERAGE (DOC. 251)

Insight's Motion for Partial Summary Judgment on Insurance Coverage largely adopts or reiterates arguments raised by Plaintiffs and/or JM Drilling concerning the Subsidence Exclusion, the Residential Construction Exclusion, and estoppel.   To the extent Rockhill has already responded to these arguments in this omnibus response or in Rockhill's Cross-Motion, Rockhill responds to Insight's arguments by adopting and incorporating the arguments set forth herein and in Rockhill's Cross-Motion.   As set forth below, to the extent Insight makes any new or supplemental arguments, those arguments are equally meritless.

### A.   It Cannot Be Reasonably Disputed that Thibodeaux's Injury Was Caused by Subsidence.

In this lawsuit, Plaintiffs and JM Drilling admit that Thibodeaux's injury was at least caused in part by subsidence.  Insight, however, takes an even more extreme position by arguing that Thibodeaux's accident was not caused by subsidence *at all*.   (Doc. 251-2 at 7-8).   That proposition is obviously untenable in light of the trial court's and appellate court's rulings, which unequivocally found that JM Drilling's negligence caused the sinkhole, which in turn caused Thibodeaux's injury.  (SUF at ¶¶ 22–23, 37, 42).  Indeed, even JM Drilling admits in its motion for summary judgment that "[t]he void/cavern caused Thibodeaux's accident." (Doc. 234-4 at 17).

To conclude that the sinkhole was not at least one of the causes of Thibodeaux's injury would necessarily require this Court to not only disregard an undisputed finding of fact in the Underlying Lawsuit, but to also abandon simple logic.  The Court should therefore reject Insight's unfounded argument.

21

**B.    The Subsidence Exclusion Contains ACC Language.**

Insight devotes a substantial part of its brief arguing that the Subsidence Exclusion does not contain ACC language.  As set forth in Rockhill's Cross-Motion, the Subsidence Exclusion does in fact contain ACC language that effectively precludes the application of the concurrent causation doctrine, regardless of any concurrent causes.  (Doc. 254-1, at 9–10).

Notably, like JM Drilling, Insight does not even attempt to argue that the substantial factor test of the concurrent causation doctrine is met.  Instead, Insight relies on the misguided notion that a purported lack of ACC language is sufficient for the Court to find coverage.  It is not.  Even if the Subsidence Exclusion did not contain ACC language, that would simply mean that the concurrent causation doctrine *might* apply, but only if the substantial factor test is met.  As set forth in Rockhill's Cross-Motion, that test can never be met because Thibodeaux's injury could not have been independently caused by JM Drilling's negligence in the absence of the subsidence. (*See id.* at 11–14, 15–16.)

Insight completely ignores this issue and instead cites to cases from other jurisdictions that have no relevance to our case.   *See Dow Chem. Co. v. Royal Indem. Co*., 635 F.2d 379, 388 (5th Cir. 1981) (addressing Texas law not even considering the concurrent causation doctrine); *Winters v. Charter Oak Fire Ins. Co.*, 4 F. Supp. 2d 1288, 1291 (D.N.M. 1998) (addressing the application of an "earth movement" exclusion with entirely different language and not addressing the interplay between the concurrent causation doctrine and the subsidence exclusion).   Insight further relies on an expert witness's opinion on the ACC issue, which this Court should disregarded as improper legal opinion.  (*See* Docs. 262, 263).

**C.    The Subsidence Exclusion Is Not Ambiguous**

Insight makes the conclusory argument that the Subsidence Exclusion is ambiguous and should be interpreted in JM Drilling's favor.  Insight, however, does not even attempt to identify

22

what language in the exclusion is allegedly "ambiguous," let alone offer a reasonable alternative interpretation of any operative language to give rise to a potential finding of ambiguity.  (*See* Doc. 251-2 at 13-14).  The Court should therefore reject Insight's baseless and conclusory argument.

## VII.   CONCLUSION

WHEREFORE, for the reasons set forth above, Rockhill prays that this Court enter an order denying the Motions for Summary Judgment filed by Plaintiffs, JM Drilling, and Insight (Doc. 234, 238, 245, and 251).

Respectfully submitted,

JUNEAU DAVID, APLC
 /s/ *Robert J. David, Jr.*
ROBERT J. DAVID, JR. (#21554)
rjd@juneaudavid.com
1018 Harding Street, Suite 202
Post Office Drawer 51268
Lafayette, LA 70505-1268
Ph: (337) 269-0052
Fax: (337) 269-0061

Adam H. Fleischer (*Pro hac admission*)
        AFleischer@BatesCarey.com
David M. Alt (*Pro hac admission*)
        DAlt@BatesCarey.com
Gustavo A. Otalvora (*Pro hac admission*)
        GOtalvora@BatesCarey.com
BatesCarey LLP
191 N. Wacker Drive, Suite 2400
Chicago, IL 60606
Ph: (312)-762-3130
Fax: (312) 762-3100
***Counsel for Rockhill Insurance Company***

23

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 22, 2021, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all known counsel of record who are participants.

  _/s/ Gustavo A. Otalvora._
Gustavo A. Otalvora

2729743